Richard F. MILLER, Plaintiff,

v.

Philipp HOLZMANN, et al., Defendants.

Civil Action No. 95–1231 (RCL).

United States District Court, District of Columbia.

Aug. 12, 2008.

Keith V. Morgan, U.S. Attorney's Office, Robert B. Bell, Gregory B. Reece, Howard M. Shapiro, Jennifer M. O'Connor, Matthew B. Baumgartner, Monya Monique Bunch, Wilmer Cutler Pickering Hale & Dorr LLP, Jonathan Goldman Cedarbaum, Wilmer Hale, Kevin Michael Henry, Sidley Austin, LLP, Washington, DC, Robert D. Cultice, Wilmer Cutler Pickering Hale & Dorr LLP, Boston, MA, for Plaintiff.

Charles Anthony Zdebski, Troutman Sanders LLP, Barry Coburn, Coburn & Coffman, PLLC, Jeffrey J. Lopez, Michael Reilly Miner, Elizabeth Ewert, Michael J. McManus, Drinker, Biddle & Reath LLP, David Schertler, Schertler & Onorato, L.L.P., Andrew Lawrence Hurst, Stephen Printiss Murphy, Reed Smith LLP, Washington, DC, Brian P. Watt, June Ann Sauntry, Bryan B. Lavine, Troutman Sanders LLP, Charles C. Murphy, Jr., Ellen G. Schlossberg, Vaughan & Murphy, Atlanta, GA, for Defendants.

### MEMORANDUM OPINION

ROYCE C. LAMBERTH, Chief Judge.

Winston Churchill prescribed magnanimity in victory. *See* Winston S. Churchill, THE SECOND WORLD WAR, VOLUME I: THE GATHERING STORM xiii (1948).

But Churchill, of course, spoke of war, not litigation.

On August 10, 2007, relator emerged victorious in this False Claims Act ("FCA") suit of epic duration when this

Court entered judgment against six defendants[1] for over $90 million.[2] (*See generally* Judgment [883].) He now seeks another $20 million in attorneys' fees and costs.

Now before the Court are plaintiffs' bills of costs [928, 929, 933] and relator's motion for attorneys' fees, costs, and expenses [930]. Pursuant to Federal Rule of Civil Procedure 54(d)(1) and Local Civil Rule 54.1, the United States asks the Court to tax its $54,437.87 in costs to defendants.[3] Relator, in turn, requests reimbursement for $31,973.96 in costs.[4] Separately, relator seeks $9,945,765.25 in attorneys' fees[5] and $511,723.06 in associated costs and expenses.[6] Finally, he proposes a 100 percent enhancement of his attorneys' fees based on exceptional quality of representation, thus raising his overall demand to $20,403,253.56. Defendants, naturally, oppose plaintiffs' requests.[7] This Opinion

---

1. They are: individual defendant E. Roy Anderson ("Anderson"); and corporate defendants Harbert Corporation ("HC"), Harbert International, Inc. ("HII"), Bill Harbert International Construction, Inc. ("BHIC"), Bilhar International Establishment f/k/a Harbert International Establishment ("Bilhar"), and Harbert Construction Services (U.K.) Ltd. ("HUK").

2. The jury set total damages at $34,346,029.22. (*See* Verdict Form [858] at 9, 10, 12.) The Court then trebled the damages award in accordance with 31 U.S.C. section 3729(a) and set off the $13.7 million the government had received from settling co-defendants. (Mem. Op. of Aug. 10, 2007[882] at 10–11.) It further determined the appropriate civil penalty to be $10,000 per false claim, yielding a total penalty of $1,100,000.00. (*Id.* at 7–9, 11.) The Court calculated total liability in this case—the sum of the trebled damages and civil penalties—as $90,438,087.66. (*Id.* at 11.) It also adjudged defendants liable for plaintiffs' costs and for relator Richard F. Miller's reasonable attorneys' fees and expenses. (*Id.* at 2–3.)

3. Initially, the government requested reimbursement in the amount of $50,702.25—$838.65 for service of summons and subpoena, $23,706.10 for trial and hearing transcripts, and $26,157.50 for deposition transcripts. (*See* U.S. Bill of Costs [928] at 1.) Due to an unanticipated closure of the courthouse, the government was unable to timely confirm certain information necessary to compute its witness fees pursuant to 28 U.S.C. section 1821, (*id.* at 2), so it later requested an additional $3,735.62, (*see* U.S. Supplemental Bill of Costs [933] at 1).

4. Relator seeks $587.00 for clerk's fees, $345.00 for service of summons and complaint, $19,271.60 for deposition transcripts, $9,323.09 for trial and hearing transcripts, $299.85 for other copying, $1,974.92 for statutory witness fees, and $172.00 for subpoena service. (*See* Relator's Bill of Costs [929] at 2.)

5. Relator's original fee petition sought $9,989,707 in fees. (*See* Mot. for Fees, Costs, and Expenses [930] at 1.) Based on criticisms raised in defendants' oppositions, relator subtracted certain time that had been inadvertently included in his original request and reduced the amount sought by $18,941.75. (*See* Ex. B to Bell Supplemental Decl., Ex. 1 to Reply to HII's Opp'n [957].) Relator also concedes the requested amount must be offset by $25,000 in attorney's fees received from AICI, a settling co-defendant. (*See* Mot. for Fees, Costs, and Expenses [930] at 1, n. 1.)

6. While the original petition sought $522,851.04, (*see* Mot. for Fees, Costs, and Expenses [930] at 1), relator subsequently lowered this amount by $11,127.98, (*see* Bell Supplemental Decl. ¶¶ 26–28, Ex. 1 to Reply to HII's Opp'n [957]).

7. Where appropriate, the Court will indicate which defendant(s) make(s) which arguments, but although they have filed five separate oppositions, defendants have largely adopted one another's objections. (*See* Anderson's Opp'n [946] at 1 ("[t]o the extent they are applicable and not inconsistent with []his response," adopting arguments in BHIC, Bilhar, HII, and HC's oppositions); BHIC and HUK's Opp'n [948] at 1 n. 1 (adopting all arguments in HII, HC, and Anderson's oppositions, to the extent they apply); HII's Opp'n [949] at 44 (referring the Court to HC's Opposition for arguments against fee enhancement); HC's Opp'n [950] at 1 (incorporating

first considers Anderson's argument that he shares liability only for the government's costs. It then examines defendants' challenges to plaintiffs' bills of costs, to relator's attorneys' fees, and to his expenses.

## I. Anderson's Liability

■ Although the jury found for the government on its sole, live claim against Anderson, this Court dismissed relator's claims against Anderson as time-barred. (*See* Verdict Form [858] at 4, 7, 11; Mem. Op. of June 14, 2007[872] at 29.) In opposing relator's fee petition, Anderson contends the FCA permits only "prevailing parties" to recover fees and costs from a defendant, that relator is not a "prevailing party" as against him, and that accordingly, he is not liable to relator. (Anderson's Opp'n at 2–7.) Relator, however, insists the FCA does not limit fee and cost recovery to prevailing parties, and that because the *government* prevailed on its claim against Anderson, Anderson is jointly and severally liable with the other defendants for *relator's* fees and costs. (Reply to Anderson's Opp'n at 1.)

As the parties (at least, implicitly) concede, this issue is one of first impression. (*See id.* at 4; Anderson's Opp'n at 5.)

In incorporating a fee-shifting provision, the FCA is far from unique among federal statutes that create private, civil causes of action. *Compare* 31 U.S.C. § 3730(d)(1) (2008) (*qui tam* relator may recover "expenses ... necessarily incurred, plus reasonable attorneys' fees and costs," from the defendants), *with* 42 U.S.C. § 1988(b) (2008) (court has discretion to award "reasonable attorney's fee as part of [ ] costs" to successful civil rights plaintiffs).

■ Under many other fee-shifting schemes, a plaintiff may recover his attorneys' fees and expenses from the defendant *only* when he is a "prevailing party." [8] *See, e.g., Richlin Sec. Serv. Co. v. Chertoff,* — U.S. —, 128 S.Ct. 2007, 2011, 170 L.Ed.2d 960 (2008) (Equal Access to Justice Act, 5 U.S.C. section 504(a)(1), "permits an eligible prevailing party to recover 'fees and other expenses incurred by that party in connection with' a proceeding before an administrative agency"); *Winkelman v. Parma City Sch. Dist.,* — U.S. —, 127 S.Ct. 1994, 2002, 167 L.Ed.2d 904 (2007) (Individuals with Disabilities Education Act, 20 U.S.C. section 1315(i)(3)(B)(i)(I), "allow[s] an award [of attorney's fees] 'to a prevailing party who

---

by reference all arguments in HII's Opposition); Bilhar's Revised Opp'n [951] at 1 (adopting "the grounds set forth in all co-defendants' oppositions"); HII and HC's Notice of Joinder [952] (adopting arguments in BHIC and HUK and Anderson's Oppositions).)

8. Under these analogous statutes, a prevailing party is one who "succeed[s] on any significant issue in litigation which achieves some of the benefit the parties sought in bringing suit." *Hensley v. Eckerhart,* 461 U.S. 424, 433, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983). "The touchstone of the prevailing party inquiry must be the material alteration of the legal relationship of the parties." *Tex. State Teachers Ass'n v. Garland Independent Sch. Dist.,* 489 U.S. 782, 792–93, 109 S.Ct. 1486, 103

L.Ed.2d 866 (1989). In this Circuit, a prevailing party must demonstrate: (1) "a court-ordered change in the legal relationship between the plaintiff and the defendant"; (2) that it is "a party in whose favor a judgment is rendered, regardless of the amount of damages awarded"; and (3) that it has done more than "having acquired a judicial pronouncement unaccompanied by judicial relief." *Select Milk Producers, Inc. v. Johanns,* 400 F.3d 939, 946–47 (D.C.Cir.2005). Moreover, "[t]hat a plaintiff has prevailed against one party does not entitle him to fees from another party." *Kentucky v. Graham,* 473 U.S. 159, 168, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985). Relator appears to concede that he did not "prevail" against Anderson under this definition.

is the parent of a child with a disability' "); *Farrar v. Hobby*, 506 U.S. 103, 109, 113 S.Ct. 566, 121 L.Ed.2d 494 (1992) ("in order to qualify for attorney's fees under [the Civil Rights Attorney's Fees Awards Act, 42 U.S.C.] § 1988, a plaintiff must be a 'prevailing party' "). *Cf.* FED.R.CIV.P. 54.1(d) (providing for recovery of costs other than attorney's fees by "the prevailing party" in civil litigation).

The FCA does not expressly limit fee recovery to "prevailing" relators, but its description of which relators may recoup their fees is not exactly a model of clarity:

> If the Government proceeds with an action brought by a [relator], such person shall ... receive at least 15 percent but not more than 25 percent of the proceeds of the action or settlement of the claim.... Where the action is one which the court finds to be based primarily on disclosures of specific information (other than information provided by the person bringing the action) relating to allegations or transactions [that have been publicly disclosed] the court may award ... no [ ] more than 10 percent of the proceeds.... Any payment to a person under the first or second sentence shall be made from the proceeds. *Any such person* shall also receive an amount for

reasonable expenses ... necessarily incurred, plus reasonable attorneys' fees and costs. All such expenses, fees, and costs shall be awarded against the defendant.

31 U.S.C. § 3730(d)(1) (2008) (emphasis added).[9] *Cf.* 42 U.S.C. § 1988(b) (2008) (court has discretion to award reasonable attorney's fee to "prevailing party" in suits brought pursuant to certain civil rights statutes).

To interpret the vague phrase "any such person," the Court must look to its context. *See Davis v. Mich. Dep't of Treasury*, 489 U.S. 803, 809, 109 S.Ct. 1500, 103 L.Ed.2d 891 (1989) ("It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme."). In light of the immediately preceding sentence, "any such person" must mean any person who receives payment under the statute's first or second sentences. *See* 31 U.S.C. § 3730(d)(1) (2008). Those two sentences merely establish the percentage bounty a relator should receive when the government intervenes in the action he has brought and ultimately secures payment for its damages. *See id.* The internal cross-reference thus suggests that *whenev-*

**9.** Notwithstanding the statutory language, courts have frequently described the FCA's fee-shifting provision as applying only to "prevailing parties," but never under the precise circumstances presented here. *See, e.g., Fed. Recovery Servs., Inc. v. United States*, 72 F.3d 447, 449–50, 453 (5th Cir.1995) (affirming district court's denial of attorneys' fees to relator whose claims were dismissed for lack of jurisdiction); *United States ex rel. ATC Distrib. Group, Inc. v. Ready–Built Transmissions, Inc.*, No. 03 Civ. 2150, 2007 WL 2522638, *1, *9, 2007 U.S. Dist. LEXIS 65963, at *1, *25 (S.D.N.Y. Sept. 7, 2007) (awarding attorney's fees to relator who was party to settlement between defendants and United States); *United ed States ex rel. Averback v. Pastor Med. Assocs. P.C.*, 224 F.Supp.2d 342, 344–45, 348

(D.Mass.2002) (awarding attorney's fees to relator after government settled with defendants where "[t]he fact that [relator] is entitled to attorney's fees is not in dispute"); *United States ex rel. Butler v. Magellan Health Servs., Inc.*, 74 F.Supp.2d 1201, 1205, 1217 (M.D.Fla.1999) (noting that "the FCA Amendments of 1986 authorize awards of attorney's fees to prevailing qui tam plaintiffs" before granting defendant's motion to dismiss relator's amended complaint); *United States ex rel. Stinson, Lyons, Gerlin & Bustamante, P.A. v. Blue Cross Blue Shield of Ga., Inc.*, 755 F.Supp. 1040, 1044 (S.D.Ga.1990) (noting that "the FCA Amendments of 1986 now authorize awards of attorney's fees to prevailing *qui tam* plaintiffs" before denying defendant's motion to dismiss relator's complaint).

*er* the government intervenes and obtains relief, no matter the circumstances, the relator should receive both a share of the government's proceeds and reasonable attorneys' fees.

This reading, however, would yield absurd results—at least some of which Congress clearly did not intend. For example, 31 U.S.C. section 3730(e) provides that no court shall have jurisdiction over certain actions, such as those "based upon the public disclosure of allegations or transactions ... unless ... the person bringing the action is an original source of the information"—that is, "an individual who has direct and independent knowledge of the information on which the allegations are based and [who] has voluntarily provided the information to the Government" before filing his *qui tam* complaint. *See* 31 U.S.C. § 3730(e)(4) (2008). Logically, having erected a jurisdictional bar to these relators' claims, Congress could not have intended them to receive attorneys' fees. *See Fed. Recovery Servs., Inc.*, 72 F.3d at 449–50, 453 (affirming district court's denial of attorneys' fees to relator whose claims were dismissed as barred under section 3730(e)(4)). *Cf. United States ex rel. Merena v. SmithKline Beecham Corp.*, 205 F.3d 97, 106 (3d Cir.2000) (Alito, J.) (reversing district court's award of relator's share to relator whose claims were subject to dismissal under section 3730(e)(4)). On the contrary, Congress has sought to *prevent*, not reward, "opportunistic suits by private persons who heard of fraud but played no part in exposing it." *Cooper v. Blue Cross & Blue Shield of Fla., Inc.*, 19 F.3d 562, 565 (11th Cir.1994)

(emphasis added) (discussing comprehensive 1986 FCA amendments).

The fee-shifting provision itself does not appear to draw this line—nor, for that matter, any other.[10] Relator suggests the Court should interpret this inscrutable language in light of the FCA's goals, which he argues support awarding attorneys' fees to relators, like himself, whose claims are dismissed due to "procedural," vice jurisdictional, defects. (*See* Reply to Anderson's Opp'n at 4–5.) Courts rightly balk at engaging in this sort of arbitrary line-drawing. *E.g., Colgrove v. Battin*, 413 U.S. 149, 182, 93 S.Ct. 2448, 37 L.Ed.2d 522 (1973) (Marshall, J., dissenting) ("Normally, in our system we leave the inevitable process of arbitrary line drawing to the Legislative Branch, which is far better equipped to make ad hoc compromises.").

Happily, here, Congress left an additional, unambiguous clue to its intent in drafting the FCA attorneys' fees provision. In its report accompanying the 1986 amendments, the Senate Judiciary Committee characterized the FCA's fee-shifting scheme as applying to *"prevailing qui tam* relators." S.Rep. No. 99–345, at 29 (1986), *as reprinted in* 1986 U.S.C.C.A.N. 5266, 5294 (emphasis added). As explained above, the qualifier "prevailing" appears in numerous other federal fee-shifting provisions, and its meaning is well-established. *See, e.g., Farrar*, 506 U.S. at 109–11, 113 S.Ct. 566. Its application here would harmonize the fee-shifting provision with the jurisdictional exclusions in subsection (e) and with more fundamental jurisdictional concerns.[11] *See Fed. Recovery Servs.,*

---

**10.** The reading deduced above would, for example, afford a relator's share and attorneys' fees where, while investigating spurious allegations in a *qui tam* complaint, the government stumbled upon wholly separate fraud by the defendant, of which the lucky relator knew nothing.

**11.** The Court would ordinarily hesitate to stake its interpretation of the fee-shifting provision's eligibility criteria on a single statement in the provision's legislative history. *See IBEW, Local Union No. 474 v. NLRB*, 814 F.2d 697, 712 (D.C.Cir.1987) ("a cardinal principle of the judicial function of statutory

*Inc.*, 72 F.3d at 450, 452 (government's intervention does not cure existing jurisdictional defect in relator's complaint so as to permit dismissed relator to recover attorneys' fees); *United States ex rel. Taxpayers Against Fraud v. Gen. Elec. Co.*, 41 F.3d 1032, 1044 (6th Cir.1994) (despite government's intervention and settlement with defendant, if district court on remand determined co-relator lacked standing, it could not recoup attorneys' fees).

As the Supreme Court has observed, "[r]espect for ordinary language requires that a plaintiff receive at least some relief on the merits of his claim before he can be said to prevail." *Hewitt v. Helms*, 482 U.S. 755, 760, 107 S.Ct. 2672, 96 L.Ed.2d 654 (1987), *overruled in part on other grounds by Sandin v. Conner*, 515 U.S. 472, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995). The Senate Report's "ordinary language" undercuts relator's contention that Anderson, against whom *his* claims garnered no relief whatever, should share liability for his attorneys' fees and costs.

Furthermore, contrary to relator's arguments, declining to assess relator's attorneys' fees against Anderson comports with the FCA's underlying purposes. Relator insists Congress enacted the FCA "to encourage the filing of this very kind of lawsuit," in which relator from the outset fingered Anderson as a ringleader in the fraud. (Reply to Anderson's Opp'n at 3–4.)

First, to answer relator's implicit proposition most directly, this Court is confident that potential relators will not be discouraged from filing *meritorious* FCA claims by a holding that 31 U.S.C. section 3730(d)(1) does not permit attorneys' fee awards against defendants who obtain *judgment as a matter of law* on the relator's claims.[12]

Second, this Court has encapsulated the FCA's purposes as follows:

> The False Claims Act seeks, first and foremost, to detect, punish, and deter the submission of false claims, while seeking to restore funds to the federal fisc. The *qui tam* provisions enlist private individuals, often motivated largely by self-interest, to report and prosecute alleged false claims. Those provisions seek to strike a balance between the interests of the government and the self-interest of relators.

*United States ex rel. Pogue v. Diabetes Treatment Ctrs. of Am.*, 474 F.Supp.2d 75, 87 (D.D.C.2007) (Lamberth, J.). "The [FCA's] statute of limitations," this Court reasoned, "advances those governmental interests." *Id.* Yet statutes of limitations,

---

interpretation is that courts have no authority to enforce principles gleaned solely from legislative history that have no statutory reference point"). Here, however, crediting this statement avoids dissonance among the statute's various provisions. And where statutory language is unclear, resort to the legislative tea leaves is a well-accepted interpretative step. *See, e.g., Green v. Bock Laundry Mach. Co.*, 490 U.S. 504, 511, 109 S.Ct. 1981, 104 L.Ed.2d 557 (1989) ("[b]ecause the plain text does not resolve these issues, we must examine the history leading to [Federal Rule of Evidence 609's] enactment"); *Pierce v. Underwood*, 487 U.S. 552, 563–65, 108 S.Ct. 2541, 101 L.Ed.2d 490 (1988) (looking to Congressional report for "elaborat[ion] on the mean-

ing of the phrase ... 'substantially justified' "); *Blum v. Stenson*, 465 U.S. 886, 893–94, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984) (relying on Senate Report in interpreting fee-shifting statute to permit calculation of fee awards "according to prevailing market rates").

12. Moreover, the Court observes that relator *will* be "rewarded with both a relator's share and attorneys fees" from the other defendants, against whom he obtained judgment, even if he receives nothing from Anderson. (*See* Reply to Anderson's Opp'n at 4.) The others contest only the amount of fees demanded, not relator's entitlement to them.

by their nature, also "facilitat[e] the administration of claims[ ] ... [and] promot[e] judicial efficiency." *John R. Sand & Gravel Co. v. United States*, — U.S. —, 128 S.Ct. 750, 753, 169 L.Ed.2d 591 (2008) (citations omitted). Thus, Congress clearly did not seek "to encourage the filing of this very kind of lawsuit" at the expense of these governmental interests and prudential considerations.[13] Denying attorneys' fees to relators whose claims are time-barred strikes this balance.

Accordingly, the Court concludes that because relator's claims against Anderson were dismissed in their entirety, relator may not recover attorneys' fees, costs, or expenses from Anderson under the FCA. Under Federal Rule of Civil Procedure 54(d)(1), only a "prevailing party" may recover costs, other than attorneys' fees, from a private defendant. FED.R.CIV.P. 54(d)(1). Because relator's legal relationship to Anderson remains wholly unchanged, he may not recover costs from Anderson under this Rule. *See Tex. State Teachers Ass'n*, 489 U.S. at 792–93, 109 S.Ct. 1486; *Graham*, 473 U.S. at 168, 105 S.Ct. 3099.

## II. Plaintiffs' Taxable Costs

■ As stated above, Rule 54(d)(1) permits a "prevailing party" to recoup his costs, other than attorneys' fees, from a private defendant. FED.R.CIV.P. 54(d)(1). *Cf.* 31 U.S.C. § 3729(a) (U.S. may recover "the costs of a civil action" brought to recover FCA penalty or damages). While Rule 54(d)(1) affords the court some discretion in awarding costs, the Courts of Appeals have consistently treated the allowance as presumptive, holding "that a court may neither deny nor reduce a prevailing party's request for costs without first articulating some good reason for doing so." *Baez v. U.S. Dep't of Justice*, 684 F.2d 999, 1004 (D.C.Cir.1982) (en banc) (per curiam). The unsuccessful party bears the burden of supplying this "good reason," and "trial judges have rarely denied costs to a prevailing party whose conduct has not been vexatious when the losing party has been capable of paying such costs." *Id.; see, e.g., Bell v. Gonzales*, No. 03–163, 2006 WL 6000485, **2–3, 2006 U.S. Dist. LEXIS 69415, at *7–8 (D.D.C. Sept. 27, 2006) (Bates, J.) (sharply reducing government's "plainly inflated Bill of Costs," where costs were "not well supported factually or legally" and comprised "a punitive effort ... against an unsuccessful discrimination plaintiff").

In particular, by statute, a prevailing party may recover "[f]ees of the court reporter for all or any part of the stenographic transcript necessarily obtained for use in the case." 28 U.S.C. § 1920(2) (2008). This Court's local rules refine this allowance:

> (6) the costs, at the reporter's standard rate, of the original and one copy of any deposition noticed by the prevailing party, and of one copy of any deposition noticed by any other party, if the deposition was used on the record, at a hearing or trial;

---

**13.** When it dismissed relator's claims against Anderson, the Court laid responsibility at the government's feet, citing its "failure to exercise due diligence in investigating the civil claims against" Anderson. (*See* Mem. Op. of June 14, 2007[872] at 29.) But it was relator, in the first instance, who failed to name Anderson as a defendant until he filed his Second Amended Complaint on December 28, 2000, when the six-year limitations period on which he might otherwise have relied had already expired. (*See id.* at 3–4 n. 4.) This delay is virtually inexplicable given that the Confidential Disclosure Statement relator provided to the government in *1995* described Anderson's leading role and extensive involvement in the bid-rigging conspiracy. (*See* Ex. 1 to Reply to HC's Opp'n, at 2, 11, 14, 20–21.)

(7) the cost, at the reporter's standard rate, of the original and one copy of the reporter's transcript of a hearing or trial if the transcript: (i) is alleged by the prevailing party to have been necessary for the determination of an appeal within the meaning of Rule 39(e), Federal Rules of Appellate Procedure, or (ii) was required by the court to be transcribed[.]

Local Civ. R. 54.1(d).

Defendants' sole objection to plaintiffs' bills of costs concerns allegedly duplicative charges for transcripts. Specifically, the United States and relator have each billed for an original and one copy of thirteen individuals' deposition transcripts.[14] In some of these cases, it is clear that plaintiffs wish defendants to pay for four copies of exactly the same document.[15] Further, the United States and relator each seek reimbursement for an original and one copy of each afternoon's trial transcript. (*See* Ex. 1 to U.S. Bill of Costs [928] at 3–4; Ex. 4 to Relator's Bill of Costs [929] at 1–2.) Again, they repeatedly paid for four copies of the same document, at a premium for expedited preparation.

Such expenditures hardly seem reasonable. The Court does not suggest that as co-plaintiffs, the United States and relator must necessarily have shared a single transcript, prepared according to the court reporter's regular schedule. But for *each* plaintiff to bill for *two copies* of an *expedited* transcript strikes the Court as possibly excessive.[16]

Nevertheless, this practice does not fall outside the letter of Local Rule 54.1. The Rule refers to "[a] prevailing party," and its choice of article ("a" rather than "the") implies that *any* prevailing party, even if there is more than one, may invoke its provisions. Local Civ. R. 54.1(a). Further, the Rule specifically provides for reimbursement for an original and one copy of deposition and trial transcripts. Local Civ. R. 54.1(d). Defendants, who bear the burden of demonstrating a "good reason" for denying plaintiffs' costs, offer no au-

**14.** These individuals are: Clarence Anderson, Allen Hall, Evangeline Hoover, William Lalor, Alfred Hill, Michael Gould, Dieter Kadenbach, Werner Hoffmeister, Wolfgang Eric Kaus, Thomas Kitchens, Richard Miller, Scott Nichols, and Robert Hemler. (*See* Ex. 2 to U.S. Bill of Costs [928]; Ex. 3 to Relator's Bill of Costs [929].)

**15.** Unlike the United States, relator has not attached copies of the court reporters' invoices. He has provided some supporting data—such as the court reporting service name, invoice number, invoice date, and/or hearing or deposition date—for each individual expenditure, however, and scrutiny yields some obvious conclusions.

For example, each plaintiff seeks reimbursement for precisely $1,282.00 for two transcripts of Kadenbach, Hoffmeister, and Kaus's depositions, provided by Anglo–American Court Reporters. (*See* Ex. 3 to U.S. Bill of Costs [928] at 11; Ex. 3 to Relator's Bill of Costs [929] at 2.) Relator's chart lists a single deposition date of September 20, 2006, while the government's invoice indicates the depositions occurred on September 20–21, 2006. Relator indicates that his invoice, # 11976, was dated October 19, 2006; the government received invoice # 11978, dated October 9, 2006. Clearly, plaintiffs collectively seek to be paid for four copies of the same thing.

Similarly, both plaintiffs paid Hedrick Court Reporting for two copies of Clarence Anderson's October 23, 2006 deposition transcript. (*See* Ex. 3 to U.S. Bill of Costs [928] at 1; Ex. 3 to Relator's Bill of Costs [929] at 2.) The details plaintiffs provide for the deposition transcripts of Nichols, Gould, Hemler, Kitchens, Hill, and Miller are likewise sufficiently similar that it is clear to the Court they paid for four separate copies.

**16.** The Court strongly suspects that Xeroxing a single, expedited transcript for trial team members who needed to promptly review it might have proven far less costly than purchasing a second hard-copy from the court reporter at $2.25 per page.

thority and little argument for deviating from this presumptive allowance. *See Baez,* 684 F.2d at 1004. Moreover, plaintiffs' "conduct has not been vexatious," and it appears defendants are "capable of paying [these] costs." *See id.* Accordingly, the Court concludes defendants' meager opposition does not overcome the strong presumption in plaintiffs' favor.

Plaintiffs' bills of costs [928, 929] shall be granted in full.[17]

## III. Relator's Attorneys' Fees

Relator also seeks an award of "reasonable attorneys' fees" against defendants under the FCA. "The initial estimate of a reasonable attorney's fee is properly calculated by multiplying the number of hours reasonably expended on the litigation times a reasonable hourly rate." *Blum v. Stenson,* 465 U.S. 886, 888, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984).[18] A strong presumption exists that the product of these two variables—the "lodestar figure"—represents a "reasonable fee." *Pennsylvania v. Del. Valley Citizens' Council for Clean Air,* 478 U.S. 546, 565, 106 S.Ct. 3088, 92 L.Ed.2d 439 (1986). Upward adjustments of the lodestar are warranted only in "rare" and "exceptional" cases, where supported by "specific evidence" and detailed

findings. *Blum,* 465 U.S. at 899–901, 104 S.Ct. 1541.

■ In calculating relator's fee award, the Court must thus make three separate determinations: (1) what constitutes a "reasonable hourly rate" for his counsel's services; (2) which among his counsel's claimed work hours were "reasonably expended on the litigation"; and (3) whether relator has offered "specific evidence" demonstrating this to be the "rare" case in which a lodestar enhancement is appropriate, and if so, in what amount. The Court considers each issue in turn.

### A. Reasonable Rate

In calculating this component of the lodestar, the Court must resolve two contested issues: (1) which source(s) should supply the reasonable rate; and (2) whether current or historical rates should apply to work performed prior to 2007.[19]

#### 1. Established vs. Matrix–Derived Rates

■ In this Circuit, "an attorney's usual billing rate is presumptively the reasonable rate, provided that this rate is 'in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation.'" *Kattan by Thomas v. District of*

---

17. As relator notes, his fee petition seeks these same costs. (*See* Mot. for Fees, Costs, and Expenses [930] at 40 n. 18.) Thus, the Court will reduce any FCA expenses award by this amount to prevent a double recovery.

18. *Blum* involved efforts to recoup attorneys' fees pursuant to 42 U.S.C. section 1988, not the FCA. 465 U.S. at 888, 104 S.Ct. 1541. But case law construing what constitutes a "reasonable" fee applies uniformly across federal fee-shifting statutes that employ this language, including the FCA. *See, e.g., City of Burlington v. Dague,* 505 U.S. 557, 562, 112 S.Ct. 2638, 120 L.Ed.2d 449 (1992) (applying *Blum* and its progeny to fee awards under Solid Waste Disposal Act and Federal Water

Pollution Control Act); *Shaw v. AAA Eng'g & Drafting, Inc.,* 213 F.3d 538, 542–44 (10th Cir.2000) (applying section 1988 case law to fee awards under FCA).

19. Relator's fee petition includes hours billed by five Wiley Rein attorneys and two paralegals, from 1995–1999, while relator's principal counsel, Robert Bell, was a partner at that firm. (*See* Bell Decl. ¶¶ 102–03 & Ex. B–2, Ex. 2 to Mot. for Fees, Costs, and Expenses [930].) Hours for Wilmer Hale, billed by eighteen attorneys and three paralegals, stretch from September 1999 through July 2007. (*Id.* ¶¶ 107–08 & Ex. D–2.)

*Columbia,* 995 F.2d 274, 278 (D.C.Cir. 1993) (quoting *Blum,* 465 U.S. at 896 n. 11, 104 S.Ct. 1541).

> [W]hen fixed market rates already exist, there is no good reason to tolerate the substantial costs of turning every attorneys fee case into a major ratemaking proceeding. *In almost every case, the firms' established billing rates will provide fair compensation.* The established rates represent the opportunity cost of what the firm turned away in order to take the litigation; they represent the lawyers' own assessment of the value of their time.

*Laffey v. Northwest Airlines, Inc.,* 746 F.2d 4, 24 (D.C.Cir.1984) (emphasis in original), *overruled on other grounds by Save Our Cumberland Mountains, Inc. v. Hodel,* 857 F.2d 1516 (D.C.Cir.1988).[20] "[T]he burden is on the fee applicant to produce satisfactory evidence—in addition to the attorney's own affidavits—that the requested rates" align with prevailing rates. *Blum,* 465 U.S. at 896 n. 11, 104 S.Ct. 1541. *See also Covington v. District of Columbia,* 57 F.3d 1101, 1107 (D.C.Cir. 1995) ("a fee applicant's burden in establishing a reasonable hourly rate entails a showing of at least three elements: the attorneys' billing practices; the attorneys' skill, experience, and reputation; and the prevailing market rates in the relevant community").

### a. Wilmer Hale

Relator asks that his attorneys be compensated at their standard billing rates, and he has submitted a declaration from his lead counsel, Robert Bell, that provides these standard rates for Wilmer Hale personnel. (*See* Bell Decl. ¶ 108, Ex. 2 to Mot. for Fees, Costs, and Expenses [930].) As one might expect, Bell avows that the requested rates are within the range of prevailing market rates charged by large law firms in the District of Columbia for lawyers and paralegals of similar experience and qualifications. (*See id.* ¶¶ 104, 109.)

To supplement Bell's own assertions, relator offers declarations from two local attorneys. The first, Stephen L. Braga, now a partner at Baker Botts—like Wilmer Hale, a large, international law firm—has practiced complex, civil litigation in the District since 1982. (Braga Decl. ¶ 1, Ex. 3 to [930].) Since 1993, Braga has also instructed law students on the subject of attorneys' fees as an adjunct professor at the Georgetown University Law Center. (*Id.* ¶ 1(g).) Beyond arguing that "[u]nder basic economic principles," Wilmer Hale's standard rates must be considered competitive within the D.C. market, Braga compares rates for four Wilmer Hale partners with those charged by his own firm and other large, D.C. litigation firms for partners with similar backgrounds and litigation experience. (*Id.* ¶ 6.) He asserts that

**20.** *See also Wilcox v. Sisson,* No. 02–1455, 2006 WL 1443981, *2, 2006 U.S. Dist. LEXIS 33404, at *8 (D.D.C. May 25, 2006) (Collyer, J.) ("The rates charged by counsel for the winning party are presumptively reasonable if they are the same rates that counsel customarily charge other fee-paying clients for similar work."); *Adolph Coors Co. v. Truck Ins. Exchange,* 383 F.Supp.2d 93, 98 (D.D.C.2005) (Facciola, M.J.) ("the most fundamental economic analysis indicates that, all things considered, the rate that [a firm] charges its clients is the market rate"); *Cobell v. Norton,* 231 F.Supp.2d 295, 302–03 (D.D.C.2002) (Lamberth, J.) (" 'There is no better indication of what the market will bear than what the lawyer in fact charges for his services and what his clients pay.' ") (quoting *Griffin v. Wash. Convention Ctr.,* 172 F.Supp.2d 193, 197 (D.D.C.2001)) (Facciola, M.J.); *Allen v. Utley,* 129 F.R.D. 1, 7 (D.D.C.1990) (Richey, J.) ("when an attorney has a customary billing rate, that rate is the presumptively reasonable rate to be used in computing a fee award").

Robert Cultice, Jennifer O'Connor, and Jonathan Cedarbaum could command *higher* hourly rates, and that Robert Bell's rate "appears to be set right where it should be in the Washington legal market." (*Id.*) Braga concludes that Wilmer Hale's established rates "fall squarely within the prevailing market rates in the District of Columbia for experienced counsel to handle complex civil litigation." (*Id.*)

The second attorney declarant, Steven K. Davidson, currently a partner at Steptoe & Johnson—another large, international law firm—has practiced commercial litigation in the District since 1985. (Davidson Decl. ¶ 2, Ex. 5 to [930].) As a member of his firm's Executive Committee, he has assisted with setting professionals' billing rates. (*Id.* ¶¶ 2, 16.) Davidson offers an opinion based not only on anecdotal knowledge of his and competitor firms' standard billing rates but also on two external sources. (*Id.* ¶¶ 19–21.) First, *The National Law Journal's* 2006 annual survey of billing rates indicates that Wilmer Hale's rates are comparable to those reported by other large firms with D.C. offices. (*Id.* ¶ 19; *see id.* Ex. A.) Second, Wilmer Hale's rates also align with those delineated in the *Laffey* matrix, as updated by relator's economist using the nationwide legal services component of the Consumer Price Index, a methodology approved in *Salazar v. District of Columbia,* 123 F.Supp.2d 8 (D.D.C.2000) (Kessler, J.).[21] (*Id.* ¶ 20; *see also* Kavanaugh Decl. ¶¶ 9–15, Ex. 4 to [930].) Davidson thus concludes that Wilmer Hale's rates "are comparable to the prevailing market rates and [ ] well within the reasonable range of rates for a law firm such as WilmerHale undertaking matters of the magnitude and complexity of those involved here." (Davidson Decl. ¶ 16, Ex. 5 to [930].)

Relator's evidence demonstrates that Wilmer Hale's established billing rates—those charged to all litigation clients—align with the established rates of lawyers of reasonably comparable skill, experience, and reputation in the D.C. legal community.[22] *See Kattan,* 995 F.2d at 278. Thus, the Court will accord these rates a presumption of reasonableness. *See Covington,* 57 F.3d at 1110.

**21.** The Court merely notes that Davidson finds Wilmer Hale's rates' correspondence with this matrix persuasive. As set forth more fully below, the Court does not adopt this methodology. *See infra* part III.A. 1.b.

**22.** Relator also bears an evidentiary burden with respect to his "attorneys' skill, experience, and reputation." *Covington,* 57 F.3d at 1108. Accordingly, he has set forth their impressive credentials in his fee petition. (*See* Mot. for Fees, Costs, and Expenses [930] at 14–17.) Defendants' only challenge to this showing—they advocate a 20% across-the-board reduction in fees based on relator's counsel's near-total lack of prior experience with *qui tam* litigation—cites no authority whatever, (HII's Opp'n [949] at 39–40), so the Court need not dwell on it here. A few highlights will convey how formidable a team relator's counsel assembled. For example, Bell and Cultice, the two senior partners most involved in the case, each boast over twenty-five years' experience as litigators. (*See* Bell Decl. ¶ 5, Ex. 2 to [930]; Cultice Decl. ¶ 3–6, Ex. 6 to [930].) Though more junior, O'Connor has represented corporate and individual clients in a wide range of federal cases across the country. (*See* O'Connor Decl. ¶¶ 5–6, Ex. 7 to [930].) Cedarbaum, a former Supreme Court clerk and Bristow Fellow in the Office of the Solicitor General, made partner during the pendency of this case, and his litigation experience is concentrated in the antitrust field. (*See* Cedarbaum Decl. ¶ 4–5, Ex. 8 to [930].) The Wilmer Hale associates who assisted with this case are, almost uniformly, graduates of prestigious law schools and/or former judicial clerks. (*See* Bell Decl. ¶ 114, Ex. 2 to [930].) Similarly, the paralegals for whose time relator seeks compensation had substantial prior experience in litigation and formal training. (*Id.* ¶ 115.)

Defendants' rebuttal to this evidentiary showing rests on a single proposition. Under *Blum*, a reasonable rate must align with "those prevailing in the community for similar services...." 465 U.S. at 896 n. 11, 104 S.Ct. 1541. Whereas relator appears to define "similar services" in terms of complex, federal-court civil litigation, defendants insist "similar" must be construed more narrowly. (*See* HII's Opp'n [949] at 30–34.) In their view, the hourly rates typically charged by FCA relators' counsel are the benchmark against which this Court should evaluate relator's requested rates. (*Id.* at 32–33.)

This contention fails for three reasons. First, the authority on which defendants rely does not support their argument.[23] Second, case law in this Circuit does not support the Balkanized approach to fee calculation that defendants advocate. In 1983, then-Chief Judge Aubrey Robinson adopted an hourly rates scheme for complex, federal litigation under which an attorney's years of experience determined his reasonable hourly rate. *Laffey v.* *Northwest Airlines, Inc.*, 572 F.Supp. 354, 371–75 (D.D.C.1983). In the ensuing twenty-five years, this scheme, the *Laffey* matrix, has achieved broad acceptance in this Circuit and has served as a guide in nearly every conceivable type of case. *See, e.g., Hansson v. Norton*, 411 F.3d 231, 236 (D.C.Cir.2005) (employment discrimination); *Role Models Am., Inc. v. Brownlee*, 353 F.3d 962, 970 (D.C.Cir.2004) (Administrative Procedures Act); *Covington*, 57 F.3d at 1110 (civil rights); *Judicial Watch, Inc. v. BLM*, 562 F.Supp.2d 159, 175 (D.D.C.2008) (Lamberth, J.) (Freedom of Information Act); *MacClarence v. Johnson*, 539 F.Supp.2d 155, 160 (D.D.C.2008) (Facciola, M.J.) (Clean Air Act). The generic matrix's use in such a diverse range of cases cuts against defendants' argument that reasonable rates can be derived only from data peculiar to a case's legal specialty area.

Third, and most critically, defendants have failed to demonstrate that for purposes of calculating a reasonable hourly rate, *qui tam* litigation differs in any

**23.** In one case, this Court declined to award "market rates" set out in a Pricewaterhouse-Coopers Survey commissioned by the plaintiffs and relied instead on an updated *Laffey* matrix. *See Cobell v. Norton*, 407 F.Supp.2d 140, 170 (D.D.C.2005) (Lamberth, J.). But in *Cobell*, the plaintiffs presented *no* evidence that these "market" rates were either comparable to their counsel's established billing rates or—as required by *Blum*—"in line with those prevailing in the community." *See id.* ("PwC Survey suggests plaintiffs be compensated [at] a rate greater than permitted by *Laffey* ... without any supporting affidavit by an attorney or law firm knowledgeable in the activities litigated by plaintiffs."). Thus, this Court relied on the U.S. Attorney's Office ("USAO") *Laffey* matrix to supply the "prevailing market rates in the District of Columbia." *Id.* Here, however, relator has complied with his evidentiary burden by submitting affidavits from attorneys with knowledge of counsel's performance in this case, their standard billing rates, and—crucially—

the prevailing rates in the community. Hence, *Cobell* is inapposite.

Defendants' other two authorities from this Circuit lend them no support whatever. Indeed, one appears to bolster *relator's* case. *See Jordan v. U.S. Dep't of Justice*, 691 F.2d 514, 521 (D.C.Cir.1982) ("affidavit[ ] attesting to the prevailing market rate," such as that offered to support instant fee claim, suffices as "specific evidence of the prevailing community rate" so long as "affiant avows that the quoted rate is based upon 'personal knowledge about specific rates charged by other lawyers'") (quoting *Nat'l Ass'n of Concerned Veterans v. Sec'y of Def.*, 675 F.2d 1319, 1325 (D.C.Cir.1982)). In the other case, this Court awarded relator's counsel his requested rates because *the defendants did not contest them,* and they were *below* the prevailing market rate in the community. (*See* Mem. Op. & Order of May 18, 2004[951] in *In re Columbia/HCA Health v. Lead Defendants*, No. 01–mc–50–RCL (MDL).)

meaningful way from other complex, civil litigation that occurs in federal court.[24] Defendants contend that "FCA litigation, particularly for relator's counsel, is a specialized, niche practice that is distinct from other types of civil litigation, and certainly differs from the defense-oriented commercial litigation practiced by firms like WilmerHale." (HII's Opp'n [949] at 33.) If, as defendants suggest, *qui tam* litigation is a "niche" field because FCA-specific treatises and hornbooks, legal symposia, and professional organizations exist, then virtually *every* type of litigated case could be so characterized. The allegation that some attorneys "dedicate their entire practice to representing relators" is no more persuasive. (*Id.* at 34.) Defendants contend the rates charged by FCA specialists at Cincinnati's Helmer, Martins, Rice & Popham ("HMRP") establish the benchmark for reasonableness. (*Id.* at 35–38.) "[E]ven assuming, *arguendo*, the existence of [ ] a

[FCA litigation] submarket," rates charged by a single, Ohio firm do not constitute "evidence that submarket rates are lower than the prevailing rates in the broader legal market." *See Covington*, 57 F.3d at 1111.

Defendants point out that HMRP's rates conform almost precisely to those outlined in the *Laffey* matrix, as updated by the U.S. Attorney's Office ("USAO"), and that using rates from *either* source would reduce relator's requested fee award by 38%. (HII's Opp'n [949] at 38–39.) This tremendous disparity gives the Court pause. But two factors overcome its skepticism.

First, simple reference to the *Laffey* matrix cannot defeat the presumption of reasonableness accorded relator's requested rates. Though it "serves as a useful starting point for determining prevailing market rates in the District of Columbia,"

---

**24.** At least one other district court has implicitly reached a contrary conclusion, requiring relators seeking attorneys' fees under the FCA to submit evidence of prevailing rates for "comparable *qui tam* litigation" in the relevant market. *See United States ex rel. Abbott-Burdick v. Un*, *8, 2002 U.S. Dist. LEXIS 26986, at *30 (D.S.C. May 23, 2002). That court relied solely on a lone Fourth Circuit precedent, which, in turn, points only to an Eleventh Circuit case. *See id.; Buffington v. Baltimore County*, 913 F.2d 113, 129 (4th Cir.1990). In this latter case, the Eleventh Circuit Court of Appeals observed that "[t]he market rate for federal civil litigation [was] too over-inclusive to be relevant" to civil rights plaintiffs' fee petition. *Perkins v. Mobile Housing Bd.*, 847 F.2d 735, 737 (11th Cir.1988). Read in context, however, this comment is attributable to the evidentiary record then before the court:

> The fee application in this case is inadequate. It provides the trial judge with no guidance as to the market rate for attorneys of similar skill representing similar clients in similar cases in the Mobile area.... The record in this case demonstrates that rates vary from $50 to more than $120 per hour for federal civil litigation without any con-

sideration of skill, client, or type of case. The typical rate within the range can be artificially raised or lowered with the inclusion of quotes for work for government authorities or work of great complexity involving sophisticated legal problems.

*Id.* at 737–38. Here, however, relator has offered evidence of the prevailing market rates for complex federal litigation charged by attorneys of comparable skill and experience. Further, his evidence reflects that in the D.C. legal market, attorneys at large, international law firms such as Wilmer Hale typically charge a standard rate for litigation matters, regardless of the "client[ ] or type of case." Hence, relator's evidence does not suffer the same deficiencies that rendered the *Perkins* fee application "inadequate." Moreover, *this* Circuit's Court of Appeals has repeatedly endorsed a method of determining "reasonable rates" (the *Laffey* matrix) that is *not* subject-matter specific. *See, e.g., Hansson*, 411 F.3d at 236; *Role Models Am., Inc.*, 353 F.3d at 970. *Cf. Laffey*, 572 F.Supp. at 374 (finding that "the relevant legal market in this action is complex employment discrimination litigation [but] that this market is subject to the same hourly rates that prevail in other complex federal litigation").

*Cobell,* 407 F.Supp.2d at 170, the *Laffey* matrix is not the *only* acceptable starting point. Our Court of Appeals has never held that *Laffey* rates are the only rates that a court may consider reasonable. Instead, it has advised that "an attorney's usual billing rate is presumptively the reasonable rate, provided that this rate" aligns with prevailing community rates. *Kattan by Thomas v. District of Columbia,* 995 F.2d 274, 278 (D.C.Cir.1993). "[F]ee claimants must provide the court with specific evidence of the prevailing community rate." *Jordan,* 691 F.2d at 521. *See also Blum,* 465 U.S. at 896 n. 11, 104 S.Ct. 1541 (fee applicant must "produce satisfactory evidence—in addition to the attorney's own affidavits—that the requested rates" align with prevailing rates). This evidence *may* include the *Laffey* matrix, in its original form and/or as updated by the USAO. *See Covington,* 57 F.3d at 1110. But it may also consist of comparable fee awards or affidavits from knowledgeable local practitioners, such as those relator has submitted here. *See Jordan,* 691 F.2d at 521. If non-conformity with updated USAO *Laffey* rates could doom a petitioner's request, this would moot the evidentiary showing envisioned by *Blum.*[25] *See* 465 U.S. at 896 n. 11, 104 S.Ct. 1541. It would effectively impose a ceiling on the rates courts can award pursuant to fee-shifting statutes—a ceiling never endorsed by Congress. Neither it nor the courts have ever "propose[d] . . . that all attorneys be remunerated at the same rate, regardless of their competence, experience, and marketability." *Save Our Cumberland Mountains, Inc. v. Hodel,* 857 F.2d 1516, 1522 n. 4 (D.C.Cir.1988).

Second, the Supreme Court clarified in *Blum* that a reasonable hourly rate should ordinarily reflect the quality of counsel's representation. *See* 465 U.S. at 899, 104 S.Ct. 1541. Defendants balk at the "mega-law firm rates" relator seeks. (HII's Opp'n [949] at 30.) But these rates reflect counsel's "mega-law firm"-quality representation. Having observed more than a few attorneys in the past twenty years, this Court is well-suited to judge the quality of counsel's representation, both in the courtroom and in written submissions. By this Court's assessment, relator's counsel—particularly the more junior trial team members—acquitted themselves admirably. Their zealous, polished, and astute advocacy justifies, and is reflected in, their established billing rates. Further, according to government counsel,

> [t]he availability of Relator's counsel from WilmerHale was essential in meeting the overwhelming demands of discovery and ultimately of the trial in this matter. Indeed, attorneys and support staff from WilmerHale played a vital role in getting this case ready for trial and ultimately in successfully trying it.

(Morgan Decl. ¶ 7, Ex. 1 to Mot. for Fees, Costs, and Expenses [930].) During the discovery period alone, relator's counsel reviewed 665 boxes of documents, from which they culled over 97,000 documents with over 320,000 pages, attended 40 depositions, taking a leading role in some, and participated in two evidentiary hearings. (Bell Decl. ¶¶ 74–75, 78, 85, Ex. 2 to [930].) Had Wilmer Hale not been able to call on its "mega-law firm" resources, plaintiffs might have struggled to meet these "overwhelming demands." *See Wilcox v. Sisson,* No. 02–1455, 2006 WL 1443981, *2, 2006 U.S. Dist. LEXIS 33404, at *8 (D.D.C. May 25, 2006) (Collyer, J.) ("The market generally accepts higher rates

---

**25.** That one Ohio FCA specialist firm's rates *do* happen to correspond to those in the up-

dated *Laffey* matrix is equally unpersuasive.

from attorneys at firms with more than 100 lawyers than from those at smaller firms—presumably because of their greater resources and investments . . . .").

For all these reasons, the Court finds defendants have failed to rebut relator's evidentiary showing that the requested rates—Wilmer Hale's established rates—align "with those prevailing in [this] community for similar services by lawyers of reasonably comparable skill, experience and reputation." *See Blum,* 465 U.S. at 896 n. 11, 104 S.Ct. 1541. Wilmer Hale's established billing scale will supply the reasonable hourly rates with which this Court will calculate the lodestar.[26]

### b. Wiley Rein

Relator also seeks compensation for work performed by four Wiley Rein attorneys (other than Bell) and two paralegals. (Bell Decl. ¶ 103, Ex. 2 to Mot. for Fees, Costs, and Expenses [930].) Of these six individuals, only one, Michael Sturm, remains at Wiley Rein. (*Id.* ¶ 104.) In light of the Court's conclusion concerning Wilmer Hale's rates, Sturm's established billing rate is eminently reasonable.[27]

For the other five professionals, however, relator has provided neither their current billing rates nor those of their Wiley Rein peers. Instead, he asks that their work be compensated at rates derived from economist Kavanaugh's *Laffey* matrix. (*See id.* ¶ 104.) Unlike the USAO's matrix, which calculates inflation based on the metropolitan D.C. Consumer Price Index ("CPI"), Kavanaugh's version relies on a legal services sub-component of the broader, national CPI. (*See* Kavanaugh Decl. ¶ 9, Ex. 4 to Mot. for Fees, Costs, and Expenses [930].)

Kavanaugh's alternative methodology has achieved only limited acceptance in this District.[28] As he did in *Salazar,* Kavanaugh presents a well-reasoned, if condensed, economic argument for his index's superiority. (*See id.* ¶¶ 9–14.) Nevertheless, after reviewing his declarations, the Court is not convinced. Kavanaugh's matrix incorporates price inflation data specific to the market for legal services, while the USAO matrix relies on data specific to the Washington, D.C. metropolitan area. (*Id.* ¶ 9.) Kavanaugh's matrix thus reflects *national* inflation trends, while the USAO matrix accounts for price inflation within *the local community*—a crucial distinction. As the Supreme Court and our Court of Appeals have both emphasized, rates used in calculating the lodestar should accord with those "prevailing in *the community.*" *Blum,* 465 U.S. at 896 n. 11, 104 S.Ct. 1541

---

**26.** Four Wilmer Hale associates for whose time relator requests fees have left the firm. (*See* Bell Decl. ¶ 108, Ex. 2 to Mot. for Fees, Costs, and Expenses [930].) Relator proposes that compensation for these individuals' time be paid at the established billing rates of current Wilmer Hale associates who graduated law school in the same years. (*Id.*) This request does not strike the Court as unreasonable, and it boasts the virtue of simplicity. Given that defendants do not specifically object, the Court will thus order these four individuals' time reimbursed at their peers' standard billing rates.

**27.** Sturm, a 1987 law graduate and Wiley Rein litigation partner, bills $495 per hour, (Bell Decl. ¶ 104, Ex. 2 to Mot. for Fees,

Costs, and Expenses [930] ), while O'Connor, a Wilmer Hale litigation partner who finished law school ten years *after* Sturm, bills $510 per hour, (*see id.* Ex. D–1).

**28.** *Compare Smith v. District of Columbia,* 466 F.Supp.2d 151, 156 (D.D.C.2006) (Kessler, J.) (approving), *and Salazar v. District of Columbia,* 123 F.Supp.2d 8, 13–14 (D.D.C.2000) (Kessler, J.) (same), *with Yazdani v. Access ATM,* 474 F.Supp.2d 134, 138 (D.D.C.2007) (Facciola, M.J.) (declining to adopt); *Am. Lands Alliance v. Norton,* 525 F.Supp.2d 135, 148–49 (D.D.C.2007) (Walton J.) (same); *and Muldrow v. Re–Direct, Inc.,* 397 F.Supp.2d 1, 3–4 & n. 3 (D.D.C.2005) (Huvelle, J.) (same).

(emphasis added); *see also Covington v. District of Columbia*, 57 F.3d 1101, 1108 (D.C.Cir.1995) ("plaintiff must produce data concerning the prevailing market rates in *the relevant community*") (emphasis added). Kavanaugh's matrix does not comply with this mandate for geographic specificity. Hence, with due respect to its colleagues, the Court declines to adopt Kavanaugh's methodology. It will thus award fees for the remaining five Wiley Rein professionals at USAO *Laffey* matrix rates.[29]

## 2. Current vs. Historical Rates

The time entries included in relator's fee petition span a thirteen-year period: Wiley Rein personnel devoted time to this case from 1995–1999, and Wilmer Hale's involvement has stretched from 1999–2007. (*See* Exs. B–2, D–2, to Bell Decl., Ex. 2 to Mot. for Fees, Costs, and Expenses [930].) Relator seeks to recover all fees at *current* billing rates, (Mot. for Fees, Costs, and Expenses [930] at 12), while defendants

favor using historical rates corresponding to the years when the work was performed, (*see* HII's Opp'n [949] at 40–43; BHIC and HUK's Opp'n [948] at 19–21.)

In 1911, Ambrose Bierce described litigation as "[a] machine which you go into as a pig and come out of as a sausage." AMBROSE BIERCE, THE DEVIL'S DICTIONARY 72 (1979 ed.). Since Bierce's day, the process has become, if anything, more drawn out and contentious. Recognizing that in many cases, an attorney may put in years of effort before realizing any tangible return, the Supreme Court has held that a "reasonable attorney's fee" awarded pursuant to a fee-shifting statute should account for delay in payment. *See Missouri v. Jenkins*, 491 U.S. 274, 282, 109 S.Ct. 2463, 105 L.Ed.2d 229 (1989).[30] "Clearly, compensation received several years after the services were rendered—as it frequently is in complex [*qui tam* ] litigation—is not equivalent to the same dollar amount received reasonably promptly as the legal services are performed...." *Id.*

---

**29.** Due to its widespread acceptance, this matrix has been aptly described as "the benchmark for reasonable fees in this Court." *Pleasants v. Ridge*, 424 F.Supp.2d 67, 71 n. 2 (D.D.C.2006) (Facciola, M.J.). Like its colleagues, this Court has frequently employed the USAO matrix in calculating fee awards. *See, e.g., Judicial Watch, Inc. v. BLM*, 562 F.Supp.2d 159, 175 (D.D.C.2008) (Lamberth, J.); *Bynum v. District of Columbia*, 412 F.Supp.2d 73, 85 (D.D.C.2006) (Lamberth, J.); *Cobell*, 407 F.Supp.2d at 170 (D.D.C. 2005) (Lamberth, J.).

**30.** As defendants point out, another court in this district has read *Jenkins* as contemplating an award of historical fees at current market rates only when delay is "substantial." *See Salazar*, 123 F.Supp.2d at 15. On this basis, Judge Kessler rejected payment at 1999 rates for hours worked during the previous calendar year. *Id.* Defendants would extend this rationale to Wilmer Hale's 2005 and 2006 hours, which they contend should be reimbursed at historic rates. (*See* BHIC and

HUK's Opp'n [948] at 19.) But circumstances here differ noticeably from those in *Salazar*. This fee award will issue in 2008. If the parties' behavior in this case to date is any guide, it will surely snowball into the second "major ratemaking proceeding" envisioned with horror by the Court of Appeals in *Laffey. See* 746 F.2d at 24. Relator's counsel would be exceedingly fortunate to receive their fees this year. Moreover, our Court of Appeals has held that even a brief delay may merit an adjustment in the fee award. *See EDF v. EPA*, 672 F.2d 42, 60 (D.C.Cir.1982) (awarding fees at current market rates *and* increasing lodestar by 17 percent due to "public benefit and delay in receipt of payments," where suit was filed less than three years earlier, and court characterized "actual period of delay" as "no more than six months"). This Court agrees with relator that the two and three-year delays in payment for hours worked in 2006 and 2005, respectively—as well as the much longer delays applicable to counsel's other pre–2007 hours—warrant such an adjustment.

at 283, 109 S.Ct. 2463. Thus, courts should make "an appropriate adjustment for delay in payment—whether by the application of current rather than historic hourly rates or otherwise." *Id.* at 284, 109 S.Ct. 2463.

Courts in this Circuit have frequently employed the Supreme Court's suggested method of adjustment. *See, e.g., Murray v. Weinberger,* 741 F.2d 1423, 1433 (D.C.Cir.1984) ("Current market rates have been used in numerous cases to calculate the lodestar figure when the legal services were provided over a multiple-year period and when use of the current rates does not result in a windfall for the attorneys."); *Muldrow,* 397 F.Supp.2d at 4 n. 4 ("Nor does the Court object to plaintiff's use of the *Laffey* rates for 2005–06 even though much of the litigation took place several years ago. The Supreme Court has held that it is acceptable to use current market rates, rather than historic rates, as a convenient method of compensating prevailing parties for a delay in receiving payment."). *See also Copeland v. Marshall,* 641 F.2d 880, 893 n. 23 (D.C.Cir.1980) (en banc) (noting that lodestar may be "based on present hourly rates, rather than the lesser rates applicable to the time period in which the services were rendered," to reduce or eliminate "harm resulting from delay in payment").

Several observations are in order. First, though relator seeks compensation for 24,584.6 billable hours, spread over thirteen years, roughly half those hours were billed in 2007, the year for which relator has provided Wilmer Hale's standard billing rates. (*See* Exs. C–2, C–4 to Bell Supplemental Decl., Ex. 1 to Reply to HII's Opp'n [957].) Indeed, only 1,826.3 hours—7.4 percent of the total—were billed prior to 2006. (*See id.*) Thus, defendants' "windfall" objection, discussed

below, pertains to only a small portion of relator's overall fee request.

Second, according to Robert Bell, Wilmer Hale's billing cycle averages 89 days. (*See* Bell Supplemental Decl. ¶¶ 23–24, Ex. 1 to [957].) By contrast, here, by the time Wilmer Hale receives payment pursuant to the instant fee award, *at least a full year* will have passed since it billed the last hours addressed therein.

Third, as relator's economist points out, accounting for delay by applying current rates across the board boasts distinct, practical advantages:

> There may be other ways to compensate [for delay in payment]—that is, to restore the firm that provided the legal services to the level of wealth it could have obtained had it been paid at the time the service was performed—but the other compensation methods are more complex, have higher transaction costs, raise the specter of interest payments and may not be any better than simply using the current prevailing market rates.

(Kavanaugh Decl. ¶ 18, Ex. 5 to Mot. for Fees, Costs, and Expenses [930].) *See also Murray,* 741 F.2d at 1433 ("Ease of administration is an important objective . . . because there is a pressing need for simple rules in attorney's fees cases."). Moreover, Kavanaugh's alternative proposed method of compensating for delay—using the historical prime rate to calculate the present value of a timely payment stream for the hours billed—produces a lodestar figure 1.6 percent *higher* than that requested by relator. (Kavanaugh Supplemental Decl. ¶¶ 6–12, Ex. 4 to Reply to HII's Opp'n [957].)

Notwithstanding these various points, defendants oppose applying current rates

to compensate for delay for two reasons.[31] First, they contend that application of current rates will result in a forbidden "windfall" to relator's counsel. (*See* HII's Opp'n [949] at 40–41; BHIC and HUK's Opp'n [948] at 19–21.) They insist that fee awards must reflect lawyers' experience levels at the time they performed the work, lest they be afforded credit for experience—and the heightened skill, productivity, and efficiency that usually accompany it—they did not then possess. (*See* HII's Opp'n [949] at 40–41; BHIC and HUK's Opp'n [948] at 19–21.) This argument has some superficial appeal, but it misunderstands the rationale behind compensating for delay in payment. "[C]ompensation received several years after the services were rendered . . . is not equivalent to the same dollar amount received reasonably promptly as the legal services are performed." *Jenkins*, 491 U.S. at 283, 109 S.Ct. 2463. Paying counsel at historical, or even current, rates based on their experience levels when they performed the work would not achieve this equivalence because it ignores the time value of money: one dollar received today is more valuable than it would be if received five years from now for two reasons—first, because it will buy more now than it will after five years of price inflation, and second, because of the interest that can be earned from it in the interim. Paying counsel at their current, established billing rates does not result in a windfall; it simply takes the this second factor into account.

Second, they contend that relator bears responsibility for the delay, and that consequently, he should not be rewarded with a fees adjustment therefor. (HII's Opp'n [949] at 42–43.) Both components of this argument are flawed. Responsibility for the first period of delay defendants cite— June 1995 to March 2001—can be laid at the government's feet, but not relator's. Under the FCA's *qui tam* provisions, once he files his complaint under seal, a relator must simply await the government's decision on intervention. *See* 31 U.S.C. § 3730(b) (2008). As this Court expressed in an earlier opinion in this case, the government's "unreasonable inaction" precipitated this first period of delay. (*See* Mem. Op. of June 14, 2007[872] at 30.) All parties contributed to the next, post-seal period of delay: defendants opposed plaintiffs' request to commence discovery in 2003, (*see* Joint Rule 16.3 Report of Nov. 13, 2003[148] at 2), and plaintiffs repeatedly amended their complaints, (*e.g.*, Relator's Third Am. Compl. [233] (filed Mar. 9, 2006); Government's First Am. Compl. [237] (filed Mar. 9, 2006)).

Moreover, regardless of who caused what period of delay, defendants' authorities for denying the responsible party com-

---

**31.** Defendants also complain that relator has offered no evidence of hardship to justify an adjustment for delay in payment. (HII's Opp'n [949] at 42 (citing *Covington v. District of Columbia*, 839 F.Supp. 894, 902 (D.D.C. 1993) (Lamberth, J.) ("Generally, to collect current rates [a fee petitioner] must show that the delay in fee payment has produced some degree of hardship such that an award of current rates does not produce a windfall.")).) This argument is specious. Kavanaugh's original declaration offers a rationale for compensating for delay in this case. (*See* Kavanaugh Decl. ¶¶ 16–18, Ex. 5 to Mot. for Fees, Costs, and Expenses [930].) Further, in his supplemental declaration, Bell explains that Wilmer Hale's billing cycle averages 89 days—far less than even the shortest delay period here. (*See* Bell Supplemental Decl. ¶¶ 23–24, Ex. 1 to Reply to HII's Opp'n [957]; *see also* Kavanaugh Supplemental Decl. ¶¶ 13–16, Ex. 4 to Reply to HII's Opp'n [957] (describing how Wilmer Hale's reliance on combined debt-equity financing magnifies the detriment it suffers from long-delayed payment for its services).) Finally, all involved are well aware that relator's counsel have worked on this case for *twelve years*, presumably largely without compensation. The hardship caused by delay is self-evident.

pensation for delay merely confirm that a court's decision to account for delay in awarding attorneys' fees is discretionary. *See Sands v. Runyon,* 28 F.3d 1323, 1334 (2d Cir.1994) (finding no abuse of discretion where district court refused to "apply multiplier to the basic hourly rate to account for the delay between the investment of time and the receipt of the fee award" because plaintiff had caused unnecessary delay); *Paris v. Dallas Airmotive, Inc.,* No. 97–0208, 2004 WL 2100227, **11–12, 2004 U.S. Dist. LEXIS 18893, at *35–36 (N.D.Tex. Sept. 21, 2004) (declining to exercise discretion to award fees at current market rates because, but for plaintiff's actions, case could have been concluded at least three years earlier).

Here, having concluded that no "windfall" will result, and in light of the practical advantages to be derived, the Court will exercise its discretion to compensate relator's counsel for delay in payment by applying current rates in calculating the lodestar.

Appendix I delineates the rates the Court will use for both Wiley Rein and Wilmer Hale professionals.

**B. Reasonable Hours**

 Several principles govern the Court's calculation of this second component of the lodestar, "the number of hours reasonably expended on the litigation." *See Hensley v. Eckerhart,* 461 U.S. 424, 433, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983). First, the fee petitioner must submit evidence that justifies the hours he claims his counsel have worked. *Id.* "Where the documentation of hours is inadequate, the district court may reduce the award accordingly." *Id.* A "fee application need not

present the exact number of minutes spent[,] nor the precise activity to which each hour was devoted[,] nor the specific attainments of each attorney." *Nat'l Ass'n of Concerned Veterans v. Sec'y of Def.,* 675 F.2d 1319,1327 (D.C.Cir.1982) (internal quotation marks omitted). But where time entries "are so vaguely generic that the Court can not determine with certainty whether the activities they purport to describe were ... reasonable," the petitioner has not met his burden. *Cobell v. Norton,* 407 F.Supp.2d 140, 158 (D.D.C. 2005) (Lamberth, J.). Instead, "the application must be sufficiently detailed to permit the District Court to make an independent determination whether or not the hours claimed are justified." *Nat'l Ass'n of Concerned Veterans.,* 675 F.2d at 1327.

Second, "[t]he hours reasonably expended are not necessarily equal to the hours actually expended." *McKenzie v. Kennickell,* 645 F.Supp. 437, 446 (D.D.C.1986) (Parker, J.). "Hours that are not properly billed to one's client also are not properly billed to one's adversary pursuant to statutory authority." *Copeland v. Marshall,* 641 F.2d 880, 891 (D.C.Cir.1980) (en banc). *See also Laffey v. Northwest Airlines, Inc.,* 572 F.Supp. 354, 369 (D.D.C.1983) (Robinson, C.J.), *reversed in part on other grounds by* 740 F.2d 1071 (D.C.Cir.1984) ("Counsel is not free ... to exercise its judgment in a fashion that unnecessarily inflates the losing party's fee liability"). The petitioner should exercise billing judgment, making "a good-faith effort to exclude from [his] fee request hours that are excessive, redundant, or otherwise unnecessary, just as a lawyer in private practice ethically is obligated to exclude such hours from his fee submission." *Hensley,* 461 U.S. at 434, 103 S.Ct. 1933.[32] As the Court

---

32. According to relator's fee petition, his counsel have made a first effort at exercising the required billing judgment. (*See* Mot. for

Fees, Costs, and Expenses [930] at 24–27.) First, relator has attempted to exclude all hours attributable solely to his claims against

of Appeals admonished in *Copeland*, however, a defendant "cannot litigate tenaciously and then be heard to complain about the time necessarily spent by the plaintiff in response." 641 F.2d at 904.

■ Third, "[c]ompensable time should not be limited to hours expended within the four corners of the litigation." *Nat'l Ass'n of Concerned Veterans*, 675 F.2d at 1335. The petitioner need only show that the hours for which he seeks compensation were "expended in pursuit of a successful resolution of the case in which fees are being claimed." *Id.* While "no compensation should be paid for time spent litigating claims upon which the party seeking the fee did not ultimately prevail," a reduction in fee is appropriate only when the non-prevailing matters " 'are truly fractionable.' " *Copeland*, 641 F.2d at 891–92 & n. 18 (quoting *Lamphere v. Brown Univ.*, 610 F.2d 46, 47 (1st Cir.1979)).

With this guidance in mind, the Court will analyze relator's claimed hours along with defendants' objections to them. The latter fall into two categories. First, defendants contend that certain tasks for which relator's counsel have billed time in this case are *per se* non-compensable. Second, they cite several broader defects in relator's counsel's billing statements which they allege warrant across-the-board, percentage reductions in the fee award. The Court will address each category of complaints in turn.

**1. Non–Compensable Tasks**

Defendants allege a variety of tasks are non-compensable. The Court has grouped their contentions under the following six subheadings.[33]

**a. Criminal Case**

After relator filed his *qui tam* complaint, the government delayed its prosecution of the civil case to pursue criminal, antitrust charges against Bilhar, Anderson, and others. (*See generally* Mem. Op. of June 14, 2007[872] at 18–26 (describing government's deplorable lack of diligence as reason multiple claims must be dismissed as untimely).) During this period, relator's counsel assisted him in securing immunity from criminal prosecution, in complying with obligations incurred as a result, and in responding to subpoenas in the criminal matter. (*See* Bell Decl. ¶¶ 12–19, Ex. 2 to Mot. for Fees, Costs, and Expenses [930]; Bell Supplemental Decl. ¶¶ 2–15, Ex. 1 to Reply to HII's Opp'n [957].) Defendants argue these efforts are not compensable because the civil and criminal cases were

Bill Harbert, who was dismissed from the case. (*See* Bell Decl. ¶ 111, Ex. 2 to [930]; Bell Supplemental Decl. ¶ 25, Ex. 1 to Reply to HII's Opp'n [957].) Second, he has excluded all time for individuals who worked fewer than 65 hours. (*See* Bell Decl. ¶ 112, Ex. 2 to Mot. for Fees, Costs, and Expenses [930].) Finally, he has excluded time dedicated to a variety of other, miscellaneous tasks deemed tangential to the case. (*See id.* ¶¶ 105, 113; Bell Supplemental Decl. ¶ 25, Ex. 1 to Reply to HII's Opp'n [957].)

**33.** For the most part, BHIC and HUK have not specifically identified which time entries they challenge. Their arguments largely pertain to the same subject areas as HII's, however, so the Court will consider them with respect to the time entries cited by HII's Opposition. As an additional note, unless its analysis of defendants' objections clearly points to uncited time entries as non-compensable, the Court will evaluate *only* those time entries which defendants have specifically challenged. *See Donnell v. United States*, 682 F.2d 240, 250 (D.C.Cir.1982) ("We emphasize that the party challenging an application for fees should frame its objections with specificity. The district court cannot inquire into the reasonableness of every action taken and every hour spent by counsel, and it will consider objections to filed hours only where it has been presented with a reasonable basis for believing the filing is excessive.").

separate and distinct matters, and because relator's immunity deal, not his interest in the *qui tam* litigation, obliged him to cooperate with the Antitrust Division. (*See* BHIC and HUK's Opp'n [948] at 3–5; HII's Opp'n [949] at 4–7.)

On the contrary, most of this work *is* compensable. Relator likely had more than one motivation to appear for depositions, provide documents, and otherwise assist the government with the criminal case. Compliance with the immunity letter's terms was doubtless among them. He also had a strong financial incentive to cooperate: to ultimately secure his relator's share, he needed to maintain good relations with DOJ, with whom he would prosecute the civil case as co-plaintiff, and to assist it in developing evidence that could be used in that case. His motives, however, are irrelevant. The information relator provided to the Criminal Division

materially aided its investigation, and the Civil Division later relied on that investigation's fruits in prosecuting the FCA case.[34] (*See* Bell Decl. ¶¶ 24–27, Ex. 2 to Mot. for Fees, Costs, and Expenses [930].) Relator's cooperation during this early period ultimately proved crucial to the "successful resolution of the case in which fees are [now] being claimed." *See Nat'l Assoc. of Concerned Veterans*, 675 F.2d at 1335. In other circumstances, courts have awarded attorneys' fees for hours expended on prior litigation if those efforts also advanced the instant case. *See, e.g., Kulkarni v. Alexander*, 662 F.2d 758, 766 (D.C.Cir. 1978) (legal services rendered in prior administrative proceedings and litigation pertaining to same claim were compensable because "holding of the first suit . . . [was] a necessary predicate for a large part of [plaintiff's] claim in the present action").[35]

---

**34.** For example, plaintiffs were able to estop Bilhar from contesting its liability on Contracts 20A and 29 based on its guilty plea in the prior, criminal case, and the Court admitted Bilhar's plea agreement and Rule 11 memorandum against all defendants in the civil case. (*See* Mem. Op. & Order of Mar. 14, 2007[713] at 5–6; Mem. Op. & Order of Mar. 20, 2007[738] at 1–2.)

**35.** *See also Armstrong v. Davis*, 318 F.3d 965, 971–72 (9th Cir.2003) (work in separate case was compensable because it was "important to the preservation of the[se][ ] Plaintiffs' rights, and because their counsel performed the work in order to protect their interests"); *McDonald v. Armontrout*, 860 F.2d 1456, 1462 (8th Cir.1988) (services rendered in prior habeas action making same claims were compensable because work in "habeas action 'obviated the need for comparable work in' this proceeding, and 'contributed directly to [its] successful outcome' ") (quoting *Webb v. County Bd. of Educ.*, 471 U.S. 234, 249–50, 105 S.Ct. 1923, 85 L.Ed.2d 233 (1985) (Brennan, J., concurring in part and dissenting in part) (alteration in original)); *Perkins v. Cross*, 728 F.2d 1099, 1100 (8th Cir.1984) (time spent on "research or investigation done in connection with [prior] proceeding" is compensable if it "proved directly relevant to the

[instant proceeding's] successful prosecution").

On closer examination, defendants' authorities are not to the contrary. *See Loranger v. Stierheim*, 10 F.3d 776 (11th Cir.1994); *Schrader v. Idaho Dep't of Health & Welfare*, 631 F.Supp. 1426 (D.Idaho 1986). In *Loranger*, where an attorney submitted a voluminous fee petition that listed hours expended on multiple state, federal, and other matters, the Eleventh Circuit Court of Appeals declared that "[t]ime expended independent of the relevant federal litigation [was] not compensable." 10 F.3d at 782. Yet the examples it cited demonstrate that its definition of "independent" matters would not reach hours relator's counsel spent assisting the government in the criminal case. *See id.* at 782 n. 7 (citing as non-compensable time devoted to defending case against petitioner's mother in state court and time spent on state court claims that were voluntarily dismissed). In *Schrader*, the district court declined to hold one defendant liable for hours expended by the prevailing plaintiff's attorneys before that defendant was joined, but it did so *without any explanation of its reasoning* leaving its conclusion devoid of persuasive value. *See* 631 F.Supp. at 1430.

This Court has no qualms about following suit and will compensate relator for time his counsel spent assisting him in complying with his immunity obligations and in responding to subpoenas in the criminal matter.

This logic does not extend to time spent *securing* the government's immunity grant, however. Bell now characterizes the immunity letter as "unnecessary" and insists relator would have aided the government regardless. (*See* Bell Supplemental Decl. ¶¶ 2, 14, Ex. 1 to Reply to HII's Opp'n [957].) Thus, any work relator's counsel performed to negotiate or effectuate the immunity deal had no impact whatever on plaintiffs' subsequent success in the civil case and is therefore not compensable.

### b. Personal Matters

Relator's counsel's billing statements include research and consultation concerning his personal, financial, and employment matters, and defendants contend these efforts in no way contributed to plaintiffs' successful resolution of the instant case. Conceding to some of defendants' objections, relator has excluded from his revised fee request time entries devoted to unrelated personal matters and preparation of counsel's fee agreement. (*See* Bell Supplemental Decl. ¶ 25, Ex. 1 to Reply to HII's Opp'n [957].) He has not, however, eliminated all challenged entries, and the Court will assess the remaining objections.

### i. Relator's Attorney–Client Privilege

Even before relator filed his original complaint under seal, his counsel began researching how to protect relevant documents potentially protected by attorney client privilege or the work product doctrine. Relator claims his counsel were simply being proactive, and that this research "was [ ] designed primarily to prevent eventual disclosure to the civil defendants in this litigation." (Reply to HII's Opp'n [957] at 21.) He points out that defendants sought and failed to obtain certain privileged documents at trial, and that his attorneys had an ethical obligation to preserve his privilege. (*Id.*) He does not, however, point to any *evidence* that supports his bald claim that his attorneys' research and discussions *in 1995* were primarily directed to protecting his privilege in a case that remained under seal until *2001*.

On reviewing the filings associated with defendants' failed motion to compel and the challenged time entries, however, the Court concludes these hours are compensable. In the civil case, the magistrate judge denied defendants discovery of certain privileged materials that relator had voluntarily disclosed to the government, holding that plaintiffs' common interest in the prosecution of common defendants in the then-existing civil case defeated waiver. (*See* Mem. Op. of Feb. 20, 2007[530] (denying motion to compel); Am. Mem. Op. of Mar. 27, 2007[750] (denying motion for reconsideration).) The subject matter of counsel's earlier research suggests they had anticipated this very issue and wanted to ensure the common interest doctrine would protect disclosed materials in the later *qui tam* litigation.[36] Rationally, based on the results of these inquiries and discussions, counsel could limit the scope of relator's disclosures to prevent defen-

---

36. (*See, e.g.,* 6/21/95 LD ("review reference materials and court decisions in case raising issues of privileged ... documents relied upon by *qui tam* plaintiff") (emphasis added); 10/25/1995 RBB ("Meet with Mr. Sturm and Ms. Hebert re Hebert's research on *common interest doctrine*") (emphasis added); 12/15/95 LD ("Research and review Jencks Act and Federal Rule of Criminal Procedure 6(c)," which limit discovery of privileged matter disclosed by potential prosecution witness to the government).)

dants from gaining a tactical advantage in the civil case. Because counsel's early research allowed them to formulate a disclosure strategy focused on the *qui tam* litigation, the Court concludes these hours were "expended in pursuit of a successful resolution of the case in which fees are being claimed." *See Nat'l Ass'n of Concerned Veterans,* 675 F.2d at 1335.

### ii. Relator's Ongoing Employment at Jones

Relator continued to work at J.A. Jones after filing his complaint under seal, which named his employer as a defendant. In connection with his continued employment at Jones, relator's counsel: (1) analyzed his potential liability for removing confidential and privileged documents from his employer's offices; (2) advised him on how to respond to an internal Jones investigation commenced after Jones received a grand jury subpoena; and (3) counseled him on how to effectuate his eventual resignation from Jones. Relator deems these tasks compensable because they are "related to representation of a whistleblower and the potential conflicts that arise from assisting the Government."[37] (Reply to BHIC and HUK's Opp'n [960] at 8.)

"Related to representation of a whistleblower," however, is not the standard in this Circuit for compensable time. While the Court accepts that "[c]ompensable time should not be limited to hours expended within the four corners of the litigation," to hold that the hours challenged here were "expended in pursuit of a successful resolution" of the *qui tam* case would render this phrase meaningless. *See Nat'l Ass'n of Concerned Veterans,* 675 F.2d at 1335. In analyzing his potential liability to his employer, relator's counsel sought to protect their client from a counterclaim in the *qui tam* action or a collateral lawsuit. This was diligent lawyering, but it had no effect on the *qui tam* claims.[38] Further, the narratives in counsel's time records indicate they spent *substantial* time weighing whether relator should refuse to cooperate with his employer's internal investigation. Whatever their substantive advice may ultimately have been—and it appears relator resigned rather than cooperate—counsel's drawn out research and strategy development almost certainly hindered Jones' own investigation of the fraud and may consequently have prolonged this litigation unnecessarily.[39] Finally, advice concerning relator's employment status lacks even a tenuous connection to the *qui tam* litigation. For example, relator does not attempt to explain, and the Court cannot surmise, how the "resignation script" his

---

**37.** The Court does not consider relator's single, out-of-circuit district court precedent for this proposition as even "persuasive" authority: that court concluded that 9.15 hours "related to [defendant's] placement of [co-relator] on administrative leave, representing the time researching the approach and negotiating the arrangement," were "reasonable," but it did so without any hint as to *why* it reached this conclusion. *See United States ex rel. Doe v. Pa. Blue Shield,* 54 F.Supp.2d 410, 417, 419 (M.D.Pa.1999).

**38.** For example, Luis de la Torre spent 7.75 hours in one day researching Jones' potential cause of action against Miller for breach of duty of loyalty under North Carolina law.

(*See* 2/24/96 LD.) This research had no application to plaintiffs' pending FCA claims.

**39.** The Sixth Circuit Court of Appeals has implicitly suggested that time devoted to such obstructionism is not compensable. *See United States ex rel. Taxpayers Against Fraud v. Gen. Elec. Co.,* 41 F.3d 1032, 1044 (6th Cir. 1994) (reversing as unsupported by evidence the district court's determination that virtually all relators' attorneys' fees were reasonable, and remanding for consideration of, *inter alia,* whether relator unfairly denied GE an opportunity to conduct an internal corporate investigation, thereby unduly extending the subsequent litigation process).

attorneys prepared for him could *possibly* have served to advance the *qui tam* litigation. (*See* 2/23/96 MLS.) Hence, the Court will not compensate relator for time his counsel expended on this set of tasks.

### iii. Relator's Share and Attorneys' Fees

Even before relator filed his complaint, his counsel had begun estimating his potential bounty, and after DOJ prioritized the criminal case, counsel researched whether relator could claim a share of any criminal fines. When the Civil Division later settled with various defendants, relator's counsel lobbied heavily for his share and sought attorneys' fees from the settling defendants.[40] Defendants object to time entries associated with each of these activities. Relator, of course, asserts that all are compensable.

Fortunately, other courts have weighed these issues before. The Court of Appeals for the Sixth Circuit has considered whether the FCA requires a liable defendant to pay attorneys' fees a prevailing relator incurs in pursuing his relator's share. *See Taxpayers Against Fraud*, 41 F.3d at 1045–46. Relator Miller offers, in essence, the same argument the court rejected in that case: " 'that as between [him] and the wrongdoer [defendant], it is the wrongdoer who should bear the costs.' "[41] *See id.* at 1046 (quoting *Bigby v. City of Chicago*, 927 F.2d 1426, 1428 (7th Cir.1991)) (second alteration in original). There, as here, the defendant had no "right to participate" in relator's share negotiations between the relator and the government, and "nothing suggest[ed] that [the defendant] prolonged the [ ] process or could have hastened its conclusion." *Id.* Thus, the court concluded, "the defendant [ ] should not be re-

40. Defendants further complain that relator has attempted to bill them for time spent negotiating his own fee agreement with Wilmer Hale. (*See* HII's Opp'n [949] at 11.) Relator concedes this time is not compensable and has withdrawn it. (*See* Bell Supplemental Decl. ¶ 25, Ex. 1 to Reply to HII's Opp'n [957].) *Cf. Role Models Am., Inc. v. Brownlee*, 353 F.3d 962, 973 (D.C.Cir.2004) (government should not have to pay for "time spent drafting and revising [ ] firm's engagement letter with [prevailing plaintiff]").

41. He also finds meaning in Congress's consolidation of the fee-shifting and relator's share provisions into the same statutory subsection. (Reply to BHIC and HUK's Opp'n [960] at 8.) But the Sixth Circuit read this statutory subsection rather differently, declining to find Congressional intent implied in the text:

The text of the *qui tam* attorneys' fees provision does not address the question of who pays for the relators' legal fees and expenses incurred during the course of a Relators'-Share Litigation. Indeed, although the statutory text explicitly states that the relator is to receive between 15% and 25% of the proceeds, in a case in which the

government intervenes, it fails to contemplate that a collateral litigation process may ensue between the government and the relator.

*Taxpayers Against Fraud*, 41 F.3d at 1045 (citation omitted). This Court agrees that nothing in the statutory text supports charging the defendants for fees incurred in such collateral proceedings. *See* 31 U.S.C. § 3730(d) (2008).

Relator also claims that if he cannot recoup these attorneys' fees from the defendant, "it would permit the Government to force a relator to take a lower share under a threat of protracted litigation." (Reply to BHIC and HUK's Opp'n [960] at 8.) The potential for hard bargaining by the government may weigh against requiring a relator to bear the cost of efforts to obtain his share, but it does not necessarily follow that *the defendant* should be required to protect him against governmental parsimony. Moreover, to paraphrase Chief Judge Sentelle of our Court of Appeals at a recent oral argument, before attempting to "parade horribles," relator should make sure they are, in fact, horrible. In the scenario relator describes, the relator would still receive at least 15% of the take, and the government would be more fully compensated for its damages.

quired to pay the costs incurred by the prevailing plaintiffs in the course of their collateral litigation." *Id.*[42] This Court finds the Sixth Circuit's reasoning persuasive and will follow it here. Accordingly, hours relator's counsel devoted to recovery of a relator's share from the government are not compensable.[43]

Authority from this Circuit speaks to the second issue presented here: whether a relator may recover attorneys' fees from non-settling defendants for time devoted to obtaining such fees from settling defendants. "It is well settled that hours reasonably devoted to negotiating and/or litigating a statutory fee award are compensable." *Laffey v. Northwest Airlines, Inc.*, 572 F.Supp. 354, 367 n. 21 (D.D.C. 1983), *reversed in part on other grounds by* 740 F.2d 1071 (D.C.Cir.1984). *See also Copeland v. Marshall*, 641 F.2d 880, 896 (D.C.Cir.1980) (en banc) ("time spent litigating the fee request is itself compensable"). Thus, the only remaining question is whether liability for attorneys' fees under the FCA is joint and several, such that non-settling defendants share liability for fees incurred in obtaining fees from settling co-defendants.

Though never presented with the precise situation here, other courts have unanimously concluded that fee liability under the FCA *is* joint and several.[44] *See Unit-*

ed *States ex rel. Greendyke v. CNOS, P.C.*, No. 04–4105, 2007 WL 2908414, *7, 2007 U.S. Dist. LEXIS 72987, at *21–22 (D.S.D. Sept. 27, 2007) (adhering to "general rule that co-defendants are to be held jointly and severally liable for costs and attorney's fees," where defendants failed to cite authority for departing from it); *United States ex rel. Abbott–Burdick v. Univ. Med. Assocs.*, No. 96–1676, 2002 WL 34236885, **4–5, 2002 U.S. Dist. LEXIS 26986, at *18–20 (D.S.C. May 23, 2002) (holding defendants jointly and severally liable for attorneys fees because FCA's "other provisions dictate a joint and several relationship among culpable parties," and due to "unequivocal congressional intent of encouraging *qui tam* suits and the unique pro-plaintiff structure of litigation under the [FCA]"); *United States ex rel. Wiser v. Geriatric Psychological Servs., Inc.*, No. 96–2219, 2001 WL 286838, *3, 2001 U.S. Dist. LEXIS 12930, at *11 (D.Md. Mar. 22, 2001) (holding that "attorneys fees awarded under 31 U.S.C. § 3730(d)(1) should [not] be apportioned among defendants [because] all other recovery need not be").

Thus, under a scheme of joint and several liability for attorneys' fees, if hours devoted to obtaining fees are, themselves, compensable, then each and every defendant against whom relator prevails is liable

---

**42.** *See also United States ex rel. Poulton v. Anesthesia Assocs. of Burlington, Inc.*, 87 F.Supp.2d 351, 358 (D.Vt.2000) ("The time counsel spent on negotiation of the Relator's share is not appropriately billed to the defendants in this case."). *Contra United States v. Stern*, 818 F.Supp. 1521, 1523 (M.D.Fla. 1993), *as modified by* 932 F.Supp. 277, 278 (1993) (defendants must compensate relator for attorneys' fees incurred in connection with relator's share litigation).

**43.** *Cf. Shaw v. AAA Eng'g & Drafting, Inc.*, 213 F.3d 538, 544–45 (10th Cir.2000) (where government did not intervene in *qui tam* action, prevailing relator who initiated execu-

tion of judgment and garnishment proceedings on government's behalf could recover "attorneys' fees for time spent in post-judgment collection activities").

**44.** This conclusion also disposes of defendants' argument that relator waived his entitlement to attorneys' fees incurred in pursuing or settling claims against Bilfinger & Berger and ABB SUSA by consenting to the Civil Division's settlements with those defendants, absent any provision for such fees in the settlements' terms. (*See* HII's Opp'n [949] at 12.)

for fees the relator incurred in obtaining fees from each and every other non-prevailing defendant. The hours relator's counsel spent attempting to recover attorneys' fees from settling co-defendants are thus compensable.[45]

### c. Settlement Efforts

Relator's petition also includes hours his counsel spent in settlement negotiations with various defendants, both successfully and unsuccessfully, and in court-ordered mediation. Contrary to defendants' protests, these tasks are uniformly compensable. The FCA's *qui tam* provisions make clear that a prevailing relator may recover fees when settlement efforts succeed. *See* 31 U.S.C. § 3730(d)(1) (2008). Under the statute, a relator receives a share "of the proceeds of the action or settlement of the claim," and any person who receives such a share "shall also receive ... reasonable attorneys' fees and costs." *Id.* More broadly, settlement efforts, by their nature, are directed toward "successful resolution of the case." *See Nat'l Ass'n of Concerned Veterans*, 675 F.2d at 1335. Here, pretrial settlements with some defendants narrowed the trial's scope and yielded cooperation from key players in the conspiracy, whose testimony significantly bolstered plaintiffs' case and doubtless contributed to the jury's verdict.[46]

---

**45.** The FCA's *qui tam* provisions offer two incentives to prospective whistleblowers—a guaranteed share of any recovery, and reimbursement for attorneys' fees—and it may seem odd that hours a relator's counsel spends securing the latter for his client are compensable, while *hours devoted to obtaining* the former are not. *See* 31 U.S.C. § 3730(d)(1) (2008). One factual distinction between these two tasks justifies their differential treatment: a relator seeks his attorneys' fees from the defendant, who can choose to prolong litigation over the fees or simply cut his losses, but the relator must obtain his share from *the government*. As the Sixth Circuit Court of Appeals observed in *Taxpayers Against Fraud, qui tam* defendants typically have no involvement in this latter process. *See* 41 F.3d at 1046. They can neither hasten nor delay nor prevent the relator's receipt of his share. *See id.* Of course, in *Taxpayers Against Fraud*, the defendant had settled with the government before trial to "minimize its losses," whereas these defendants lost at trial. *See id.* But here, as there, defendants had no control over whether, when, and under what circumstances the government would award relator a share. In principle, it would seem inequitable to hold defendants accountable for fees incurred due to governmental intransigence. Moreover, even preliminary research—such as Luis de la Torre's memorandum on "whether relator can be awarded part of recovery from a defendant not initially named in relator[']s complaint," (6/24/95 RBB)—would be non-compensable under *National Association of Concerned Veterans* be-

cause such research is not directed toward "a successful resolution of the case." *See* 675 F.2d at 1335.

Relator has responded to HII's itemized list of allegedly non-compensable time entries with explanations and recommended deductions. (*See* Ex. E–4 to Bell's Supplemental Decl., Ex. 1 to Reply to HII's Opp'n [957].) Bell classifies these entries, which HII characterizes as efforts to secure a relator's share and/or attorneys' fees, as, *inter alia*, "relator's share," "successful settlement," "unsuccessful settlement," "preservation of ability to collection judgment," and "Jones fee claim." (*See id.*) Rather than speculate as to counsel's primary motivation for activities such as "review[] extensive research on financial condition of Philipp Holzmann," (10/1/99 RBB), the Court will accept Bell's classifications as having been made in good faith and will adopt them in reducing the challenged time entries.

**46.** In 1997 and 1998, relator's counsel advised him concerning his role in a potential government contract debarment proceeding against J.A. Jones, and defendants contend they should not be compensated for work related to this "completely collateral" matter. (*See* HII's Opp'n [949] at 13.) Relator represents that the government considered debarment as a means to pressure Jones to settle, (*see* Reply to HII's Opp'n [957] at 22), and there is some support for this position in the record, (*see, e.g.,* 6/25/97 RBB (Antitrust Division attorney requested that relator testify at

Other settlement negotiations and court-ordered mediation in this case did not produce such tangible results, but hours relator's counsel devoted to these efforts were no less "expended *in pursuit of* a successful resolution."[47] *See id.* (emphasis added). Moreover, substantial authority supports relator's claim to compensation for his attorneys' pursuit of settlement, whatever the ultimate outcome.[48]

#### d. Travel

In the course of this litigation, relator's counsel traveled throughout the United States and Europe to meet with Antitrust Division attorneys and to depose witnesses. Defendants contend this time is non-compensable "absent a showing that the time charges relate to work done in transit," and that in any event, productive travel time "is reimbursable at only half the regular rate." (HII's Opp'n [949] at 13.)

Our Court of Appeals has "not specifically addressed whether an attorney's fee award may include travel time." *Cooper v. United States R.R. Retirement Bd.,* 24 F.3d 1414, 1417 (D.C.Cir.1994). In *Cooper,* the Court first observed that "[o]ther circuits allow payment for attorney travel time, although sometimes at a lower hourly rate," then somewhat cryptically "conclude[d] that travel time *in this case* will be compensated at half the base hourly rate." *Id.* (emphasis added). Seizing on the emphasized phrase, relator insists that because the attorney in *Cooper* billed for thirteen hours spent driving to and from oral argument, only *unproductive* travel time should be compensated at half the base hourly rate, and that to ensure counsel receive a fully compensatory fee, productive travel time must be compensated at the full rate.[49] (Reply to HII's Opp'n

AID debarment hearing)). Because this time was thus "expended in pursuit of a successful resolution" of the case against J.A. Jones, which resolution greatly advanced the civil case against these defendants, it is compensable. *See Nat'l Ass'n of Concerned Veterans,* 675 F.2d at 1335. *See also Chrapliwy v. Uniroyal, Inc.,* 670 F.2d 760, 766–67 (7th Cir. 1982) (awarding attorneys' fees to Title VII plaintiffs for "efforts to persuade the government to debar the defendant from its federal contracts [that] ... caused the defendant to settle the Title VII action").

47. Furthermore, it would be anomalous to withhold compensation for fees relator incurred in connection with mediation ordered by this Court. *Cf. Wilkett v. ICC,* 844 F.2d 867, 874 (D.C.Cir.1988) (awarding fees for work on court-ordered supplemental brief because "[a]ny work ordered by this Court is [ ] compensable").

48. *See, e.g., Hite v. Vermeer Mfg. Co.,* 361 F.Supp.2d 935, 952 (S.D.Iowa 2005) (awarding attorneys' fees to FMLA plaintiff who prevailed at trial for time devoted to unsuccessful settlement negotiations); *Lintz v. Am. Gen. Fin., Inc.,* 87 F.Supp.2d 1161, 1163, 1168–69 (D.Kan.2000) (awarding attorneys' fees to Ti-

tle VII plaintiff who prevailed at trial for time "spent on matters relating to mediation and settlement efforts" because "[t]o hold otherwise might discourage counsel for plaintiffs from exploring settlement possibilities"); *United States ex rel. Poulton v. Anesthesia Assocs. of Burlington, Inc.,* 87 F.Supp.2d 351, 354, 357, 359 (D.Vt.2000) (awarding attorneys' fees to FCA relator for all relator's requested hours, including successful settlement efforts); *Davis v. Catholic Univ. of Am.,* No. 99–1153, 1999 WL 813663, *6, 1999 U.S. Dist. LEXIS 15654, at *18–19 (D.D.C. Aug. 31, 1999) (Urbina, J.) (awarding attorneys fees to civil rights plaintiff for time spent on successful settlement efforts). *Cf. Cobell v. Norton,* 407 F.Supp.2d 140, 156 (D.D.C.2005) (Lamberth, J.) (refusing to compensate plaintiffs in *interim* fee award for unsuccessful settlement and court-ordered mediation efforts).

49. *Cooper* forecloses relator's reliance on *Environmental Defense Fund.* (*See* Reply to HII's Opp'n [957] at 23.) The Court of Appeals read this earlier decision as having "apparently" included travel time in a fee award without actually deciding the issue. 24 F.3d at 1417.

[957] at 23 & n. 37.) Yet other courts in this Circuit have read *Cooper* as a more definitive statement. *See, e.g., Doe v. Rumsfeld,* 501 F.Supp.2d 186, 193 (D.D.C. 2007) (Sullivan, J.) ("Travel [ ] time is supposed to be compensated at half the attorney's hourly rate."); *Blackman v. District of Columbia,* 397 F.Supp.2d 12, 15 (D.D.C. 2005) (Friedman, J.) ("In this circuit, travel time generally is compensated at no more than half the attorney's appropriate hourly rate.").[50] This Court will follow suit and will compensate travel time at half counsel's standard billing rates.[51]

### e. Clerical Work

At various times, relator's counsel and paralegals performed clerical tasks, and relator's fee petition includes some time entries embracing these tasks. A prevailing party entitled to "reasonable" attorneys' fees may not recoup fees for time professionals spend on purely clerical tasks because such tasks "ought to be considered part of normal administrative overhead." *Michigan v. United States EPA,* 254 F.3d 1087, 1095–96 (D.C.Cir. 2001). *Cf. Missouri v. Jenkins,* 491 U.S. 274, 288 n. 10, 109 S.Ct. 2463, 105 L.Ed.2d 229 (1989) ("Of course, purely clerical or secretarial tasks should not be billed at a paralegal rate, regardless of who performs them."). Though paralegals, like attorneys, should be compensated at their mar-

ket rates, they may only recover fees for services that are legal in nature, *Cobell,* 407 F.Supp.2d at 156, such as "factual investigation, locating and interviewing witnesses; assistance with depositions, interrogatories and document production; compilation of statistical and financial data; checking legal citations; and drafting correspondence," *Jenkins,* 491 U.S. at 288 n. 10, 109 S.Ct. 2463.

Relator insists the clerical duties that appear in his counsel's billing statements are compensable because they "requir[ed] familiarity with the documents, case, and issues." (Reply to BHIC and HUK's Opp'n [960] at 11.) He points to a supplemental declaration from attorney Davidson, who claims that it is customary in the District of Columbia to bill clients for clerical tasks performed by paralegals, and that "much of the 'clerical work' . . . of which [defendants] complain[ ] is not clerical at all." (*See* Davidson Supplemental Decl. ¶¶ 32–35, Ex. 2 to Reply to HII's Opp'n [957].)

Because the law in this Circuit is to the contrary, however, neither custom nor post-facto rationalizations will render clerical tasks compensable. The Court recognizes that certain seemingly clerical tasks—such as quality checking and otherwise preparing documents for production, (*see, e.g.,* 5/24/2006 Tillotson, 5/25/2006 Tillotson, 6/1/2006 Tillotson)—necessarily in-

---

50. *Cf. In re Segal (Segal Fee Application ),* 145 F.3d 1348, 1353 (D.C.Cir., Spec.Div.1998) (in fee application under Ethics in Government Act, travel expenses not reimbursable absent showing that use of local counsel to accomplish task was not feasible); *Cobell v. Babbitt,* 188 F.R.D. 122, 127 (D.D.C.1999) (Lamberth, J.) (refusing to include travel time in sanctions award of reasonable attorneys' fees and expenses incurred due to defendants' failure to obey court's orders).

51. Due to relator's counsel's practice of block billing, the Court cannot perform this calculation with precision. In his supplemental dec-

laration, Bell proposes reductions the Court may use should it choose to compensate travel time at 50% of hourly rates. (*See* Bell Supplemental Decl. ¶ 21 & Ex. E–7, Ex. 1 to Reply to HII's Opp'n [957].) Though Bell has not addressed all time entries involving travel, his calculations appear reasonable given the destinations involved, and the Court will apply them consistently to entries involving travel to those destinations. For local travel and for destinations for which Bell has not proposed travel time reductions, the Court will make reasonable calculations.

volve, or are at least rendered more efficient by, an in-depth understanding of the underlying legal issues. But the Court simply cannot fathom how, for example, telephone calls to obtain corporate addresses can be deemed "legal" in nature.[52] (*See, e.g.,* 6/21/95 FHQ; 6/23/95 FHQ; 6/26/95 FHQ.) Similarly, the notion that filing a change of address notice constitutes substantive legal work strains credulity. (*See* 4/28/2006 MMB.) The Court will not award fees for such administrative housekeeping.

Defendants have not attempted to identify all time entries that include clerical tasks, and they argue that the Court should either require relator to expunge them from his petition or discount all paralegal fees by 50 percent. (BHIC and HUK's Opp'n [948] at 10.) Relator has declined the former invitation and insists the latter request is excessive. (Reply to BHIC and HUK's Opp'n [960] at 11–12.) Even if the Court were to examine coun-

sel's time entries line by line, their practice of block billing would still obscure the true number of hours devoted to clerical work. In the course of preparing this Opinion, the Court has reviewed many of relator's time entries, and it is convinced that clerical tasks occupied only a very small portion of the hours billed by attorneys and a slightly larger portion of those billed by paralegals. Based on these observations, the Court will discount all attorney hours by one-half percent and all paralegal hours by five percent to ensure the fee award does not include compensation for clerical tasks.

### f. Non–Prevailing Claims[53]

While relator achieved a stunning victory on the claims litigated at trial, this Court had previously dismissed several other claims, which were not submitted to the jury.[54] Specifically, it adopted Magistrate Judge Facciola's ruling that this Court had personal jurisdiction over HUK

---

**52.** *Cf. United States ex rel. LeFan v. Gen. Elec. Co.,* 00–222, 2008 WL 152091, **3–4, 2008 U.S. Dist. LEXIS 3020, at * 12 (W.D.Ky. Jan. 15, 2008) ("While some of the billed tasks, such as reviewing and organizing documents and preparing binders for witness interviews may appear clerical, the Court accepts the Relators' argument that these tasks had to be performed by an attorney or paralegal familiar with facts and law of the case.").

**53.** Defendants cite *Copeland v. Marshall* for the proposition that "no compensation should be given for hours spent litigating *issues* on which plaintiff did not ultimately prevail," *see* 641 F.2d at 902 (emphasis added), and on this basis, they argue that hours devoted to relator's unsuccessful pursuit of grand jury materials protected by Federal Rule of Criminal Procedure 6(e) are not compensable. (HII's Opp'n [949] at 14–15.) Elsewhere in its decision, however, the Court of Appeals made clear that only non-prevailing claims are non-compensable. *See* 641 F.2d at 891–92 & n. 18 ("no compensation should be paid for time spent litigating *claims* upon which the party seeking the fee did not ultimately prevail")

(emphasis added). This reading is in harmony with the Court of Appeals' subsequent holding that a petitioner may seek fees for hours "expended in pursuit of a successful resolution of the case in which fees are being claimed." *See Nat'l Ass'n of Concerned Veterans,* 675 F.2d at 1335.

Parties often proceed under more than one legal theory, or seek to acquire supporting evidence from more than one source. *See Copeland,* 641 F.2d at 892 n. 18. Generally, some efforts succeed, while others fail, but *all* are clearly "expended in pursuit of a successful resolution of the case." *See Nat'l Ass'n of Concerned Veterans,* 675 F.2d at 1335. Relator failed to secure a modification of the protective order that would have allowed him to use grand jury testimony adduced in the prior criminal case, but his counsel's efforts in this vein were directed toward successful resolution of the *qui tam* action. Accordingly, they are compensable.

**54.** HII also argues that no work performed in connection with relator's claims on Contracts 29 and 07 is compensable because: 1) this Court lacked jurisdiction to hear them, as

**32**

only as to Contract 20A, (Mem. & Order of Mar. 6, 2007[618]), and it dismissed all claims against Bill L. Harbert on statute of limitations grounds, (Order of May 4, 2007[854], at 3). Defendants assert that relator's fee petition improperly includes time devoted to pursuit of these failed claims. (BHIC and HUK's Opp'n [948] at 5–8.); *see Copeland,* 641 F.2d at 891–92 & n. 18 ("no compensation should be paid for time spent litigating claims upon which the party seeking the fee did not ultimately prevail").

Relator has acknowledged that his original fee petition did include some hours devoted solely to his claims against Bill Harbert, and Bell has itemized the time entries now conceded as non-compensable. (*See* Reply to BHIC and HUK's Opp'n [960] at 10; Bell Supplemental Decl. ¶ 25, Ex. 1 to Reply to HII's Opp'n [957].) To the extent defendants seek to exclude time spent on matters involving Bill Harbert *and* other defendants, the Court finds this time is compensable. Plaintiffs alleged an overarching conspiracy to rig bids on government contracts of which Harbert was a ringleader. (*See, e.g.,* Order of Mar. 6, 2007[613] at 12.) Their claims against Harbert and against the present defendants were "part and parcel of one matter"—those against Harbert were by no means "fractionable." *See Lamphere v. Brown Univ.,* 610 F.2d 46, 47 (1st Cir. 1979). To illustrate their objection, defendants describe counsel's preparation of discovery requests propounded to Harbert and others. (*See* BHIC and HUK's Opp'n [948] at 5–6.) Even leaving aside relator's claim that he sent "similar or identical written discovery [ ] to all parties," (*see* Reply to BHIC and HUK's Opp'n [960] at 10), Harbert's responses to relator's discovery demands almost certainly yielded material helpful to plaintiffs' case against the other defendants.[55] Hence, the Court is satisfied with Bell's redactions.

■ As to relator's dismissed claims against HUK, defendants contend that dis-

relator was not the original source of the information on which they were based; and 2) these claims did not relate back to the date of relator's original complaint and thus were time-barred. (HII's Opp'n [949] at 15–16.)

This Court has previously weighed and rejected both these arguments—repeatedly. (*See* Mem. Op. & Order of Mar. 14, 2007[715] (denying HII and HC's motion *in limine* to preclude relator from participating in all phases of trial concerning contracts 07 and 29); Order of May 4, 2007[854] (denying HII and HC's motion to dismiss relator's claims on Contracts 07 and 29 due to lack of subject matter jurisdiction and for reconsideration of ruling on relator's status as an original source); Mem. Op. & Order of Mar. 6, 2007 (sustaining relator's objection to magistrate judge's recommendation that his Contract 07 and 29 claims were time-barred); Mem. Op. of June 23, 2008[964] (denying HII's motion for judgment as a matter of law, based on statute of limitations, as to relator's Contract 07 and 29 claims).)

HII now raises these issues yet again in a rather unusual procedural context—its opposition to relator's fee petition. Even if these questions are properly before the Court, which it doubts, the Court sees no infirmity in the reasoning of its previous rulings on them. Time expended litigating relator's Contract 07 and 29 claims is compensable.

**55.** Defendants also claim that "a review of the deposition of Billy Harbert demonstrates that it clearly was taken solely with respect to issues related to Bill Harbert." (BHIC and HUK's Opp'n [948] at 7.) They have not affixed this deposition to their opposition, however, and do not point to its location elsewhere in the record, so the Court cannot review the deposition for itself. Without doing so, it can only reason that issues "related to Bill Harbert" are not necessarily unrelated to other defendants—particularly in a conspiracy case such as this one. Moreover, relator insists the younger Harbert was deposed "to determine if he knew anything about the conspiracy," and to learn details of "meetings he may have had with co-conspirators and other witnesses beyond his father." (Reply to BHIC and HUK's Opp'n [960] at 10.) This explanation is perfectly reasonable,

covery requests directed to HUK and time counsel expended on the personal jurisdiction issue should not be compensable in full. (*See* BHIC and HUK's Opp'n [948] at 7–8.) Defendants misapprehend the law. The Court of Appeals in *Copeland v. Marshall* did, at one point, state that "no compensation should be given for hours spent litigating *issues* on which plaintiff did not ultimately prevail." *See* 641 F.2d at 902 (emphasis added). But the opinion as a whole leaves the court's position quite clear: "no compensation should be paid for time spent litigating *claims* upon which the party seeking the fee did not ultimately prevail." *Id.* at 891–92 (emphasis added). A reduction in fee is appropriate only when the non-prevailing claims " 'are truly fractionable.' " *Id.* at 892 n. 18 (quoting *Lamphere v. Brown Univ.,* 610 F.2d 46, 47 (1st Cir.1979)). This interpretation accords with positions taken by other Circuits.[56] It also accords with common sense: even efforts directed to non-prevailing issues may be "expended in pursuit of a successful resolution of the case." *See Nat'l Ass'n of Concerned Veterans,* 675 F.2d at 1335.

The Supreme Court's language in *Hensley* echoes this standard. There, the Court indicated that the lodestar should be adjusted downward where the plaintiff "fail[s] to prevail on claims that were *unrelated* to the claims on which he succeeded." 461 U.S. at 434, 103 S.Ct. 1933 (emphasis added). It explained:

> In some cases a plaintiff may present in one lawsuit distinctly different claims for relief that are based on different facts and legal theories. In such a suit, even where the claims are brought against the same defendants ... counsel's work on one claim will be unrelated to his work on another claim. Accordingly, work on an unsuccessful claim cannot be deemed to have been "expended in pursuit of the ultimate result achieved."

*Id.* at 434–35, 103 S.Ct. 1933 (citation omitted). Here, plaintiffs alleged that HUK participated in an overarching conspiracy involving Contracts 20A, 29, and 07. (*See, e.g.,* Order of Mar. 6, 2007[613].) The Contract 20A claims on which they succeeded were closely intertwined with the Contract 29 and 07 claims on which they failed. While these latter claims did involve some "different facts," plaintiffs developed and presented these same facts to the jury in pursuing claims against the other defendants, HUK's co-conspirators, as to Contracts 29 and 07.

Where, as here, a "plaintiff has obtained excellent results, his attorney should recover a fully compensatory fee," and the award "should not be reduced simply because the plaintiff failed to prevail on every contention raised in the lawsuit." *Hensley,* 461 U.S. at 435, 103 S.Ct. 1933. The Court will make no reductions based on the dismissal of relator's Contract 29 and 07 claims against HUK.

### g. Summary

For the reasons explained above, the Court will not award fees for the following classes of time entries: hours devoted to

---

and the Court will compensate relator's counsel for time devoted to preparing for and taking the deposition.

**56.** *See, e.g., Uniroyal v. Goodrich Tire Co. v. Mut. Trading Corp.,* 63 F.3d 516, 526 (7th Cir.1995) ("we are not prepared to link our definition of 'reasonable' to whether the fees are incurred in pursuit of a successful task"); *Grant v. Martinez,* 973 F.2d 96, 99 (2d Cir.

1992) ("[t]he relevant issue ... is not whether hindsight vindicates an attorney's time expenditures, but whether, at the time the work was performed, a reasonable attorney would have engaged in similar time expenditures"); *Blum v. Witco Chem. Corp.,* 829 F.2d 367, 378 (3d Cir.1987) ("mere failure of certain motions or the failure to use depositions is insufficient to warrant a fee reduction under *Hensley* ").

securing immunity from prosecution for relator, tasks arising from his ongoing employment at J.A. Jones, research and other efforts to obtain his relator's share, and clerical tasks performed by attorneys and paralegals. For the first three classes, the Court has reviewed the parties' submissions and has made reasonable reductions. Appendix II to this Opinion itemizes these deductions. Percentage reductions for clerical tasks appear in Appendix III, along with other subtractions for broad defects in the fee petition.

## 2. Broader Defects

Defendants have also identified several pervasive flaws in relator's fee petition, on which basis they seek across-the-board, percentage reductions in the lodestar.[57] (*See* BHIC and HUK's Opp'n [948] at 11–18; HII's Opp'n [949] at 16–30.)

### a. Inadequate Records

As noted above, a fee petitioner must provide sufficient support for his claim to

"permit the District Court to make an independent determination whether or not the hours claimed are justified." *Nat'l Ass'n of Concerned Veterans.*, 675 F.2d at 1327. Defendants contend relator has failed at this endeavor in at least two respects: 1) counsel's time entries consistently refer to research, meetings, and telephone conferences without specifying their subject matter; and 2) counsel have followed the practice of block billing.[58] (*See* BHIC and HUK's Opp'n [948] at 11–13; HII's Opp'n [949] at 23–27.)

### i. Vague Descriptions

First, defendants cite several examples of time entries for which counsel's narrative descriptions are so vague as to preclude meaningful review. They point to two of Robert Bell's time entries from March 2001, in which he billed for "telcon Carolyn Mark" and "telcon Carolyn Mark re: tactics." (*See* HII's Opp'n [949] at 24 (citing 3/13/2001 RBB; 3/14/2001 RBB).)

---

**57.** Comprehensive deductions are a well-accepted remedy for the widespread defects defendants allege. *See, e.g., Role Models Am., Inc. v. Brownlee*, 353 F.3d 962, 973–74 (D.C.Cir.2004) ("A fixed reduction is appropriate given the large number of entries that suffer from one or more of the deficiencies we have described."); *Cobell v. Norton*, 407 F.Supp.2d 140, 166 (D.D.C.2005) (Lamberth, J.) (collecting cases).

**58.** BHIC and HUK also object to counsel's use of labels, e.g., "Witness A," to identify individuals in their time records. Relator explains in his reply that these labels are designed to protect attorney-client privilege and/or attorney work product. (Reply to HII's Opp'n [957] at 15.) The Court finds this claim plausible, and in any event, the problematic labels appear so infrequently that their impact on the Court's ability to subject the records to meaningful review is negligible.

Further, defendants contend that counsel's time records are internally inconsistent: where one attorney bills time for a conference with another, his supposed conversation part-

ner's time entry for the day fails to mention this discussion. (*See* BHIC and HUK's Opp'n [948] at 11–12.) Given counsel's consistent practice of block-billing, such discrepancies would be unsurprising. Yet defendants' marquee example is ill-chosen. They cite Howard Shapiro's time entry for May 25, 2006, which lists "meet with Ms. O'Connor," but the quoted language to which they refer— "confer with O'Connor"—appears in the subsequent time entry, for May 30. (*Id.; see* 5/26/2006 HS; 5/30/2006 HS.) O'Connor's time entries for those days reflect a "conference with team re various issues" which Shapiro may well have attended, (5/26/2006 JMO), and a "confer[ence] with Ms. Terry and Mr. Shapiro re various issues," (5/30/2006 JMO). These entries are impenetrably vague, but they do match up. To the extent the other examples defendants relegate to a footnote fail to correspond, the Court considers this inconsistency an outgrowth of block billing, addressed below, that does not require separate discussion.

Even more egregiously meaningless are Michael Sturm's time entries for "review and analyze issues re development." (*See id.* (citing 11/2/1998 MLS; 11/3/1998 MLS; 5/27/1999 MLS).) Similarly, Jennifer O'Connor's time entry for November 8, 2006 includes the wholly uninformative phrases "confer with Mr. Bell, Mr. Connell re strategy questions" and "confer with Mr. Shapiro re same." (*See* BHIC and HUK's Opp'n [948] at 13 (citing 11/8/2006 JMO).)

As defendants observe, these entries and others in relator's petition are *virtually identical* to the sorts of descriptions this Court and others have repeatedly deemed inadequate:

> For example, many of plaintiffs' time records "provide little or no reference to the substance of the work claimed." Entries such as: "research read cases; searched Westlaw"; "meet with attys"; "prepare for trial"; [and] "further trial preparation and document review" . . . are so vaguely generic that the Court can not determine with certainty whether the activities they purport to describe were . . . reasonable.
>
> . . . Other time records make, "no mention . . . of the subject matter of a meeting, telephone conference or the work performed during hours billed." Entries illustrative of this particular problem include: "conference call with Dennis & E. Worliss"; "telephone call to KH re: general update"; "call for Plaintiffs"; "background research for RD"; "confce call and follow-ups."

Similarly infirm are those time entries containing "vague and cryptic designations," such as: "rvw & respond to email inquiry from A. Jarett"; "confer w/RD"; "Discussed strategy w/Dennis, Thad, Bob & Keith"; "Met w/Keith & Bob re: strategy"; "conference with Elliott Levitas regarding strategy and legal issues"; "confer w/RD & RP re: legal strategy." *Cobell,* 407 F.Supp.2d at 158–59 (citations omitted). *See also Hensley,* 461 U.S. at 437 n. 12, 103 S.Ct. 1933 ("at least counsel should identify the general subject matter of his time expenditures"); *In re Meese,* 907 F.2d 1192, 1204 (D.C.Cir. Spec.Div.1990) (time entries in which "no mention is made of the subject matter of a meeting, telephone conference or the work performed during hours billed" are "not adequately documented"); *In re Olson,* 884 F.2d 1415, 1428–29 (D.C.Cir. Spec.Div.1989) (decrying time entries "that wholly fail to state, or to make any reference to the subject discussed at a conference, meeting or telephone conference" as well as generic references to "strategy" conferences); *Kennecott Corp. v. EPA,* 804 F.2d 763, 767 (D.C.Cir.1986) (per curiam) (citing "[a]nalysis of final NSO regulations; first joint petition for review; research" as too generalized to meet fee applicant's burden). The resemblance is uncanny.

Relator characterizes defendants' examples as having been "cherry-picked" from among otherwise "sufficiently detailed" time entries.[59] (*See* Reply to HII's Opp'n [957] at 13–14.) Had the Court not examined relator's counsel's time entries at some length, it might give credence to this

---

59. To bolster this rebuttal, he relies on declarations from attorneys Braga and Davidson. (*See* Davidson Supplemental Decl. ¶¶ 7–8 and Braga Supplemental Decl. ¶ 2, Exs. 2, 3 to Reply to HII's Opp'n [957].) But Davidson's assertion that "courts [do not] routinely expect more detail than that provided" is demonstrably incorrect. (*See* Davidson Supple-

mental Decl. ¶ 8.) His assurance that "[u]nder these circumstances . . . the Court . . . would know precisely what activities counsel have undertaken" does not render counsel's cryptic time entries more intelligible to *this* Court. (*See id.* ¶ 7.) Braga's declaration is similarly unpersuasive.

argument. Instead, its review of the entire fee application confirms that counsel's time records are simply rife with ambiguous and nugatory entries.[60] Michael Sturm, for example, has billed time for "review[ing] and analyz[ing] issues re strategy" no fewer than *sixteen* times. (*See* 6/26/1995 MLS; 8/14/1995 MLS; 8/30/1995 MLS; 9/8/1995 MLS; 1/19/1996 MLS; 2/14/1996 MLS; 2/28/1996 MLS; 6/25/1997 MLS; 2/26/1998 MLS; 5/7/1998 MLS; 2/25/1999 MLS; 5/28/1999 MLS; 6/15/1999 MLS; 6/24/2999 MLS; 9/8/1999 MLS; 9/13/1999 MLS.) Other gems include "reviewing and revising memorandum to file; research on bid-rigging cases," (1/7/2000 RBB), for which relator's counsel seek $650.00; "review indices, docs; confer with G. Reece," (6/20/2006 MMB), for which counsel billed $1,295.00; and "prepare for trial," (3/14/2007 CR; 3/15/2007 CR; 3/16/2007 CR; 3/17/2007 CR; 3/18/2007 CR), for which counsel charged $30,021.50.

The relevant question is not *whether* the lodestar should be reduced due to counsel's impenetrable narratives, but by *how much*. Not all counsel's time entries exhibits such flaws. Indeed, some far exceed the minimum level of detail needed for meaningful analysis. And as relator urges, certain vague descriptions acquire greater substance when considered in context. *See Heard v. Dist. of Columbia,* No. 02–296, 2006 WL 2568013, \*\*14–16, 2006 U.S. Dist. LEXIS 62912, at \*44–46 (D.D.C. Sept. 5, 2006) (Kotelly, J.) (surrounding

entries must be taken into account in reviewing allegedly vague time entries). *Cf. Cobell,* 407 F.Supp.2d at 159 (declining to "cross-reference each of plaintiffs' voluminous time entries to compensate for [counsel's] failure to more fully describe his activities in the first instance" because this "responsibility rests squarely with plaintiffs"). For example, on one of the five consecutive days for which Colin Rushing billed only "prepare for trial," (3/14/2007 CR), Bell's time record indicates he met for some period of time with Rushing and others to discuss "trimming [the] case," (3/14/2007 RBB), and Cedarbaum's entry for that day notes Rushing was present for a meeting regarding "demonstratives," (3/14/2007 JC). It seems unlikely, however, that these two meetings consumed the entire thirteen hours Rushing billed that day. Moreover, contextual analysis saves only a small portion of the problematic time entries.

Accordingly, the Court agrees with defendants that counsel's time entries' ambiguity warrants an across-the-board reduction. Based on the Court's review of the full fee application, it considers 10 percent to be reasonable and appropriate.[61]

### ii. Block Billing

Defendants also criticize counsel's use of block billing—that is, their time entries aggregate all tasks performed for this case on a given day, with no indication as to how much time counsel spent on each individual task.[62] As our Court of Appeals has

---

**60.** *Cf. United States ex rel. Abbott–Burdick v. Univ. Med. Assocs.,* No. 96–1676, 2002 WL 34236885, \*16, 2002 U.S. Dist. LEXIS 26986, at \*50 (D.S.C. May 23, 2002) ("while the fee application may contain some vague entries, the Court's review of the entire fee application gives it ample information to determine the reasonableness of the request").

**61.** *Cf. Role Models Am., Inc.,* 353 F.3d at 973 (reducing compensation by 50 percent due to

"inadequate documentation, failure to justify the number of hours sought, inconsistencies, and improper billing entries").

**62.** For example, on October 2, 2006, Jennifer O'Connor billed 13.8 hours in this case. Her time entry reads:

Prepare for Anderson prep session, participate in same; prepare for light prep session, participate in same; conf Ms. Mark et

observed, block billing "make[s] it impossible for the court to determine, with any degree of exactitude, the amount of time billed for a discrete activity," leaving the court "to estimate the reduction to be made because of such insufficient documentation." *In re Olson*, 884 F.2d at 1428–29. *See also Role Models Am., Inc.*, 353 F.3d at 971 (time records that "lump together multiple tasks[ ] mak[e] it impossible to evaluate their reasonableness"). In *Cobell*, this Court refused to "undertake the futile task of separating plaintiffs' block entries into their constituent tasks and apportioning a random amount of time to each." 407 F.Supp.2d at 160. Instead, it "exercise[d] the discretion accorded it by

the *Hensley* Court and reduce[d] the time requested." *Id.* (citing *Hensley v. Eckerhart*, 461 U.S. 424, 437 n. 12, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983)).[63]

Relator attempts to justify his counsel's block time entries by turning again to fellow attorneys' declarations: Davidson contends block billing is "[t]he most prevalent practice among firms in the Washington, D.C. marketplace," and Braga characterizes it as "standard fare in today's billing world." (Davidson Decl. ¶ 12, Ex. 5 to Mot. for Fees, Costs, and Expenses [930]; Braga Supplemental Decl. ¶ 2, Ex. 3 to Reply to HII's Opp'n [957].) Davidson also insists that more truly con-

al. re various strategic issues, emails Mr. Reece and Ms. Moore re Nagel issues, review correspondence from defendants re discovery issues, email Mr. Lang re Hemler interview or deposition, finalize and send letter to Mr. Murphy, emails Mr. Cedarbaum re Bilhar motion to compel, emails to Archer deposition, review Wendorff letters of request, review draft protective order and correspondence re same, review email to Ms. Mark re coordination.
(10/2/2006 JMO.)

63. Another court in this district has looked on block billing with a more friendly eye. *See Smith v. District of Columbia*, 466 F.Supp.2d 151 (D.D.C.2006) (Kessler, J.) In *Smith*, Judge Kessler observed that "[n]one of the factors examined and relied upon [by our Court of Appeals in issuing its 'stinging criticism' of block-billing] in *Role Models* exist in this case." *Id.* at 157. Unlike *Role Models*, and much like the instant case, *Smith* was exceedingly complex, involving "a very substantial motion to dismiss," "a substantial summary judgment motion, and post-trial motions," as well as "extremely significant" discovery. *Id.* More critically, however, Judge Kessler compared the underlying fee petitions:

While there is no question that block billing does, as the Court of Appeals emphasized in *Role Models*, make it difficult to determine the accuracy and reasonableness of billing entries, the use of such entries in this case was not unduly excessive[,] nor did the entries in this case[ ] suffer from the inade-

quate description concerns voiced in *Role Models* . . . .
*Id.* at 158. By contrast, counsel here *routinely* documented their time in daily blocks, and as explained above, *see supra* part III.B.2.a.i, their time entries most certainly "suffer from [ ] inadequate description concerns," *see* 466 F.Supp.2d at 158. Thus, *Role Models* offers far more apt guidance in the instant case than it did in *Smith*.

This Court heartily agrees with Judge Kessler that "[i]n examining the fee petition and evaluating the reasonableness of the hours claimed, it is essential for the trial Court to be practical and realistic about how lawyers actually operate in their day-to-day practice." *Id.* Indeed, like Judge Kessler, it does not propose that "[w]hen a lawyer writes, for example, that she spent six or eight hours in one day 'researching and drafting' a brief[,]" she should be required to "itemize every case she looked up or every paragraph she labored over." *Id.* But where during that six or eight hours, the lawyer also attends a meeting, makes telephone calls, reviews (unidentified) documents, and responds to and drafts emails, this Court believes she *can* and *should* distinguish how much time she spent on these various, disparate tasks. Judge Kessler predicted "two undesirable results"—"fee petitions will be higher, and [ ] lawyers will [ ] waste precious time doing menial clerical tasks"—would follow from more detailed time-keeping. *Id.* This Court, however, is sanguine that existing technology and a little training can forestall both.

temporaneous time-keeping would be "burdensome" and "disruptive to the flow of work involved." (Davidson Supplemental Decl. ¶ 8, Ex. 2 to [957].)

Such platitudes fail the common sense test. Wilmer Hale's time records clearly reveal a policy of billing in six-minute increments, while Wiley Rein's counsel seem to have billed in fifteen-minute increments. In several instances, an individual attorney performed only one task on this case in a given day and billed only six or fifteen minutes. (*See, e.g.,* 6/30/2006 HS (0.10 hours billed for "confer with Ms. O'Connor"); 12/9/1998 RBB (0.25 hours billed for "telephone call with Mr. Dillon re status of investigation").) Thus, counsel were clearly *able*, under both firms' existing record-keeping systems, to document the time spent on individual tasks. The Court acknowledges that more consistently precise time-keeping might prove somewhat disruptive to work-flow, but in a fee-shifting case, it is necessary to facilitate subsequent judicial review. Most saliently, counsel's time entries are riddled with conferences, telephone calls, and meetings involving multiple professionals, but it is impossible to determine how long these conclaves lasted—or, as noted above, what subject matter they involved. Without such basic details, the Court simply cannot ascertain whether this time was reasonably expended.

Because relator's counsel's time records "lump together multiple tasks, making it impossible to evaluate their reasonableness," this Court finds that a wholesale reduction in the lodestar is appropriate. *See Role Models Am., Inc.,* 353 F.3d at

971. It will thus reduce the tentative lodestar by a further 10 percent.[64]

### b. Unnecessary Work

Defendants next contend that relator's counsel engaged in unnecessary work, gratuitously inflating the fee petition. (BHIC and HUK's Opp'n [948] at 13–14.) Such superfluous time is not compensable. *See Hensley,* 461 U.S. at 434, 103 S.Ct. 1933 (requiring petitioner "to exclude from [his] fee request hours that are excessive, redundant, or otherwise unnecessary"); *Laffey v. Northwest Airlines, Inc.,* 572 F.Supp. 354, 369 (D.D.C.1983) (Robinson, C.J.) ("Counsel is not free ... to exercise its judgment in a fashion that unnecessarily inflates the losing party's fee liability").

Specifically, defendants claim that "[o]nce the government intervened, there was no need for the Relator to continue to amend his complaint, merely asserting the same claims as those contained in the government's complaints." (BHIC and HUK's Opp'n [948] at 13.) Hence, they argue, the Court should order relator's counsel to identify all time entries associated with these amendments and should exclude them from the fee award. (*Id.* at 14.)

This demand fails for two reasons. First, defendants again mistake the governing "reasonableness" standard for one of *necessity. See Hensley,* 461 U.S. at 433, 103 S.Ct. 1933 (lodestar calculated based on "hours reasonably expended on the litigation"). Even an unnecessary amendment might yet be reasonable. Second, in each of the three instances in which relator

---

**64.** *Cf. Role Models Am., Inc.,* 353 F.3d at 973 (reducing compensation by 50 percent due to "inadequate documentation, failure to justify the number of hours sought, inconsistencies, and improper billing entries"); *Reyes v. Nations Title Agency of Ill., Inc.,* No. 00–7763, 2001 WL 687451, *2, 2001 U.S. Dist. LEXIS 8446, at *6 (N.D. Ill. June 19, 2001) (reducing block-billed entries by 10 percent); *Oberdorfer v. Glickman,* No. 98–1588, 2001 WL 34045732, *6, 2001 U.S. Dist. LEXIS 14677, at *18 (D.Or. Sept. 14, 2001) (declining to allow fees for block-billed entries).

amended his complaint after the government had intervened, Magistrate Judge Facciola or this Court authorized the amendment. (*See* Order of Mar. 9, 2006[232] (magistrate judge granted relator's motion for leave to file a third amended complaint); Scheduling Order of Apr. 10, 2006[253] (magistrate judge ordered that parties comply with April 24, 2006 deadline for filing amended complaints); Mem. Op. & Order of Mar. 6, 2007[620] (this Court granted relator's motion for leave to file fifth amended complaint).) The Court will not deny compensation for work it authorized. *Cf. Wilkett v. ICC*, 844 F.2d 867, 874 (D.C.Cir.1988) ("[a]ny work ordered by this Court is [ ] compensable").

### c. Inefficiencies

Next, defendants point to sundry inefficiencies reflected in counsel's time records that fall into two broad categories. Their "too many lawyers" complaints include: (1) an excessive number of meetings and conference calls, many of uncertain duration, involving multiple senior personnel; (2) assignment of a *per se* unreasonable number of different time-keepers to the case; and (3) assignment of too many high-billing partners to the case. Their "too many hours" complaints include: (1) excessive time spent drafting relator's original complaint; (2) an unreasonable amount of time devoted to basic research; and (3) plaintiffs' continued agreements to seal. The Court will briefly examine each purported inefficiency and will then determine whether, in light of its findings, an across-the-board reduction for "excessive, redundant,

or otherwise unnecessary" hours is appropriate. *See Hensley*, 461 U.S. at 434, 103 S.Ct. 1933.

### i. Too Many Lawyers

First, defendants highlight several "team meetings" that illustrate their concern over the innumerable, multi-participant meetings and conference calls that litter counsel's time records. On December 12, 2006, for example, no fewer than eleven people attended a "team meeting." (*See* 12/12/2006 MB; 12/12/2006 AB; 12/12/2006 RBB; 12/12/2006 MMB; 12/12/2006 JC; 12/12/2006 MG; 12/12/2006 AFM; 12/12/2006 JMO; 12/12/2006 GR; 12/12/2006 HS; 12/12/2006 STS.) Howard Shapiro's time entry indicates the meeting lasted 0.6 hours, and Stephen Smith's time entry reveals it pertained to that day's deposition of plaintiffs' expert, Terry Musika. (*See* 12/12/2006 HS; 12/12/2006 STS.) The price tag: $4,885.00.

Relator argues "such interactions and collaboration" were necessary in "a case as complex and fast-paced as this one." (Reply to BHIC and HUK's Opp'n [960] at 14.) Indeed, "conferences between attorneys to discuss strategy . . . are an essential part of effective litigation" and facilitate "proper supervision and efficient staffing." *McKenzie v. Kennickell*, 645 F.Supp. 437, 450 (D.D.C.1986) (Parker, J.). This Court recognizes the value of information-sharing and dialogue [65] but it agrees with defendants that "neither preparation for the defense of [Musika's] deposition nor debriefing after[ward] . . .

---

**65.** On this same note, attorney Davidson deems such conferences reasonable "because it is not at all uncommon on tight discovery schedules to divide work among different attorneys, necessitating their participation in group discussions to share their knowledge." (Davidson Supplemental Decl. ¶ 11, Ex. 2 to Reply to HII's Opp'n [957] at 6.) Division of labor, however, does not necessarily require

that each participant have complete knowledge of each stage in the overall process. This defeats the very purpose of dividing work—improving efficiency through specialization. Assigning eleven different attorneys to work on one deposition, however crucial the witness, can hardly be characterized as efficient.

justifies" billing $5,000.00 for a thirty-six minute period.[66] (*See* BHIC and HUK's Opp'n [948] at 15.)

Similarly, the Court cannot condone counsel's June 2006 conference calls with BHIC's counsel. On June 23, four attorneys participated in a teleconference with June Ann Sauntry regarding follow-up questions to defendants' discovery responses. (6/23/2006 MMB; 6/23/2006 JC; 6/23/2006 JMO; 6/23/2006 GR.) Due to counsel's block time entries, the Court cannot ascertain how long this call lasted, but its hourly price tag was a whopping $1,740.00. Four days later, at this same, $1,740.00 per hour rate, these four attorneys conferred by phone again with Sauntry and then held a separate meeting amongst themselves. (6/27/2006 MMB; 6/26/2006 JC; 6/26/2006 JMO; 6/23/2006 GR.)

This troublesome pattern extends to counsel's written work product: *seven* different attorneys worked on relator's fifth amended complaint. (*See, e.g.,* 1/30/2007 JC; 1/31/2007 JC; 1/31/2007 MB; 12/22/2006 AB; 1/30/2006 AB; 12/26/2006 RBB; 1/30/2006 RBB; 11/25/2006 MMB; 1/31/2007 MMB; 12/22/2006 MG; 1/30/2007 MG; 1/30/2007 JMO; 1/31/2007 JMO.) Relator claims seven lawyers' participation was reasonable "because, as the last Complaint filed before trial, various attorneys needed to review it before it was filed to ensure that facts they knew based on their particular areas of expertise on the case were incorporated." (Reply to BHIC and HUK's Opp'n [957] at 14.) This explanation contradicts his justification for the

innumerable "team meetings" that occurred throughout the case: team members shared information so freely and regularly to ensure knowledge would not be compartmentalized. (*See id.*) Furthermore, this Court granted leave to amend "solely for the purpose of curing the 9(b) deficiency ... pertaining to [HC's] involvement in the alleged fraudulent conspiracy." (Mem. Op. & Order of Mar. 6, 2007[620] at 3.) Satisfying this limited mandate did not call for such excessive drafting manpower. Relator explains that he also sought to add additional facts, (*see* Reply to BHIC and HUK's Opp'n [960] at 14 n. 14), but given that relator had *eleven years* to prepare the factual allegations in his fourth amended complaint, the Court finds it difficult to believe seven different drafters were necessary to document any "new" facts. Moreover, while the Court accepts that others must review a drafter's work, drafting by committee is a recipe for inefficiency.

Relator's justification for dispatching three attorneys to certain depositions, also attended by government counsel, is similarly flawed. (*See* Ex. A to Bell Decl., Ex. 2 to Mot. for Fees, Costs, and Expenses [930].) The Court does not dispute that the FCA "contemplates [ ] continued participation by a relator after the government intervenes in a *qui tam* action." *United States ex rel. Abbott–Burdick v. Univ. Med. Assocs.*, No. 2:96–1676–12, 2002 WL 34236885, **14–15, 2002 U.S. Dist. LEXIS 26986, at *47–48 (D.S.C. May 23, 2002). Given relator's status as co-plaintiff with the United States, it was

---

**66.** *Cf. In re North (Reagan Fee Application* ), 94 F.3d 685, 691 (D.C.Cir.Spec.Div.1996) ("Because of the number of attorneys involved, the fees for these meetings aggregate to well over $1,000 per hour. While it may be reasonable for a client facing serious charges to pay the additional costs of having a highly staffed case ... this does not mean that

a petitioner has established the reasonableness of billing such duplication of effort to the public fisc."); *In re North (Bush Fee Application)*, 59 F.3d 184, 191–92 (D.C.Cir. Spec.Div.1995) (deducting hours for "multiple attendance at the same conferences, or production of the same documents").

perfectly reasonable for his counsel to attend depositions, regardless of government counsel's presence. Further, while the Court questions its necessity, it cannot conclude that dispatching two Wilmer Hale attorneys to each deposition was wholly unreasonable. At three, however, it draws the line.[67] More is not always better.

Having perused counsel's records in full, and having studied the examples defendants cite in detail, the Court concludes that too many attorneys were assigned to discrete tasks. In many circumstances, assigning more than one attorney to a task makes eminent good sense. The work may be burdensome and readily divisible, a deadline may be fast approaching, or as the maxim holds, two heads may prove better than one. But relator's counsel, quite simply, went overboard.

Second, HII contends it was *per se* unreasonable for Wilmer Hale to assign fifty-two attorneys and thirty paralegals to this case.[68] (*See* HII's Opp'n [949] at 19.) As they point out, relator's co-plaintiff, the United States, devoted only five attorneys to the case, and they managed to perform substantially the same volume and types of tasks—attending and defending depositions, responding to discovery requests, filing pleadings, and advocating at trial— for which Wilmer Hale needed more than ten times the staff. (*See id.* at 20–21.)

As relator notes, however, HII has not identified specific time entries it believes reflect duplication of effort. (*See* Reply to HII's Opp'n [957] at 13.) Furthermore, in calculating the lodestar, the Court's duty is to ascertain "the number of hours reasonably expended on the litigation," not the number of lawyers reasonably assigned. *See Hensley*, 461 U.S. at 433, 103 S.Ct. 1933; *Donnell v. United States*, 682 F.2d 240, 250 n. 27 (D.C.Cir.1982) ("The issue is not whether [petitioners] used too many attorneys, but whether the work performed was unnecessary.").

Moreover, defendants' attack on the number of Wilmer Hale attorneys who assisted the government with the "overwhelming[ly] demand[ing][ ] discovery" that occurred in this case, (*see* Morgan Decl. ¶ 7, Ex. 1 to Mot. for Fees, Costs, and Expenses [930] ), rings hollow, *see Copeland v. Marshall*, 641 F.2d 880, 904 (D.C.Cir.1980) (en banc) (defendant "cannot litigate tenaciously and then be heard to complain about the time necessarily spent by the plaintiff in response"). Wilmer Hale's ability to leverage additional human resources as the case's demands changed may actually have rendered its representation *more* efficient. Moreover, both partners and associates frequently change firms or move between public and private practice; consequently, one would expect some turnover in assigned personnel over the course of twelve years. Hence, the Court cannot conclude Wilmer Hale's aggregate staffing was *per se* inefficient.

Third, and in the same vein, defendants contend Wilmer Hale's assignment of five different partners—none with prior FCA litigation experience—to the case was un-

---

**67.** For example, Jonathan Cedarbaum's presence at Evangeline Hoover's deposition appears to have been superfluous. His time records reveal no advance preparation, and he appears to have concentrated on the depositions of Alan Hall and BHIC's corporate representative, which he conducted on the same trip to Birmingham. (*See* 10/15– 10/20/2006 JC.)

**68.** Exercising "billing judgment," Bell limited the fee petition to hours billed by 18 lawyers and 3 paralegals. (*See* Bell Decl. ¶¶ 108, 112, Ex. 2 to Mot. for Fees, Costs, and Expenses [930].)

reasonable, leading to inflated billings. (*See* HII's Opp'n [949] at 29–30.) In total, partners Robert Bell (1980 law graduate), Jonathan Cedarbaum (1996), Robert Cultice (1978), Jennifer O'Connor (1997), and Howard Shapiro (1985), billed 7,667.05—or about 31 percent—of the 24,626.5 hours listed in relator's original fee petition. (*See* Exs. B–1, D–1 to Bell Decl., Ex. 2 to Mot. for Fees, Costs, and Expenses [930].) This equates to $4,310,980.00—or about 43 percent—of the $10,014,707.00 in fees sought in that petition. (*See* Exs. B–1, D–1 to Bell Decl.)

Defendants style this objection as one concerning "duplication of work," (*see* HII's Opp'n [949] at 29), and indeed, *Hensley* prescribes exclusion of "redundant" efforts from a fee petition, 461 U.S. at 434, 103 S.Ct. 1933. Yet defendants do not identify any specific areas in which they believe Wilmer Hale's efforts, or those of an individual partner, were truly duplicative of others.[69] Perhaps some of the work performed by the five partners—at $495 per hour and up—might have been delegated to associates with lower hourly rates, but defendants have neither made this argument explicitly nor endeavored to identify examples. The Court finds the previous paragraph's calculations rather troubling: despite the involvement of so many different attorneys and the assignment of associates to the "core" team, five partners' time accounts for nearly *half* the fees relator seeks. Nonetheless, without evidence of duplication, the Court will not speculatively second-guess Wilmer Hale's staffing decisions in the invited manner.

### ii. Too Many Hours

Defendants' first "too many hours" objection concerns relator's original complaint: by their count, counsel devoted 141.50 hours to drafting, reviewing, and revising this document. (HII's Opp'n [949] at 27.) A single sentence encapsulates their argument: "After three years of being involved in the case, it is hard to imagine how Wiley Rein could spend 141.5 hours in drafting a Complaint which thereafter required five successive amendments. . . ." (*Id.*) Relator's counsel's practice of block billing has inflated defendants' figure: attorney time entries listing work on the complaint also include other, unrelated tasks. (*See, e.g.* 6/21/1995 LD; 6/21/2005 CRY.) Further, counsel drafted a thirty-page, factually detailed confidential disclosure statement along with the complaint, preparation of which required document review and privilege considerations. (*See, e.g.,* 6/21/2005 MLS; 6/21/2005 RBB.) Hence, the Court cannot conclude counsel devoted excessive time to drafting the complaint and accompanying disclosure statement. *Cf. Cobell,* 407 F.Supp.2d at 161 (finding excessive 20.7 hours spent "drafting a two-page filing containing no legal analysis or discussion," 122.33 hours spent "drafting a nine-page filing entitled Plaintiffs' Reply to Defendants' Opposition to Setting a Trial Date," and 852.47 hours spent "drafting Appellee's 66–page Response Brief").

Second, defendants contend relator's counsel spent 300.55 hours on "the most basic 'getting up to speed'" research. (HII's Opp'n [949] at 27–28.) Again, this figure is inflated due to counsel's block time entries, and defendants' examples are ill-chosen. They highlight, for instance, that on June 13, 1995, Robert Bell re-

---

**69.** They somewhat confuse the issue by pointing to government counsel's allegedly superior FCA litigation skills, downplaying relator's merely "supporting role" in the litigation, and spotting supposed logical fallacies in Bell's laudatory description of his own value to the case. (*See* HII's Opp'n [949] at 29–30.) Defendants utterly fail to tether any of these cavils to the law, so the Court will not address them.

viewed an ABA publication on the False Claims Act. (*Id.* (citing 6/13/1995 RBB).) Yet the Court suspects that even an attorney with prior FCA experience would wish to ensure his familiarity with recent developments in the field. (*Accord* Braga Supp. Decl. ¶ 3, Ex. 3 to Reply to HII's Opp'n [957] ("it is prudent for even the most expert counsel ... to perform additional research on topics they are otherwise familiar with in order either to confirm their beliefs in the state of the law or to ascertain any changes in the state of the law as a result of recent developments").) On June 12, 1995, Luis de la Torre—in addition to reviewing a memo from a colleague—researched cases interpreting the FCA's statute of limitations and drafted a memo on the subject. (6/12/1995 LD.) Given that timeliness proved a significant and fiercely contested issue in this case, this research seems entirely justified.

More broadly, the Court finds attorney declarant Davidson's pragmatic comments on this point particularly apt:

> Experts in substantive practice areas are still required to conduct "research" (indeed, a lawyer would be negligent if he or she did not conduct "research") to determine the current state of the law[,] and no practitioner would be expected to know all answers to legal questions, even within the practitioner's area of expertise. Moreover, regardless of an attorney's level of expertise, the pertinent authorities need to be referenced and researched when briefing or considering the legal issues in the case. This time will be described as "research." Undertaking "research" does not mean that the attorney involved is undertaking basic research on the substantive law. In my opinion, and in my practice, it is customary for attorneys at all levels to review case law—to do "research"—as it becomes relevant for the task they are performing.

(Davidson Supplemental Decl. ¶ 29, Ex. 2 to Reply to HII's Opp'n [957].) Having reviewed the supposedly offensive time entries, (*see* Ex. 1 to HII's Opp'n [949] ), the Court concludes defendants' objection to counsel's "basic" research is unfounded.

Finally, defendants argue plaintiffs' repeated agreements to extend the sealed period in this case were unreasonable because they unduly prolonged the litigation.[70] (*See* HII's Opp'n [949] at 28–29.)

---

**70.** HII also argues that relator and the government are "solely responsible" for the eleven-year delay in bringing this case to trial and that as a result, "a substantial portion of the attorney hours expended was unreasonable." (HII's Opp'n [949] at 19.) As the Court has already explained, HII's initial proposition is inaccurate. *See supra* part III.A.2. While relator does share *some* responsibility for this case's protracted duration, defendants have identified no evidence of bad faith. *Cf. United States ex rel. Taxpayers Against Fraud v. Gen. Elec. Co.*, 41 F.3d 1032, 1044 (6th Cir.1994) (remanding to district court for further factfinding where some evidence supported defendant's allegation that relators and their counsel hatched a "deliberate scheme to delay filing an action, systematically 'running up' attorneys' fees and trebling the relators'-share bounty"). Relator Miller's suspicions were aroused in November 1990, and he immediately reported them to his superiors, who purportedly conducted an investigation that found nothing amiss. (*See* Apr. 28, 2007 PM Tr. at 88–108.) Two months later, when unusual financial transactions caught his eye, he tipped the previous investigator. (*See* Apr. 29, 2007 AM Tr. at 24.) In April 1991, he recommended an independent audit, and when his supervisor directed him to destroy the memo embodying this recommendation, he moved up the food chain, sending a memo to company president Johnie Jones. (*Id.* at 25–33.) Management rebuffed relator's repeated attempts to draw attention to what he believed were suspicious financial transactions, and until June 1995, relator made no effort to raise the alarm outside the company. Though he learned of the FCA in 1992, he waited three years to contact the government out of concern that he would render himself unemployable just when his children were

This Court has stated, and still believes, that relator did himself a grave disservice by conceding to the government's numerous motions to extend the seal. (*See* Apr. 27, 2007 PM Tr. at 165–66; Mem. Op. [872] at 29.) Nevertheless, in each instance, the government sought, and a judge granted, the extension. The Court will not deny relator's counsel compensation for work it authorized.[71] *Cf. Wilkett v. ICC*, 844 F.2d 867, 874 (D.C.Cir.1988) ("[a]ny work ordered by this Court is [ ] compensable").

### iii. Inefficiencies Summary

To summarize, the Court has considered each alleged inefficiency identified by defendants and concludes that counsel's time records do evince one problematic trend. At least during the litigation's later stages, too many attorneys were assigned to discrete tasks. The Court does not propose to dictate law firms' staffing, and it acknowledges the benefits of a division of labor. But it is common knowledge that at some point, allocating portions of a task among group members ceases to raise productivity and instead begins to hinder it. As illustrated above, relator's counsel passed this equilibrium point. The Court finds the resulting inefficiency unreasonably inflated counsel's billing statements and thus warrants an across-the-board reduction of five percent.[72]

### C. Lodestar

Relator originally sought $599,351.00 as compensation for 1054.5 hours worked by Wiley Rein personnel. (*See* Ex. B–2 to Bell's Decl., Ex. 2 to Petition for Fees, Costs, and Expenses [930].) His supporting documents reflect a slightly lesser total of 1054.25 hours. (*See* Ex. B–3 to Bell's Decl.) The time entry-specific deductions detailed in Appendix II, *infra*, along with relator's voluntary withdrawals for inadvertently included time, reduce the Wiley Rein total to 936.05 hours. At the rates set forth in Appendix I, *infra*, fees for these hours amount to $497,763.30—$3,875.00 for paralegal work, and $493,888.30 for attorney work.

For Wilmer Hale personnel, relator originally sought $9,415,356.00 as compensation for 23,572 hours' work. (*See* Ex. D–2 to Bell's Decl.) After the Appendix II deductions and relator's voluntary withdrawals, Wilmer Hale's total compensable hours amount to 23,283 hours. At Appendix I rates, fees for this time run to $9,268,467.75—$677,748.75 for paralegal work, and $8,590,719.00 for attorney work.

As set forth in Appendix III, the Court has concluded that systematic defects in relator's fee petition warrant across-the-board reductions in these subtotals: ten percent for ambiguous time entries, ten percent for block billing, and five percent for inefficient staffing. Further, the Court will discount all attorney hours by one-half

---

reaching college-age. (*See* Apr. 29, 2007 AM Tr. at 49–53.) Thus, the only *evidence* concerning the reason for this delay suggests relator quailed when confronted with a difficult choice. Defendants must offer more than innuendo to persuade the Court that relator engaged in calculated stalling for which his counsel's fees should be reduced.

71. Notably, the particular time entries defendants have challenged, which total only 37.45 hours, also include other, unrelated tasks, (*see, e.g.,* 2/20/1996 RBB), as well as mandato-

ry attendance at court hearings, (*see, e.g.,* 4/11/1997 MLS).

72. *Cf. Role Models Am., Inc.*, 353 F.3d at 973 (reducing compensation by 50 percent due to "inadequate documentation, failure to justify the number of hours sought, inconsistencies, and improper billing entries"); *Okla. Aerotronics, Inc. v. United States*, 943 F.2d 1344, 1347 (D.C.Cir.1991) (upholding district court's reduction of chargeable hours by 40 percent due to excessive time spent on specific tasks).

percent and all paralegal hours by five percent to omit compensation for clerical work. The Court will apply the total percentage reductions—25.5 percent of attorney fees and 30 percent of paralegal fees—to fees for compensable time, computed above, vice requested time. For Wiley Rein, these percentages translate to reductions of $1162.50 in paralegal fees and $125,941.52 in attorney fees. Subtracting these amounts from the fees for compensable hours, calculated above, yields lodestar values of $2,712.50 for Wiley Rein paralegals and $367,946.78 for Wiley Rein attorneys. For Wilmer Hale, these percentages translate to reductions of $203,324.62 in paralegal fees and $2,190,633.34 in attorney fees. Subtracting these amounts from the fees for compensable hours, calculated above, yields lodestar values of $474,424.13 for Wilmer Hale paralegals and $6,400,085.66 for Wilmer Hale attorneys.

The resulting lodestar sub-components appear in the table below:

| | Wiley Rein | Wilmer Hale |
| --- | --- | --- |
| Attorney Fees | $367,946.78 | $6,400,085.66 |
| Paralegal Fees | $ 2,712.50 | $ 474,424.13 |
| Total Lodestar | $370,659.28 | $6,874,509.79 |

The total lodestar value—"the number of hours reasonably expended on the litigation times a reasonable hourly rate," *Blum v. Stenson*, 465 U.S. 886, 888, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984)—thus equals $7,245,169.07.

## D. Enhancement

A "strong presumption" exists that the lodestar figure, without more, constitutes a reasonable fee award. *City of Burlington v. Dague*, 505 U.S. 557, 562, 112 S.Ct. 2638, 120 L.Ed.2d 449 (1992). Yet in "rare" and "exceptional" cases, a fee applicant may rebut this strong presumption against upward adjustments to the lodestar by producing "specific evidence" that shows "an adjustment is *necessary* to the determination of a reasonable fee." *Blum*, 465 U.S. at 898–99, 104 S.Ct. 1541 (emphasis added).

Relator must believe his case to be exceedingly rare, indeed: he claims his counsel's quality of representation and the "exceptional results" achieved "entitle[ ]" them to *double* the lodestar amount. (Mot. for Fees, Costs, and Expenses [930] at 27.) He further suggests the FCA's incentive structure supports his eye-watering request. (*Id.* at 38–40.) The Court will evaluate each of these three proposed bases for a 100 percent lodestar enhancement in turn, but first, it will set out the applicable law.

In his fee petition, relator relies principally on *Blum*, one of the Supreme Court's early pronouncements on the subject of fee enhancements. (*See* Mot. for Fees, Costs, and Expenses [930] at 27–28.) There, the district court had granted a fifty percent enhancement for, *inter alia*, quality of representation and result obtained, and the Supreme Court deemed this an abuse of discretion. 465 U.S. at 891, 902, 104 S.Ct. 1541. It left the door open to lodestar multipliers, noting that "in some cases of exceptional success an enhanced award may be justified," but it instructed that the lodestar amount "is presumed to be the reasonable fee." *Id.* at 897, 104 S.Ct. 1541 (quotation marks and citation omitted). Of particular relevance here, it observed that

> [t]he "quality of representation" … generally is reflected in the reasonable hourly rate. It, therefore, may justify an upward adjustment only in the rare case where the fee applicant offers specific evidence to show that the quality of service rendered was superior to that one reasonably should expect in light of the hourly rates charged and that the success was "exceptional."

*Id.* at 899, 104 S.Ct. 1541. Absent such "specific evidence," an enhancement for

quality of representation would constitute "a clear example of double counting." *Id.* Additionally, though relevant, the result obtained "normally should not provide an independent basis for increasing the fee award." *Id.* at 900, 104 S.Ct. 1541. Indeed, as another court in this district has observed, these two factors are necessarily intertwined: "a review of [ ] exceptional results is integral to an analysis of the quality of representation." *McKenzie v. Kennickell,* 684 F.Supp. 1097, 1106 (D.D.C. 1988) (Parker, J.)

Two years later, the Court adopted an even less permissive stance with respect to lodestar enhancements. *See Pennsylvania v. Del. Valley Citizens' Council for Clean Air,* 478 U.S. 546, 106 S.Ct. 3088, 92 L.Ed.2d 439 (1986). There, the Court elevated *Blum's* presumption that the lodestar represents the reasonable fee to a *strong* presumption, explaining that fee-shifting statutes "were not designed as a form of economic relief to improve the financial lot of attorneys, nor were they intended to replicate exactly the fee an attorney could earn through a private fee arrangement with his client." *Id.* at 565, 106 S.Ct. 3088. To that end, both quality of representation and results obtained "are presumably fully reflected in the lodestar amount." *Id.* Fundamental ethical principles dictate this conclusion:

> [W]hen an attorney first accepts a case and agrees to represent the client, he obligates himself to perform to the best of his ability and to produce the best possible results commensurate with his skill and his client's interests. Calculating the fee award in a manner that accounts for these factors, either in determining the reasonable number of hours expended on the litigation or in setting the reasonable hourly rate, thus adequately compensates the attorney, and leaves very little room for enhancing

the award based on his post-engagement performance.

*Id.* at 565–66, 106 S.Ct. 3088. Thus, to avoid double counting, "the overall quality of performance ordinarily should not be used to adjust the lodestar." *Id.* at 566, 106 S.Ct. 3088. *See also Donnell,* 682 F.2d at 254 ("We have found it all too common for the district courts to adjust the lodestar upward to reflect what the courts view as a high … quality of representation. This trend should stop.").

With these principles in mind, the Court will weigh relator's enhancement arguments.

### 1. Results Obtained

In this *qui tam* action, the jury returned a total verdict of $34.4 million against six defendants after several others agreed to pretrial settlements. Relator and his "experts" dwell effusively on its aggregate size. (*See* Mot. for Fees, Costs, and Expenses [930] at 28 ("this is one of the three largest jury verdicts in the almost 200–year history of the FCA, and the fourth largest U.S. jury verdict in 2007 at the time it was handed down"); Braga Decl. ¶ 6, Ex. 3 to [930] (calling verdict "historical"); Davidson Decl. ¶ 34, Ex. 5 to [930] ("this size of a verdict from a jury in the District of Columbia is rare and demonstrates exceptional success").) The Court does not dispute that $90 million—the trebled damages value—is a staggering sum.

But this result must also be placed in perspective. Plaintiffs sought up to $60.8 million in damages—nearly twice the jury's ultimate award. (*See* May 1, 2007 PM Tr. at 73 (seeking $42 million in damages on Contract 20A); Mar. 23, 2007 AM Tr. at 84 (original Contract 29 bid was $137.3 million); May 1, 2007 PM Tr. at 76 (arguing fair and reasonable Contract 29 bid would have been $120 million); *id.* (suggesting $1.5 million damages award on

Contract 07).) Given the sum sought, the jury verdict's magnitude is far from astounding.

Relator also insists the criminal case's results—four guilty pleas, one conviction, and over $140 million in fines—are "highly relevant in awarding an enhancement." (Mot. for Fees, Costs, and Expenses [930] at 28.) The Court fails to see how. As BHIC and HUK point out, relator cites no authority for awarding a fee enhancement to counsel in a civil action based on the outcome of other litigation.[73] (See BHIC and HUK's Opp'n [948] at 22.) As discussed above, counsel will be compensated for their representation of relator throughout his assistance with the government's criminal investigation. See supra part III.B. 1.a. But the Court does not believe they deserve a bonus for Government

counsel's success in translating the information relator provided into a full-fledged antitrust investigation that culminated in criminal penalties.[74]

Next, relator emphasizes that the jury's damages award here "goes directly to benefit the public interest by compensating the Government for Defendants' proven fraud." (Mot. for Fees, Costs, and Expenses [930] at 29.) Yet this is true of every damages award in False Claims actions: any recovery always goes to the government. By relator's logic, successful qui tam relators' counsel would receive lodestar enhancements in every case.[75] The Supreme Court's admonition that the result obtained "normally should not provide an independent basis for increasing the fee award" forecloses this outcome. See Blum, 465 U.S. at 900, 104 S.Ct. 1541.

**73.** In neither of the two decisions he cites for this proposition—one of which has been vacated—did the court reward counsel for other attorneys' conduct of other litigation. See Hyatt v. Apfel, 195 F.3d 188, 192 (4th Cir. 1999) (approving lodestar enhancement where plaintiffs brought "about fundamental change to a recalcitrant agency" and "recover[ed] several hundred million dollars in disability benefits to which they are lawfully entitled" after years of proceedings before the Social Security Administration and in federal court); United States ex rel. Garibaldi v. Orleans Parish Sch. Bd., 46 F.Supp.2d 546, 571 (E.D.La.1999), vacated by 244 F.3d 486 (5th Cir.2001) (awarding lodestar enhancement where, because government declined to intervene, "relators' lawyers earned an enormous, multi-million dollar verdict for the United States government, for which the United States paid not one penny").

**74.** HC denigrates relator's assistance to the criminal investigation at length. (See HC's Opp'n [950] at 6–9.) In response, relator first explains that his counsel's contribution, not his contribution, is relevant to the enhancement issue, then proceeds to tout his efforts in furthering the government's criminal case. (Reply to HC's Opp'n [959] at 13–16.) Relator's initial point is accurate. This Court must review the result as part of its "analysis

of the quality of [counsel's] representation." See McKenzie, 684 F.Supp. at 1106. Relator's individual role in that result is immaterial to an assessment of counsel's performance.

HC's attempts to rebut relator's claim that he was "directly responsible for the information underlying [the civil] victory," (Mot. for Fees, Costs, and Expenses [930] at 1), are equally irrelevant. (HC's Opp'n [950] at 9–11.) Again, the pertinent issues are the nature of the result achieved and its causal connection to counsel's professional performance.

**75.** Helpfully, relator has identified two examples of the truly extraordinary circumstances in which vindication of the public interest militates in favor of adjusting the lodestar upward. See Ill. Congressional Dists. Reapportionment Cases, 704 F.2d 380, 381, 383 (7th Cir.1983) (plaintiff brought successful challenge to state's failure to reapportion congressional districts after 1980 census, thus protecting all state citizens' voting rights); Louis v. Nelson, 646 F.Supp. 1300, 1304–05, 1318 (S.D.Fla.1986) (human rights activists sought to free Haitian refugees who had been unlawfully imprisoned pending adjudication of their political asylum applications and to stop mass exclusion hearings being held without counsel).

All in all, the Court finds the result obtained, while laudable, does not weigh strongly in favor of awarding a fee enhancement in this case.

## 2. Representation Quality

Relator next argues the quality of his counsel's performance merits a lodestar enhancement, and he identifies three separate facets of this performance as establishing its superiority: (1) his counsel's "essential" and "vital" role, and their coordination with the government, produced efficiencies not reflected in the lodestar; (2) Bell's cradle-to-grave involvement in the case also yielded such efficiencies; and (3) a small core of young lawyers who performed well beyond their seniority levels bore principal responsibility for relator's representation. (Mot. for Fees, Costs, and Expenses [930] at 30, 32, 33.) Because relator's first two justifications both take aim at the strong presumption that the lodestar adequately reflects representation quality, *Delaware Valley,* 478 U.S. at 565, 106 S.Ct. 3088, the Court will address them together.

## a. Unaccounted-for Efficiencies

To support his contention that the lodestar fails to capture certain efficiencies achieved by his counsel, relator turns to two sources: government counsel Keith Morgan's affidavit, and his "expert" declarations. (*See* Mot. for Fees, Costs, and Expenses [930] at 30–33.)

He begins with the proposition that

[b]ut for relator's counsel's active and integral participation in this suit, it would have been extremely difficult for the Government to prevail because it may not have been able to respond to the plethora of motions effectively, meet the highly intense demands of discovery, and present this case as effectively at trial.

(*Id.* at 30–31.) To support this characterization of his counsel's role, he relies on Morgan's declaration:

The availability of Relator's counsel from Wilmer Hale was essential in meeting the overwhelming demands of discovery and ultimately of the trial in this matter. Indeed, attorneys and support staff from Wilmer Hale played a vital role in getting this case ready for trial and ultimately successfully trying it. . . . Throughout this period counsel for the United States and Relator's counsel met regularly to coordinate our efforts to ensure that there was no duplication of efforts and that we worked as an integrated team.

(Morgan Decl. ¶¶ 7–8, Ex. 1 to [930].)

Relator and his attorney declarants cast this straightforward prose as effusive praise, repeatedly quoting the words "essential" and "vital" from Morgan's otherwise terse narration of the case's progress. (*See* Mot. for Fees, Costs, and Expenses [930] at 31; Braga Decl. ¶ 6, Ex. 3 to [930] ("The fact that the Civil Division of the United States Attorney's office is willing to recognize that Wilmer Hale's role in this case was both 'essential' and 'vital' to the successful preparation and trial of this 'overwhelming' case speaks volumes"); Davidson Decl. ¶ 46, Ex. 5 to [930] ("The statements by the Government in support of Wilmer Hale's efforts are not at all typical and reflect the extraordinary contribution the Wilmer Hale team provided for the public benefit.").)

Read objectively, however, Morgan's two-page affidavit offers only faint praise. His first statement, concerning counsel's "availability," reveals nothing about the quality of counsel's performance—it merely suggests Wilmer Hale provided additional warm bodies to supplement the government's resources. His second statement does reflect significant credit

on the Wilmer Hale team: their participation was "vital" to successful prosecution of the government's claims. But starting from relator's premise—that the government could not have handled this case without Wilmer Hale's assistance—counsel owed a duty to their client to offer up the additional resources needed to permit success, lest relator walk away with nothing. *See Delaware Valley,* 478 U.S. at 565, 106 S.Ct. 3088 ("When an attorney first accepts a case and agrees to represent the client, he obligates himself to perform to the best of his ability and to produce the best possible results commensurate with his skill and his client's interests."). The same logic applies to Morgan's third statement: that relator's counsel coordinated their efforts with the government to avoid duplication merely indicates they endeavored to avoid *inefficiency;* such conduct should serve as a baseline in client representation and does not justify a bonus.

Relator's arguments concerning Bell's continuous involvement are similarly unpersuasive. His attorney declarants' praise for Bell's loyalty to his client, "over a total of 16 years and across his shift in law firms," borders on hyperbole. (*See* Braga Decl. ¶ 6 (relator was "blessed to have complete continuity of his lead counsel, Robert Bell," and such long-term attorney-client relationships are "rare indeed in this modern legal world"); Davidson Decl. ¶ 42 (Bell's continuous involvement was "invaluable and result[ed] in substantial savings").) Likewise, where plaintiffs' lead counsel "remain[ed] at the helm" throughout fifteen years of litigation, another court in this district observed that "[s]uch continuity promotes tremendous efficiency and necessarily reduces the ultimate expenditure of hours." *McKenzie v. Kennickell,* 684 F.Supp. 1097, 1107 (D.D.C.

1988) (Parker, J.). *See also Hartman v. Duffey,* 973 F.Supp. 199, 202 (D.D.C.1997) (Robertson, J.) (awarding enhancement in part due to continuity of lawyers' efforts, which promoted efficiency and reduced overall time expenditure).

Ordinarily, this Court would concur. Here, however, the Court has already concluded that counsel's time records reveal substantial inefficiencies caused by assignment of too many attorneys to discrete tasks. *See supra* part III.B.2.c.i. Though nominally "lead counsel," Bell was one of *five* Wilmer Hale partners, and *fifty-two* attorneys total, to work on this case, and he did not represent relator at trial. Bell, who claims he "only added people to our team when necessary," managed the Wilmer Hale battalions, "set strategy for the team," and "supervise[d] and direct[ed][his] colleagues so that they could use their time more effectively." (Bell Decl. ¶ 66, Ex. 2 to Mot. for Fees, Costs, and Expenses [930].) Bell, then, presumably bears responsibility for the staffing overkill.

This Court does not doubt that Bell's knowledge of the case history and his relationships with government counsel contributed to plaintiffs' win. But the Court believes the lodestar adequately accounts for Bell's lengthy involvement: he will be compensated at his standard, partner's billing rate of $650.00 for each of the 1,991.55 hours he reasonably expended. Presumably, he will also benefit from the contingency fee Wilmer Hale will receive once the government pays relator his bounty. (*See* Ex. 2 to Mot. for Leave to File Surreply [937] at 3.) But the Court will not reward him for phantom "efficiencies" belied by the record.[76]

Consequently, the Court concludes neither efficiency for which relator alleges the lodestar fails to account overcomes the

---

**76.** Indeed, it agrees with Judge Carnes of the

Eleventh Circuit Court of Appeals that "bad

"strong presumption" against fee enhancements for quality of representation. *See Delaware Valley*, 478 U.S. at 565–66, 106 S.Ct. 3088.

### b. Beyond–Paygrade Performance

Relator proposes one further basis for a lodestar enhancement based on quality of representation. Specifically, he contends that "young" lawyers comprised the bulk of the Wilmer Hale team, and that these attorneys performed "well beyond the standards expected of attorneys of similar experience." [77] (Mot. for Fees, Costs, and Expenses [930] at 33.) He offers that Gottlieb, Bunch, Baumgartner, and Reece

and excessive billing is inconsistent with superb lawyering." *Kenny A. v. Perdue*, 532 F.3d 1209, 1229 (11th Cir.2008) (citing *Delaware Valley*, 478 U.S. at 567, 106 S.Ct. 3088). Analogously, routinely devoting excessive manpower to tasks is inconsistent with efficient case management.

77. Relatedly, relator also declares that "Wilmer Hale went to great lengths to limit the number of lawyers on [this] matter." (Mot. for Fees, Costs, and Expenses [930] at 35.) This purportedly small cadre of young lawyers notched some impressive numerical records. During the discovery period alone, relator's counsel reviewed 665 boxes of documents, from which they culled over 97,000 documents with over 320,000 pages, attended 40 depositions, taking a leading role in some, and participated in two evidentiary hearings. (Bell Decl. ¶¶ 74–75, 78, 85, Ex. 2 to [930].) In total, the parties filed 260 motions, many of them substantive, prompting roughly 165 court orders. (*Id.* ¶ 10.) During the thirty-two day trial, counsel examined 31 live witnesses, whose testimony was supplemented by ten others' deposition transcripts, and dealt with 539 exhibits. (*Id.* ¶ 96.)

Attorney declarant Davidson can scarcely find sufficient adjectives to praise this work:

> To gear up a case to this level in this short period is very impressive, even for a firm with the resources of Wilmer Hale. There was a staggering amount of work to do. The ability of the firm to commit the talented and tireless human resources to this case to meet the extremely rigorous schedule set by the court is extraordinary.

(Davidson Decl. ¶ 26, Ex. 5 to [930].) Braga declares that when this Court set "an expedited schedule which compressed discovery, pretrial and trial proceedings into an eleven-month schedule, all-out litigation hell began. What followed from Wilmer Hale's attorneys was far more than standard hourly rate legal service in the face of such difficulties...." (Braga Decl. ¶ 6, Ex. 3 to [930].)

Three points are in order. First, to paraphrase HC's Opposition, by no rational definition of the term do *fifty-two* attorneys constitute a "small" team of lawyers.

Second, counsel had *eleven years* to contemplate their strategy and gather information before this Court set the "expedited schedule" to which Braga refers, and the "compressed discovery" period was entirely reasonable given that the government had (in essence) tried this case once before. The Court recognizes that a criminal antitrust conspiracy trial and a civil FCA conspiracy trial differ in many respects. (*See* Reply to HC's Opp'n [959] at 16–18.) But evidence the government compiled in pursuing its criminal case against Anderson and Bilhar would necessarily be probative to proving their civil liability for the same conduct, giving plaintiffs' counsel in this case a significant head start.

Third, like our Court of Appeals in *Role Models*, this Court does not believe that "[p]roducing high-quality work on a short deadline" requires "specialized skills or knowledge beyond what lawyers use on a regular basis." *See* 353 F.3d at 969. Further, its "experience with the work of many large firms convinces [this Court] that [relator's] lawyers were far from the only ones who could have achieved [this] result under the same time pressure." *Id.* Indeed, as the Court explained above, one factor influencing its decision to use Wilmer Hale's established "mega-law firm" billing rates in calculating the lodestar was Wilmer Hale's ability to leverage "mega-law firm" resources to meet the "overwhelming demands" of litigating this case. *See supra* part III.A.1.a. To enhance the lodestar for the same reason would result in "double counting." *See Delaware Valley*, 478 U.S. at 566, 106 S.Ct. 3088.

Thus, neither the size of relator's litigation team, nor the schedule according to which they worked, justifies a lodestar enhancement.

"functioned in roles—sitting at counsel table, examining witnesses at trial, taking depositions, interviewing witnesses, and preparing witnesses—in which much more senior lawyers typically engage." (*Id.* at 34 (citing Bell Decl. ¶ 114, Ex. 2 to [930] ).) Attorney declarant Braga emphasizes that

> [o]rdinarily traditional law firm staffing would have involved a lesser number of junior associates and a greater number of senior associates.... Wilmer Hale's standard hourly rates for these junior associates do[ ] not fairly capture the degree of difficulty and level of responsibility at which they performed their services in this case.

(Braga Decl. ¶ 6, Ex. 3 to [930].) Similarly, relator contends that O'Connor and Cedarbaum, "both young partners," excelled beyond their paygrades. (Mot. for Fees, Costs, and Expenses [930] at 34.) O'Connor served as lead counsel in discovery and other pretrial matters and played a major role at trial, while Cedarbaum served as "lead motions attorney." (*Id.*) Both were far junior to defendants' lead trial counsel. (*Id.*) At Wilmer Hale, more junior partners typically bill "at lockstep rates on the basis of seniority," so relator contends O'Connor and Cedarbaum's rates do not accurately reflect their superior skill levels. (*Id.* at 35.)

This Court heartily agrees that relator's counsel generally, and the more junior team members in particular, performed at a consistently high standard throughout this litigation. Nothing in this Opinion should be read as dismissing the Wilmer Hale associates' outstanding written and oral advocacy for their client. They are to be commended. Similarly, young partners O'Connor and Cedarbaum acquitted themselves creditably in their leadership roles. But as this Court observed above, Wilmer Hale's established billing rates are "rea-

sonable" precisely because they align with those of other *highly skilled* attorneys in the District of Columbia legal community. *See supra* part III.A.1. Simply put, these superstars already bill at superstar rates.

Relator's declarations do not alter this assessment. His attorney declarants' pronouncements are too superficial to be of much evidentiary value. For example, Braga asserts that O'Connor and Cedarbaum "provided services at a level significantly above that contemplated by their standard hourly rates." (Braga Decl. ¶ 6, Ex. 3 to [930].) But he does not then explain what sort of services he believes a client can reasonably expect for $510 or $495 per hour. Nor does he indicate what rates would be reasonable for the level of service provided. Another assertion in relator's motion is equally bewildering: he declares that certain young Wilmer Hale associates "functioned in roles ... in which much more senior lawyers typically engage." (Mot. for Fees, Costs, and Expenses [930] at 34 (citing Bell Decl. ¶ 114, Ex. 2 to [930] ).) This implies that Wilmer Hale would not ordinarily permit a fourth-year associate and former U.S. Supreme Court clerk, such as Gottlieb, to sit at counsel table, take depositions, or examine, interview, or prepare witnesses. Relator does not, however, describe the tasks that would typically fall to Wilmer Hale associates of Gottlieb's seniority and credentials. In sum, relator's evidence that counsel's established billing rates do not adequately reflect the quality of their performance is simply too paltry to overcome the "strong presumption" against fee enhancements for quality of representation. *Delaware Valley*, 478 U.S. at 565–66, 106 S.Ct. 3088. Absent amplifying details, this "evidence" consists of nothing more than superlative-laden platitudes.[78]

---

**78.** The Court must evaluate the record before

it, and factually analogous precedents thus

As the Supreme Court has cautioned, "the overall quality of performance ordinarily should not be used to adjust the lodestar." *Id.* at 566, 106 S.Ct. 3088. When they agreed to represent relator, Bell and his colleagues obligated themselves "to perform to the best of [their] abilit[ies] and to produce the best possible results commensurate with [their] skill and [their] client's interests." *Id.* at 565, 106 S.Ct. 3088. Their having fulfilled this duty to entitles them only to compensation at a reasonable rate for the hours they reasonably expended—no more.[79]

### 3. Statutory Purpose

Finally, relator argues that awarding an enhancement here would "satisfy" the FCA's "incentive structure." (Mot. for Fees, Costs, and Expenses [930] at 38.) Even if true, this contention would not provide an independent basis for awarding an enhancement absent other, recognized factors (such as quality of representation, discarded above) weighing in favor. Hence, the Court will treat it only briefly.

Relator begins with the uncontroversial proposition that Congress enacted the FCA's fee-shifting and relator's share provisions to encourage private citizens to expose fraud against the government through lawsuits on its behalf. (*See id.*) In particular, he argues, Congress wanted to enable prospective *qui tam* relators to retain private counsel whose assistance would prevent "resource mismatch" situations, in which "the Government's enforcement team is overmatched by the legal teams major contractors retain[ ]." *See* S. Rep. 99–345, at 8 (1986), *as reprinted in* 1986 U.S.C.C.A.N. 5266, 5273.[80] Thus, re-

---

offer limited guidance. For that reason, the sole relevant precedent cited in relator's petition is easily distinguishable. In *McKenzie*, Judge Parker—on a different record—awarded an enhancement for quality of representation based in part on the exceptional performance of two young associates. 684 F.Supp. at 1107. He noted that the two junior associates had performed "[t]he majority of the work during the early stages of this proceeding" and had "remained actively involved in this litigation for fifteen years." *Id.* Indeed, one "acted as lead counsel throughout." *Id.* Moreover, Judge Parker appears to have relied heavily on his own observations, "stat[ing] without hesitation, that counsel's efforts were well above the quality of attorneys appearing before this Court in similar and comparable litigation." *Id.* Here, by contrast, the more junior Wilmer Hale attorneys' involvement began only a year or two before trial, and while this Court commends their performance, it was consistent with what this Court expects from major law firm associates with comparable credentials and experience levels.

79. In their filings, the parties battle over whether and to what extent relator's counsel may take credit for various tasks performed in preparation for trial. (BHIC and HUK's Opp'n [948] at 23–25; Reply to BHIC and HUK's Opp'n [960] at 18–20; HC's Opp'n [950] at 11–13; Reply to HC's Opp'n [959] at 8–18.) The Court agrees with relator that his "counsel plainly made major contributions to the success of Plaintiffs' case and the size of the award achieved." (Reply to HC's Opp'n [959] at 18.) But if "major contributions to the success" of one's client's case warranted a *bonus*, then virtually *every* prevailing plaintiff's counsel would be entitled to a fee enhancement under any fee-shifting statute. On the contrary, enhancements are appropriate only in "rare" and "exceptional" cases. *See Blum v. Stenson*, 465 U.S. 886, 899, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984).

80. In full, the relevant portion of the Report reads:

An additional problem noted by hearing witnesses[ ] exists when large, profitable corporations are the subject of a fraud investigation and able to devote many times the manpower and resources available to the Government. This resource mismatch was recognized by DOD Inspector General Joseph Sherick who said that in far too many instances the Government's enforcement team is overmatched by the legal teams major contractors retain[ ].

The Committee believes that the amendments in S. 1562 which allow and encour-

lator reasons, "Congress's goal was for relators to be equally [ ] well-represented as FCA defendants, and therefore, the fee-shifting provision is intended to attract counsel of the highest quality." (Mot. for Fees, Costs, and Expenses [930] at 39.)

Here, relator's logic begins to break down. The Senate Report indicates Congress believed relators' counsel could supplement the government's efforts, ameliorating any resource disadvantage. Construed *extremely* liberally, it could be read to endorse resource parity between plaintiffs and defendants. But both the Report and the statutory text clearly view relator's efforts, and those of his counsel, as secondary to those of the federal government. *See* 31 U.S.C. § 3730 (2008) ("[i]f the Government proceeds with the action, it shall have the primary responsibility for prosecuting the action"); S. Rep. 99–345, at 8 (1986), 1986 U.S.C.C.A.N. 5266, 5273 (*qui tam* relators and their counsel will "bolster[ ] the Government's fraud enforcement effort"). The fee-shifting provision thus aims to top up the government's formidable resources,[81] not to bankroll relators' recruitment of private counsel of equal caliber to defendants' counsel.

Even were the Court to disregard this flaw in relator's reasoning, his ultimate conclusion rests on shaky factual ground. He contends that "[w]ithout an enhancement, large firms like Wilmer Hale—which

are necessary to match talented defense counsel . . .—would have little reason to take on such contentious, long-running cases." (Mot. for Fees, Costs, and Expenses [930] at 39; *accord* Davidson Decl. ¶ 36, Ex. 5 to [930].) First, while large law firms frequently offer high-quality representation, "mega-firm" attorneys are not the only lawyers equipped to "match talented defense counsel." More than a few talented attorneys have practiced before this Court, among them solo practitioners, government attorneys, and lawyers at small and medium-sized firms. Second, in this very case, Wilmer Hale accepted representation—and indeed, has continued it for *nine* years, with no guarantee of a fee enhancement. To the extent that relator suggests his counsel *assumed from the beginning* that they would receive a bonus—otherwise, they "would have [had] little reason to take on such [a] contentious, long-running case[ ]," (*see* Mot. for Fees, Costs, and Expenses [930] at 39)—this was foolishly presumptuous.

Furthermore, the Supreme Court's opinion in *Delaware Valley* forecloses this line of argument: "In short, the lodestar figure includes most, if not all, of the relevant factors constituting a 'reasonable' attorney's fee, and *it is unnecessary to enhance the fee . . . in order to serve the statutory purpose of enabling plaintiffs to secure legal assistance.*" 478 U.S. at 566, 106 S.Ct. 3088 (emphasis added).[82]

---

age assistance from the private citizenry can make a significant impact on bolstering the Government's fraud enforcement effort. S. Rep. 99–345, at 8 (1986), *as reprinted in* 1986 U.S.C.C.A.N. 5266, 5273.

**81.** As defendants observe, DOJ "Civil Division attorneys have for years ably represented the government's interests in FCA cases where defendants are represented by large national law firms." (HC's Opp'n [950] at 18.) The government regularly litigates cases of this size and complexity.

**82.** Relator relies on two, out-of-Circuit cases in which specific facts persuaded courts that an enhancement *was* necessary to enable plaintiffs to secure legal counsel. *See Knop v. Johnson,* 712 F.Supp. 571 (W.D.Mich.1989); *Allen v. Freeman,* 694 F.Supp. 1554 (S.D.Fla. 1988). These factually distinct cases merely illustrate the "rare" circumstances in which fee enhancements remain appropriate.

In *Knop,* a "major prison conditions case" brought by the American Civil Liberties Union ("ACLU") on Michigan prisoners' behalf, the

#### 4. Enhancement Summary

For the reasons discussed above, the Court concludes no fee enhancement is warranted in this case. Without minimizing the significance of the result obtained, the Court does not find it so extraordinary as to justify a bonus for relator's counsel. Further, the FCA's incentive structure supports only compensation at a reasonable rate for hours reasonably expended—without any additional enhancement—in this case. Finally, though the Court commends counsel's performance—particularly that of the more junior attorneys—it concludes the lodestar, calculated using counsel's established billing rates, adequately reflects this superior quality of representation. In *Donnell*, our Court of Appeals lamented district courts' increasing predilection for "adjust[ing] the lodestar upward to reflect what the courts [subjectively] view as a high . . . quality of representation," urging that "[t]his trend should stop." 682 F.2d at 254. It stops here.

### IV. Relator's Litigation Expenses

In addition to attorneys' fees, the FCA entitles a prevailing relator to an award against the defendant of "an amount for reasonable expenses which the court finds to have been necessarily incurred." 31 U.S.C. § 3730(d)(1) (2008). Relator seeks

---

ACLU tried and failed "to find private attorneys willing to handle more than one aspect of the case" due to "the complexity of the issues involved, the potential for protracted litigation and the massive expenses which counsel would have to advance in order to properly litigate this case." 712 F.Supp. at 585. Here, by contrast, there is no evidence relator had any difficulty whatsoever in finding counsel. Further, the *Knop* court's reasoning suggests no fee multiplier is necessary here: "In order to convince counsel in private practice to accept cases of this nature, the fee awards must . . . be sufficient to convince them to forego fees they would have earned from their regular clients. . . ." *Id.* In a competitive marketplace, Wilmer Hale's established billing rates necessarily represent the prices at which its attorneys are willing to forego other representation. Thus, *Knop* does not support an enhancement here.

In *Allen*, a civil rights action brought against a county sheriff and two police officers, the court awarded a lodestar enhancement for several reasons. *See* 694 F.Supp. at 1556. First, it noted, "[t]he quality of representation was superior to that which the plaintiff could have expected to receive in light of the rates claimed." *Id.* Here, by contrast, counsel's outstanding performance was in line with what relator could reasonably have expected in light of their established billing rates. Second, the *Allen* court, pointed to "the undesirability of suing the police in the relatively small community of Monroe County," noting that plaintiffs' counsel risked an adverse economic impact on his future practice. *Id.* Here, if anything, relator's victory will generate *more* business for Wilmer Hale. Third, by accepting Allen's case, his attorney "limited his small firm's ability to accept other employment." *Id.* Here, Wilmer Hale's 1000+ other attorneys continued to accept other employment throughout the case, and while at least one associate (Reece) was apparently fully dedicated to *this* case, this was true only for a limited period (2006). (*See* Ex. D–2 to Bell's Decl., Ex. 2 to Mot. for Fees, Costs, and Expenses [930].) Thus, *Allen*, like *Knop*, is inapposite.

Like Judge Carnes of the Eleventh Circuit, this Court believes an enhancement would likely be entirely appropriate in cases such as *Allen* and *Knop*, where "an attorney's representation vindicates the federal rights of an unpopular client and as a result that attorney suffers a loss of standing in the community which damages his practice and income." *Kenny A. v. Perdue*, 532 F.3d at 1232–33 (11th Cir.2008). As examples, Judge Carnes cited "an attorney who represents a pedophile attacking a sexual offender registration law on Due Process grounds, or perhaps [ ] an attorney in a small Bible Belt town who succeeds in having a popular public religious practice enjoined as contrary to the Establishment Clause." *Id.* at 1234. This Court agrees that when a lawyer risks permanent harm to his career to defend fundamental, if unpopular, legal principles, the lodestar may be inadequate to fully compensate him for this extraordinary sacrifice.

$511,723.06 under this provision. (*See* Bell Supplemental Decl. ¶¶ 26–28, Ex. 1 to Reply to HII's Opp'n [957] ).

Defendants contend this award must be limited to costs and expenses reimbursable under the Equal Access to Justice Act ("EAJA"), because the FCA's wording is similar to the EAJA's. (BHIC and HUK's Opp'n [948] at 27–28.)

This argument is a non-starter. Having compared the statutes side-by-side, the Court sees no similarity whatsoever. The EAJA refers to "other expenses, in addition to any costs awarded pursuant to subsection (a), incurred . . . in any civil action . . . unless the court finds that the position of the United States was substantially justified or that special circumstances make an award unjust." 28 U.S.C. § 2412(d)(1)(A) (2008). By contrast, the FCA refers to "reasonable expenses which the court finds to have been necessarily incurred." 31 U.S.C. § 3730(d)(1) (2008). *Cf. id.* § 3730(g) (EAJA governs award of fees and expenses to prevailing *defendant* in FCA action). The FCA's statutory text requires the court to determine whether the expenses are "reasonable" and "necessarily incurred"—not whether defendants' position "was substantially justified," nor whether "special circumstances [exist that] make an award unjust." *Compare* 31 U.S.C. § 3730(d)(1) (2008), *with* 28 U.S.C. § 2412(d)(1)(A) (2008).

Moreover, defendants have cited no precedent for applying the EAJA's limitations to a costs award under the FCA. Rather, as they explicitly recognize, courts commonly look to judicial interpretations of 42 U.S.C. section 1988 for guidance as to FCA expenses awards. *See, e.g., United States ex rel. J. Cooper & Assocs., Inc. v. Bernard Hodes Group, Inc.,* 422 F.Supp.2d 225, 237–38 & n. 17 (D.D.C. 2006) (Urbina, J.); *United States ex rel. Coughlin v. IBM,* 992 F.Supp. 137, 145–46

(N.D.N.Y.1998). *Cf. Neal v. Honeywell, Inc.,* 191 F.3d 827, 834 (7th Cir.1999) ("Having assimilated § 3730(h)[, FCA attorneys' fees and costs provision applicable in whistleblower retaliation cases,] to § 1988 on fee issues, we finish the job by assimilating it to § 1988 on cost issues.").

Under section 1988, compensable expenses include "those reasonable out-of-pocket expenses incurred by the attorney which are normally charged to a fee-paying client, in the course of providing legal services." *Laffey v. Northwest Airlines, Inc.,* 746 F.2d 4, 30 (D.C.Cir.1984), *overruled on other grounds by Save Our Cumberland Mountains, Inc. v. Hodel,* 857 F.2d 1516 (D.C.Cir.1988). *See also Salazar v. District of Columbia,* 123 F.Supp.2d 8, 16–17 (D.D.C.2000) (Kessler, J.) (finding "out-of-pocket litigation expenses for postage, photocopying, telephone calls, facsimile transmissions, messengers, local travel, Westlaw, transcripts, medical records and miscellaneous [items] . . . eminently reasonable in light of the extensive legal services performed"). Applying this standard in FCA cases, where the court must find the expenses to have been necessarily incurred, courts have held that "relators are under a duty to minimize their expenses," and that "those expenses incurred without proper documentation should be disallowed." *United States ex rel. Abbott–Burdick v. Univ. Med. Assocs.,* No. 2:96–1676–12, 2002 WL 34236885, *23, 2002 U.S. Dist. LEXIS 26986, at *75 (D.S.C. May 23, 2002) (citations omitted). Further, they have limited recovery to "those costs which are 'incidental and necessary' to the representation of the client." *Coughlin,* 992 F.Supp. at 145. "[C]osts are not allowed if they cannot be attached to the advancement of a specific claim, or if they are so general that they could be placed under the cost umbrella of overhead or office expense." *Id.* This Court will review rela-

tor's expenses according to these standards.[83]

First, costs and expenses associated with time entries this Court has determined to be non-compensable are, likewise, non-compensable. Where hours were not "expended in pursuit of a successful resolution of the case in which fees are being claimed," *Nat'l Ass'n of Concerned Veterans v. Sec'y of Def.*, 675 F.2d 1319, 1335 (D.C.Cir.1982), associated costs cannot have been "necessarily incurred," *see* 31 U.S.C. § 3730(d)(1) (2008). Thus, the Court must exclude costs associated with efforts to secure immunity from prosecution for relator, tasks arising from his ongoing employment at J.A. Jones, and research and other efforts to obtain his relator's share.[84]

The Court has cross-referenced the time entries including immunity-related work with relator's itemized expenses, and it finds that no expenses need be excluded on this basis. (*Compare infra* Appendix II, *with* Ex. C–2 to Bell Decl., Ex. 2 to Mot. for Fees, Costs, and Expenses [930].) For expenses arising from relator's ongoing employment at Jones and efforts to secure his relator's share, Bell has proposed cost reductions the Court may apply should it conclude time associated with these activi-

ties is not compensable. (*See* Ex. F to Bell Supplemental Decl., Ex. 1 to Reply to HII's Opp'n [957].) Bell's proposed cost reductions correspond to his proposed fee reductions. (*Id.*) While the Court adopted Bell's proposals with respect to numerous time entries, it also deducted time from entries Bell did not address. (*See infra* Appendix II.) Rather than comb through counsel's cryptic expenses documentation and speculate about line items' purposes, the Court will adopt Bell's proposed deductions, with proportional adjustments.[85] Of the 89.55 hours the Court deducted for relator's share recoupment efforts, Bell identified 65.80 hours, and the Court identified a further 23.75 hours. (*See id.*) Bell recommends a corresponding expenses reduction of $745.61, (Ex. F to Bell Supplemental Decl., Ex. 1 to [957] ), which the Court will adjust proportionally to $1,014.73. Of the 67.35 hours the Court deducted as arising from relator's ongoing employment, Bell identified 47.00 hours, and the Court identified a further 20.35 hours. (*See infra* Appendix II.) Bell recommends a corresponding expenses reduction of $250.18, (Ex. F to Bell Supplemental Decl., Ex. 1 to [957] ) which the Court will adjust proportionally to $358.50. The

---

83. This conclusion disposes of defendant' argument that certain categories of expenses—such as travel, long-distance telephone calls, and courier service—are *per se* non-compensable under the EAJA. (*See* BHIC and HUK's Opp'n [948] at 29.)

84. Because the Court has concluded that time spent assisting the government's criminal case is compensable, *see supra* part III.B. 1.a, it rejects defendants' objections to associated expenses, (*see* BHIC and HUK's Opp'n [948] at 29–30).

85. Defendants' list of proposed expense deductions appears to bear no relationship to the excluded time entries. (*See* Ex. 2 to HII's Opp'n [949].) For example, they wish to ex-

clude a $368.72 charge for Bell's Westlaw research from November 30 through December 14, 1999, as associated with efforts to secure relator's share or counsel's fees. (*See id.*) But the Court did not reduce any of Bell's time entries for that period for any reason. Similarly, they seek to exclude three photocopying charges from February 25, 2004, which sum to $142.40. (*See id.*) They attribute these charges to Bowsher, (*id.*) though nothing in relator's fee petition associates the charges with him (or anyone else), (*see* Ex. E–2 to Bell Decl., Ex. 1 to [930] at 7), and this Court did not deduct any hours from Bowsher's time entry for that day, (*see infra* Appendix II).

Defendants have not offered the Court a viable alternative to Bell's proposals.

total reduction for these three categories sums to $1,373.23.

Second, defendants contend certain charges—for books and other publications, office supplies, and offsite storage—should be deemed non-compensable "overhead" expenses.[86] (BHIC and HUK's Opp'n [948] at 32.) They do not, however, direct the Court to the specific line items they consider problematic. Moreover, in his declaration, Bell avers that Wiley Rein and Wilmer Hale "incurred . . . [the requested expenses] in connection with this litigation." (Bell Decl. ¶¶ 106, 116, Ex. 1 to Mot. for Fees, Costs, and Expenses [930].) He further declares the costs he claims "are typical of the costs that law firms incur in this type of complex and protracted litigation, and typical of costs that law firms reasonably charge to their clients, separately, and not part of their overhead expenses." (*Id.* ¶ 116.) Defendants do not specifically rebut Bell's claims or cite to any relevant case law. Hence, the Court will take Bell at his word.

Finally, defendants argue that relator's expenses documentation is inadequate in two respects. (*See* BHIC and HUK's Opp'n [948] at 30–31.) First, they note that relator's records do not associate charges for computerized research, copying, freight, and courier services, with any particular subject matter. Second, and relatedly, many of these charges do not correspond to attorneys' time entries. In theory, one could look to an attorney's time entry for the day the cost was incurred to determine the subject matter of his research. But in several instances, relator has not billed any time, or time on the relevant days, for the attorney who conducted the research. (*See, e.g.,* Ex. C–2 to Bell Decl., Ex. 2 to [930], at 2 ($55.88 Westlaw research charge for Sam Dickson on June 29, 1995); Ex. E–2 to Bell Decl., Ex. 2 to [930], at 11 ($633.00 Westlaw research charge for Michael Gottlieb on April 23, 2006).) Because these charges are so vaguely described, defendants argue, the Court cannot meaningfully assess whether they were "necessarily incurred" in pursuing this litigation. *See* 31 U.S.C. § 3730(d)(1) (2008).

Relator defends his time entries in three ways: (1) as a matter of standard practice, law firms charge their clients for research and photocopies without identifying, or even keeping track of, their subject matter; (2) keeping more detailed records would be "unduly cumbersome and [would] waste valuable attorney time"; and (3) the discrepancies between research charges and time records stem from Bell's voluntary exclusions and from simple imprecision. (*See* Reply to BHIC and HUK's Opp'n [960] at 23–24.)

This last defense proves most compelling. Bell's original declaration explained that he had excluded time for twelve lawyers and six paralegals from Wiley Rein, and 34 lawyers and 27 paralegals from Wilmer Hale, "to avoid litigation over the reasonableness of [the firms'] hours." (Bell Decl. ¶¶ 105, 112, Ex. 2 to [930].) He

---

**86.** In their final substantive paragraph, defendants challenge several miscellaneous charges as "clearly for the convenience of the Wilmer-Hale lawyers." (BHIC and HUK's Opp'n [948] at 32.) They object, for example, to paying for a long-distance conference call involving O'Connor because she "chose to attend the Judicial Conference, rather than being at the office where she could meet in person." (*Id.*) Carried to its logical conclusion, this reasoning would bar payment for any telephone call, because the lawyer could choose to meet with her client in person; for any means of transportation, because the lawyer could always walk; or for any computerized research charge, given that the lawyer could simply visit the local law library. This would be clearly absurd. This Court considers the challenged expenses wholly reasonable and finds they were necessarily incurred.

did not, however, pledge that he had omitted any charges for *expenses* they incurred, so the presence of charges by mystery researchers is perfectly explicable. More broadly, lawyers regularly use research tools to perform substantive tasks, and some might reasonably have listed only the broader task, such as drafting a motion, without itemizing the computer and print-resource research, writing, and editing which that task entailed. Hence, the discrepancies defendants cite do not render counsel's expenses unreasonable.

Relator's other two justifications, however, lack equal logical force. Attorney declarant Davidson insists "[i]t is not customary to provide the details concerning every item of expense in a major litigation," nor "to identify each piece of paper copied." (Davidson Supplemental Decl. ¶ 39, Ex. 2 to Reply to HII's Opp'n [957].) Requiring a fee petitioner to identify each sheet of paper copied would, as relator suggests, be "unduly cumbersome." But the Court does not believe it would "waste valuable [ ] time" to briefly indicate that the copied documents were, for example, "motions *in limine,*" "exhibits," or "research memos." The same logic applies to research charges. *Some* substantive information would permit the Court to ascertain that these expenses were "necessarily incurred." *See* 31 U.S.C. § 3730(d)(1) (2008). Relator's counsel's records list only "duplicating" or "photocopy—DC—for [date]," followed by the number of pages, or "computerized research Westlaw," followed by the researcher's name and the date. (*See generally* Ex. E–2 to Bell Decl., Ex. 2 to [930].) To "find" that such vaguely described charges "were necessarily incurred," this Court would have to function as a rubber stamp. This, it will not do.[87]

■ This Court imposed a ten percent across-the-board reduction on relator's billed hours due to generic and ambiguous narrative descriptions. *See supra* part III.B.2.a.i. Vague entries are scattered throughout relator's time records, but in their expense records, such entries are downright ubiquitous. Accordingly, the Court concludes a forty percent across-the-board reduction in compensable expenses is appropriate.

Relator seeks $511,723.06 in litigation expenses. (*See* Bell Supplemental Decl. ¶¶ 26–28, Ex. 1 to Reply to HII's Opp'n [957] ). Subtracting non-compensable charges from this total, and accounting for the acknowledged duplication with relator's bill of costs, *see supra* note 17, leaves $478,375.87. Applying the forty percent wholesale reduction brings relator's total compensable expenses to $287,025.52.

### CONCLUSION

For the reasons set forth above, the Court shall grant in part and deny in part relator's motion for attorneys' fees, costs, and expenses [930]. Pursuant to 31 U.S.C. section 3730(d)(1), the Court shall order

---

87. In reviewing fee petitions under the Ethics and Government Act, our Court of Appeals has required a similarly reasonable, minimal level of detail:

As the OIC points out, however, the expense pages contain multiple entries for "Taxi" cab rides, "Photocopying," "Courier Service," and "Computer Legal Research," all of which are not otherwise explained.... The court has in the past made deductions for comparable expenses because of a lack of supporting documentation and should do so here....

*In re Cisneros (Finkelstein Fee Application ),* 454 F.3d 342, 350 (D.C.Cir.Spec.Div.2006) (citations omitted). *Accord In re Cisneros (Needle Fee Application),* 454 F.3d 334, 341–42 (D.C.Cir.Spec.Div.2006); *In re Madison Guar. Sav. & Loan (Marceca Fee Application ),* 366 F.3d 922, 929 (D.C.Cir.Spec.Div.2004) (per curiam).

defendants BHIC, HUK, Bilhar, HII, and HC to pay relator $7,245,169.07 in reasonable attorneys' fees, and $287,025.52 in reasonable expenses, which this Court finds were necessarily incurred—in total, $7,532,194.59.

Further, the Court shall grant plaintiffs' bills of costs [928, 929]. Pursuant to Federal Rule of Civil Procedure 54(d)(1) and Local Civil Rule 54. 1, the Court shall direct the Clerk to tax $54,437.87 in costs to all defendants, including Anderson, on the United States' behalf. It shall further direct the Clerk to tax $31,973.96 to defendants BHIC, HUK, Bilhar, HII, and HC on relator's behalf.

A separate order shall issue this date.

## ORDER

The Court has considered plaintiffs' bills of costs [928, 929, 933], relator's motion for attorneys' fees, costs, and expenses [930], the entire record herein, and the applicable law. For the reasons set forth in the accompanying memorandum opinion, it is hereby:

ORDERED that the United States' initial and supplemental bills of costs [928, 933] are GRANTED. Pursuant to Federal Rule of Civil Procedure 54(d)(1) and Local Civil Rule 54. 1, the Clerk is directed to tax $54,437.87 in costs to all defendants. It is further

ORDERED that relator's bill of costs [929] is GRANTED. The Clerk is directed to tax $31,973.96 to defendants BHIC, HUK, Bilhar, HII, and HC. It is further

ORDERED that relator's motion [930] is GRANTED in part and DENIED in part. Pursuant to 31 U.S.C. section 3730(d)(1), defendants BHIC, HUK, Bilhar, HII, and HC shall pay relator $7,245,169.07 in reasonable attorneys' fees, and $287,025.52 in reasonable expenses, which this Court finds were necessarily incurred—in total, $7,532,194.59.

SO ORDERED.

## APPENDIX I

The following table lists the billing rates applied in calculating the lodestar, per the discussion in part III.A, *supra*.

| Name | Firm | Hourly Rate | Source |
|---|---|---|---|
| Yaa A. Apori | Wilmer Hale | $485 | Bell Decl. ¶ 108, Ex. 2 to [930] |
| Matthew Baumgartner | Wilmer Hale | $350 | Bell Decl. ¶ 108, Ex. 2 to [930] |
| Ashley Baynham | Wilmer Hale | $350 | Bell Decl. ¶ 108, Ex. 2 to [930] |
| Robert B. Bell | Wilmer Hale | $650 | Bell Decl. ¶ 108, Ex. 2 to [930] |
| David Bowsher | Wilmer Hale | $485 | Bell Decl. ¶ 108, Ex. 2 to [930] |
| Monya M. Bunch | Wilmer Hale | $350 | Bell Decl. ¶ 108, Ex. 2 to [930] |
| Mary Beth Caswell | Wilmer Hale | $210 | Bell Decl. ¶ 108, Ex. 2 to [930] |
| Jonathan Cedarbaum | Wilmer Hale | $495 | Bell Decl. ¶ 108, Ex. 2 to [930] |
| Annie L. Chelovitz | Wiley Rein | $125 | USAO *Laffey* Matrix 2007–08 [88] |
| Robert Cultice | Wilmer Hale | $625 | Bell Decl. ¶ 108, Ex. 2 to [930] |
| Michael Gottlieb | Wilmer Hale | $385 | Bell Decl. ¶ 108, Ex. 2 to [930] |
| Keven C. Heffel | Wilmer Hale | $315 | Bell Decl. ¶ 108, Ex. 2 to [930] |
| Monika Moore | Wilmer Hale | $385 | Bell Decl. ¶ 108, Ex. 2 to [930] |
| Allison F. Murphy | Wilmer Hale | $275 | Bell Decl. ¶ 108, Ex. 2 to [930] |

88. *See* U.S. Attorney's Office for the District of Columbia, Laffey Matrix 1992–2003, *available at* http://www.usdoj.gov/usao/dc /Divisions/Civil_Division/Laffey_Matrix_7.html.

| Jennifer M. O'Connor | Wilmer Hale | $510 | Bell Decl. ¶ 108, Ex. 2 to [930] |
|---|---|---|---|
| F.H. Quaynor | Wiley Rein | $125 | USAO *Laffey* Matrix 2007–08 |
| Gregory Reece | Wilmer Hale | $385 | Bell Decl. ¶ 108, Ex. 2 to [930] |
| Colin Rushing | Wilmer Hale | $485 | Bell Decl. ¶ 108, Ex. 2 to [930] |
| Howard Shapiro | Wilmer Hale | $750 | Bell Decl. ¶ 108, Ex. 2 to [930] |
| Milton R. Shook | Wilmer Hale | $210 | Bell Decl. ¶ 108, Ex. 2 to [930] |
| Stephen T. Smith | Wilmer Hale | $385 | Bell Decl. ¶ 108, Ex. 2 to [930] |
| Stanley R. Soya | Wiley Rein | $440 | USAO *Laffey* Matrix 2007–08 |
| Michael L. Sturm | Wiley Rein | $495 | Bell Decl. ¶ 104, Ex. 2 to [930] |
| Laura K. Terry | Wilmer Hale | $485 | Bell Decl. ¶ 108, Ex. 2 to [930] |
| Nancy Tillotson | Wilmer Hale | $175 | Bell Decl. ¶ 108, Ex. 2 to [930] |
| Luis de la Torre | Wiley Rein | $390 | USAO *Laffey* Matrix 2007–08 |
| Chris R. Yukins | Wiley Rein | $390 | USAO Laffey Matrix 2007–08 |

### *APPENDIX II*

The tables below include all time entries from which the Court has deducted specific amounts of time spent on noncompensable tasks, as discussed in part III.B.1, *supra*. The far right column lists the reason for each reduction and its source—that is, whether the particular number of hours deducted was proposed by Bell, in the attachments to his supplemental declaration, or calculated by the Court. For certain travel-related reductions, the Court has applied Bell's estimates for travel to or from a particular city to entries for which Bell did not propose any reduction; for these entries, the source is listed as "Court/Bell." Finally, to the extent possible, the Court has attempted to highlight the non-compensable tasks listed in the "Narrative" column in boldface type.

A. Wiley Rein

| Date | Attorney | Billed Hours | Net Hours | Narrative | Reduction | Reason for Reduction (Source) |
|---|---|---|---|---|---|---|
| 06/16/1995 | RBB | 5.00 | 3.00 | Review and revise complaint; meet with Mr. Soya re strategy; meet with team to review and assign tasks; review and revise draft disclosure statement; revise fee agreement. | 2.00 | Fee Agreement (Bell) |

| Date | | Hours | Description | | | |
|---|---|---|---|---|---|---|
| 06/23/1995 | LD | 7.25 | 6.25 Review and edit latest versions of complaint and disclosure statement; research issue of relator's entitlement to share of recovery from defendant not named in relator's complaint; research issue of discoverability of disclosure statement; draft memo regarding these two issues; review messages from Mr. Yukins regarding business done by the various defendants in Washington, D.C.; review monograph regarding causes of action by companies being investigated or charged with fraud and discuss with Mr. Yukins; discuss complaint, disclosure statement, and jurisdictional issue with Mr. Bell, Mr. Sturm, and Mr. Yukins. | | 1.00 | Relator's Share (Court) |
| 06/24/1995 | RBB | 0.25 | 0.00 Read memorandum from Mr. de la Torre on whether relator can be awarded part of recovery from a defendant not initially named in relator's complaint. | | 0.25 | Relator's Share (Bell) |

| Date | | Hours | Description | Hours | Matter |
|---|---|---|---|---|---|
| 06/25/1995 | LD | 8.25 | Draft alphabetical list of relevant persons and entities; prepare chart showing profits on international contracts of Jones Construction; review documents and information furnished by Mr. Miller for purposes of editing latest draft of complaint and disclosure statement and determining which exhibits to use for disclosure statement; leave messages for Mr. Sturm and Mr. Yukins regarding revisions to the disclosure statement; **review proposed retention letter and correspondence with Mr. Miller** | 1.00 | Fee Agreement (Bell) |
| 06/28/1995 | LD | 5.50 | Review disclosure statement and exhibits thereto for accuracy of citation to exhibits; edit exhibit list; draft memo regarding proposed edits to complaint and disclosure statement; discuss finalizing and serving the complaint and disclosure statement, including possible counterclaims and privilege issues regarding exhibits, with Mr. Bell and Mr. Sturm; **review recent False Claims Act cases involving counterclaims**; review Federal Rules, local court rules, and confirm with clerk's office information regarding forms, procedure, and fee required for filing complaint under seal. | 0.25 | Employment (Court) |

| Date | Initials | | Description | | | Category |
|---|---|---|---|---|---|---|
| 06/29/1995 | RBB | 3.00 | Prepare for meeting and meeting with **Mr. Klein and Mr. Spratling (DOJ)**; draft letter to Mr. Klein and letter to Mr. Hertz | 2.75 | 0.25 | Immunity (Court) |
| 06/29/1995 | MLS | 2.50 | **Meeting at Antitrust Division**; preparation for same; telephone conference with Mr. Miller re same. | 2.25 | 0.25 | Immunity (Court) |
| 07/07/1995 | RBB | 4.00 | Review memorandum from **Mr. Luh on counterclaims in qui tam cases and read cases cited therein; review memorandum from Ms. Ben-David on possible common law claims J.A. Jones, Inc. might seek to assert against Mr. Miller; meet with Mr. Luh and Ms. Ben-David.** | 0.00 | 4.00 | Employment (Court) |
| 07/20/1995 | SRS | 0.25 | Telephone conference with Mr. Bell re possible Government use of covert investigative techniques in connection with anti-trust investigations and advice to Mr. Miller re possible questions from corporate management once the investigation becomes public. | 0.15 | 0.10 | Employment (Court) |
| 08/03/1995 | RBB | 9.00 | Meet with Mr. Miller and Mr. Sturm; all day meeting at DOJ with Messrs. Dillon, Kindred, Morgan, and Ms. Mark; review leniency letter. | 8.00 | 1.00 | Immunity (Court) |
| 08/03/1995 | MLS | 9.00 | Meeting with Mr. Miller; meeting at DOJ; review and analyze issues re outcome of same. | 8.00 | 1.00 | Immunity (Court) |

| Date | | | | Description | | |
|---|---|---|---|---|---|---|
| 08/04/1995 | RBB | 0.75 | 0.25 | Draft letter to Mr. Spratling; **telephone call with Mr. Miller re yesterday's meeting** | 0.50 | Immunity (Court) |
| 08/04/1995 | LD | 0.25 | 0.15 | **Review and file correspondence regarding** Antitrust Division's investigation to date and grant of leniency; review complaint and disclosure statement. | 0.10 | Immunity (Court) |
| 08/29/1995 | RBB | 8.00 | 6.50 | Review notes of prior meetings with DOJ; travel to Charlotte; meet with Mr. Miller, meet with DOJ | 1.50 | Travel (Court/Bell) |
| 08/29/1995 | MLS | 8.00 | 6.50 | Prepare for and meet with Messrs. Miller, Dillon, and Kindred; prepare Mr. Miller for meeting; **travel to Charlotte for meeting** | 1.50 | Travel (Court/Bell) |
| 09/18/1995 | MLS | 0.75 | 0.00 | **Review and analyze issues re relator's entitlement to portion of criminal fine; conferences with Ms. Faunce re same.** | 0.75 | Relator's Share (Bell) |
| 09/19/1995 | RBB | 9.00 | 7.50 | **Travel to Charlotte;** review memorandum describing previous meeting; meet with Mr. Sturm; meet with Messrs. Dillon, Miller and Sturm, and Ms. Mueller; post-mortem with Mr. Miller, post-mortem with Mr. Sturm | 1.50 | Travel (Bell) |
| 09/19/1995 | MLS | 8.50 | 7.00 | Meeting with FBI, US Attorney's Office and DOJ in Charlotte; prepare for same; **travel to Charlotte for same.** | 1.50 | Travel (Bell) |

| Date | Initials | Hours | | | Category |
|---|---|---|---|---|---|
| 09/20/1995 | RBB | 9.00 | 7.50 | Meet with Mr. Dillon; meet with Messrs. Miller and Dillon and Ms. Mueller; **travel.** | 1.50 | Travel (Bell) |
| 09/20/1995 | MLS | 9.50 | 8.00 | Meetings in Charlotte with DOJ and FBI; lunch with Mr. Dillon; review and analyze complaint against Jones, et al.; **return travel from Charlotte** | 1.50 | Travel (Bell) |
| 10/17/1995 | RBB | 13.00 | 9.00 | **Travel to and from Atlanta**; meet with Mr. Miller; meet with Messrs. Dillon, Kindred, and Miller; conference with Mr. Sturm | 4.00 | Travel (Bell) |
| 10/17/1995 | MLS | 12.50 | 8.50 | Prepare for meeting with Messrs. Dillon, Miller, et al.; **travel to Atlanta** for meeting; meeting in Atlanta re document review; **return travel from Atlanta** | 4.00 | Travel (Bell) |
| 11/07/1995 | RBB | 10.50 | 9.00 | Review documents sent to me by Mr. Miller; prepare exhibits to submit to the government; **travel to Charlotte**; meet with Messrs. Miller, Sturm, Dillon, Kindred, and Ms. Mueller; meet with Messrs. Miller and Sturm | 1.50 | Travel (Bell) |
| 11/07/1995 | MLS | 8.50 | 7.00 | Prepare for meeting and meet with Messrs Miller, Dillon, and Kindred and Ms. Mueller; **travel to Charlotte** for same; conference with Mr. Bell re outcome of meeting | 1.50 | Travel (Bell) |

| Date | Initials | | | Description | | Category |
|---|---|---|---|---|---|---|
| 11/08/1995 | RBB | 4.00 | 2.50 | Breakfast meeting with Messrs. Sturm, Dillon, and Kindred; travel to Washington; attempt to reach Mr. Miller; meet with Mr. Sturm | 1.50 | Travel (Bell) |
| 11/08/1995 | MLS | 4.50 | 3.00 | Meeting with Messrs. Dillon and Kindred re strategy; return travel from Charlotte; conference with Mr. Bell re status and strategy. | 1.50 | Travel (Bell) |
| 11/09/1995 | MLS | 1.00 | 0.75 | Telephone conference with Mr. Miller re issues raised by DOJ; conference with Mr. Bell re same; review and analyze memorandum re qui tam awards | 0.25 | Relator's Share (Court) |
| 01/14/1996 | RBB | 0.75 | 0.00 | Telecon Rick Miller re: strategy concerning possible interviews by company lawyers | 0.75 | Employment (Court) |
| 01/17/1996 | RBB | 2.75 | 0.00 | Telephone call with Mr. Miller re request that he be interviewed by outside counsel; meet with Mr. Sturm re same; separate meetings with Messrs. Brunner and Gordon, telephone call with Mr. Douglas, all re strategy for whether or not to cooperate with company investigation | 2.75 | Employment (Bell) |
| 01/17/1996 | MLS | 0.50 | 0.00 | Review and analyze issues and response to interview request; conference with Messrs. Bell and Gordon re same | 0.50 | Employment (Court) |

| Date | | | | Description | | Category |
|---|---|---|---|---|---|---|
| 01/18/1996 | RBB | 2.00 | 0.50 | 1.50 Finalize arrangements for meeting with Mr. Miller; conference with Mr. Soya re status of case; outline alternative strategies | | Employment (Court) |
| 01/18/1996 | SRS | 0.50 | 0.50 | 0.00 Telephone conference with Mr. Bell re status and consideration of issues in connection with the company's request to interview Mr. Miller | | Employment (Bell) |
| 01/19/1996 | RBB | 8.00 | 8.00 | 0.00 Prepare flip charts for meeting with Mr. Miller; dinner meeting with Messrs. De la Torre, Gordon, Douglas, and Soya; lengthy meeting with Messrs. Miller, Sturm, de la Torre, Soya, Gordon, and Douglas to discuss whether to submit to interviews with company counsel, refuse to be interviewed, announce whistleblower status, or resign | | Employment (Bell) |
| 01/19/1996 | LD | 4.75 | 0.50 | 4.25 Review documents provided by Mr. Miller and qui tam disclosure statement and meet with Mr. Miller, Mr. Bell, Mr. Gordon, Mr. Soya, and Mr. Douglas to discuss status of criminal investigation and its impact on Mr. Miller's employment, and handling of document issues; discuss status of case with Mr. Yukins | | Employment (Bell) |

| Date | Initials | | | Description | | Category |
|---|---|---|---|---|---|---|
| 01/19/1996 | SRS | 4.00 | 0.00 | Office conference with Mr. Miller and Messrs. Bell, Douglas, Gordon and Soya re. strategy; review and analyze issues re same; telephone conference with Mr. Bell re same. | 4.00 | Employment (Bell) |
| 01/23/1996 | RBB | 0.50 | 0.00 | Telephone call with Mr. miller re documents and re resignation plans | 0.50 | Employment (Bell) |
| 01/24/1996 | RBB | 0.25 | 0.00 | Conference with Mr. Sturm re my discussion last night with Mr. Miller | 0.25 | Employment (Court) |
| 01/24/1996 | MLS | 0.25 | 0.00 | Conference with Mr. Bell re developments | 0.25 | Employment (Court) |
| 02/13/1996 | RBB | 1.00 | 0.50 | Telephone call with Mr. Dillon re status; telephone call with Mr. Miller re outside counsel seeking to interview him | 0.50 | Employment (Bell) |
| 02/14/1996 | RBB | 4.00 | 3.00 | Meet with Messrs. Sturm, Douglas, Gordon, and de la Torre re strategy for Mr. Miller resigning; telephone call with Mr. Dillon re grand jury subpoena to be served on Mr. Miller; lengthy telephone call with Mr. Miller re grand jury subpoena, strategy for resigning from company, and strategy for dealing with questions from lawyers and co-workers | 1.00 | Employment (Bell) |

| Date | | | Description | | | |
|---|---|---|---|---|---|---|
| 02/14/1996 | LD | 2.25 | Review notes of January 19 meeting with Mr. Miller and discuss status of criminal investigation and of Jones Construction's in-house investigation, Mr. Miller's response thereto, and the impact of the investigations on Mr. Miller's employment with Mr. Bell, Mr. Gordon, Mr. Sturm, and Mr. Douglass | 0.50 | 1.75 | Employment (Bell) |
| 02/14/1996 | MLS | 3.00 | Conference with Mr. Bell, et al. re strategy; review and analyze issues re same; conference with Mr. Bell re issues raised by Mr. Dillon; conference with Mr. Bell re subpoena | 2.50 | 0.50 | Employment (Court) |
| 02/19/1996 | RBB | 0.75 | Telephone call with Mr. Miller re voice mail from Mr. Flexner and re grand jury subpoena | 0.50 | 0.25 | Employment (Court) |
| 02/20/1996 | RBB | 3.00 | Telephone call with Mr. Flexner re his request to interview Mr. Miller; draft memorandum to file; conferences with Messrs. Sturm, Gordon, and Douglas re options; telephone call with Mr. Miller; telephone call with Ms. Mark re extending sealed period for qui tam action | 1.00 | 2.00 | Employment (Court) |
| 02/20/1996 | MLS | 1.50 | Telephone conferences with Mr. Bell re service of subpoena, response to request for interview and strategy | 0.75 | 0.75 | Employment (Court) |

| Date | | | Description | | Category |
|---|---|---|---|---|---|
| 02/21/1996 | RBB | 2.25 | 0.00 | Meet with Miller team re strategy; draft scripts for telephone calls with Mr. Flexner; conference call with Messrs. Miller and Sturm; meet with Mr. Brunner | 2.25 | Employment (Bell) |
| 02/21/1996 | LD | 3.25 | 1.25 | Research and review recent False Claims Act decision regarding the qui tam provisions; review memo to file prepared by Mr. Bell regarding Jones Construction's request for interview with Mr. Miller; discuss status of criminal investigation and of Jones in-house investigation and the impact of the investigations on Mr. Miller's employment with Mr. Bell, Mr. Gordon, Mr. Sturm, and Mr. Douglass; discuss status of case with Mr. Yukins | 2.00 | Employment (Bell) |
| 02/21/1996 | MLS | 1.75 | 0.75 | Telephone conference with Mr. Miller re developments and strategy; conferences with Mr. Bell re approach from Jones counsel | 1.00 | Employment (Bell) |
| 02/22/1996 | RBB | 4.50 | 2.00 | Telephone calls with Mr. Flexner, Mr. Dillon, Ms. Mueller, and Mr. Gardner; conferences with Messrs. Sturm, Douglas, and Gordon re strategy; lengthy telephone call with Mr. Miller re resignation | 2.50 | Employment (Bell) |

| Date | | | | | | |
|---|---|---|---|---|---|---|
| 02/22/1996 | MLS | 2.00 | 0.50 | Telephone conference with Ms. Mueller re progress of investigation; review and analyze issues re response to request for interview; conferences with Mr. Bell re same | 1.50 | Employment (Bell) |
| 02/23/1996 | RBB | 3.00 | 2.00 | Two telephone calls with Mr. Flexner re Miller's resignation; telephone call with Ms. Mueller; telephone calls with Mr. Miller; telephone call with Mr. Gordon. | 1.00 | Employment (Bell) |
| 02/23/1996 | LD | 2.25 | 0.00 | Review draft letter and talking points regarding Mr. Miller's resignation prepared by Mr. Bell; review reference materials regarding claims against employees for breach of duty of loyalty; discuss status of criminal investigation and of Jones in-house investigation, the impact of the investigations on Mr. Miller's employment, and potential resignation of Mr. Miller, with Mr. Bell, Mr. Gordon, Mr. Walker, Mr. Sturm, and Mr. Douglass. | 2.25 | Employment (Bell) |

| Date | Initials | | | Description | | Category |
|---|---|---|---|---|---|---|
| 02/23/1996 | MLS | 4.75 | 0.00 | Review and revise resignation script and letter; conference with Mr. Bell, et al. re same; telephone conference with Mr. Bell re developments; telephone conferences with Mr. Miller re resignation; final revision of documents; telephone conference with Ms. Mueller re resignation | 4.75 | Employment (Bell) |
| 02/24/1996 | LD | 7.75 | 0.00 | Research, review, and take notes on case law and journal articles regarding breach of duty of loyalty under North Carolina law | 7.75 | Employment (Court) |
| 02/26/1996 | RBB | 5.50 | 5.00 | Telephone call with Mr. Dillon and Mr. Gordon re Miller's resignation and re his discussion with Mr. Corley; telephone call with Mr. Miller, conference call with Messrs. Miller, Dillon, and Gordon re knowledge of four witnesses government will interview this week; draft memo to file | 0.50 | Employment (Bell) |
| 02/26/1996 | MLS | 0.50 | 0.00 | Telephone conference with Mr. Bell re resignation issues and developments | 0.50 | Employment (Bell) |
| 02/27/1996 | MLS | 0.50 | 0.00 | Telephone conference with Mr. Miller re developments; review and analyze draft file memorandum re telephone conference with Mr. Flexner; telephone conference with Mr. Bell re status | 0.50 | Employment (Bell) |

| Date | | Hours | Description | Hours | Category |
|---|---|---|---|---|---|
| 02/28/1996 | RBB | 3.00 | Telephone call with Mr. Ashcraft (attorney for Fritz Beseecher); telephone call with Mr. Miller re status; telephone call with Mr. Flexner; draft memo to file re conversation with Mr. Flexner; telephone call with Mr. Miller re Flexner conversation | 1.50 | Employment (Bell) |
| 02/29/1996 | RBB | 4.00 | Telephone call with Mr. Dillon; draft letter to Messrs. Flexner and Burdette; telephone call with Mr. Burdette re Miller talking to Mr. Bowden about issues raised in February 23 letter; telephone call with Mr. Miller re meeting with Mr. Bowden; conferences with Messrs. Sturm and Gordon | 0.50 | Employment (Court) |
| 02/29/1996 | LD | 0.50 | Review and take notes on memo to file prepared by Mr. Bell concerning Mr. Flexner's requests for information regarding any participation by Mr. Miller in government's investigation and Mr. Miller's resignation | 0.50 | Employment (Bell) |
| 02/29/1996 | MLS | 1.25 | Review and analyze issues re resignation; telephone conferences with Mr. Miller re same; review and analyze memorandum re telephone conferences with Mr. Flexner; conference with Mr. Bell re same | 1.25 | Employment (Bell) |

| Date | Initials | Hours | Description | Hours | Category |
|---|---|---|---|---|---|
| 03/01/1996 | RBB | 2.00 | 1.00 Telephone call with Mr. Miller re his meeting with Mr. Bowden; telephone calls with Ms. Mueller and Mr. Gordon; telephone call with Mr. Miller re grand jury appearance | 1.00 | Employment (Court) |
| 03/08/1996 | RBB | 1.00 | 0.00 Telephone call with Mr. Miller re strategy for his meetings today with Messrs. Bowden and Davidson; telephone calls with Mr. Miller re outcome of his meeting with Mr. Bowden and re not saying anything to bankers that could harm Jones' business relationships | 1.00 | Employment (Bell) |
| 03/12/1996 | RBB | 1.00 | 0.50 Telephone call with Mr. Dillon re Miller's last day; telephone call with Ms. Mueller; telephone call with Mr. Miller | 0.50 | Employment (Court) |
| 05/31/1996 | MLS | 0.50 | 0.00 Review and analyze issues re responses to inquiries re job departure | 0.50 | Employment (Bell) |
| 06/03/1996 | RBB | 1.50 | 0.00 Meet with Mr. Sturm; telephone call with Mr. Dillon re language to be used by Mr. Miller; telephone call with Mr. Miller | 1.50 | Employment (Bell) |

| Date | Initials | Hours | Description | Hours | Category |
|---|---|---|---|---|---|
| 06/03/1996 | MLS | 1.25 | **0.00** Review and analyze issues re responses to inquiries re job departure; review and revise memorandum re same; telephone conferences with Messrs. Miller and Dillon re same and case status | 1.25 | Employment (Bell) |
| 06/04/1996 | RBB | 0.75 | **0.00** Draft letter to Mr. Miller suggesting two responses to questions about resigning from prior employment; telephone call with Mr. Miller | 0.75 | Employment (Bell) |
| 06/04/1996 | MLS | 0.25 | **0.00** Review and revise letter to Mr. Miller re job inquiries | 0.25 | Employment (Bell) |
| 09/04/1996 | RBB | 7.50 | **6.00** Travel to Charlotte, NC; lunch meeting with Mr. Miller; meet with Mr. Dillon and Mr. Gordon to answer their questions and prepare for grand jury appearance | 1.50 | Travel (Court/Bell) |
| 09/05/1996 | RBB | 8.00 | **6.50** Breakfast meeting with Mr. Miller re grand jury testimony; meet with Messrs. Dillon and Gordon; wait for grand jury appearance; travel to D.C. | 1.50 | Travel (Court/Bell) |
| 02/26/1997 | RBB | 1.50 | **1.00** Telephone call with Mr. Miller re consulting offer from Womble Carlyle; telephone call with Mr. Dillon re additional day of testimony and re various document issues; conference with Mr. Sturm re strategy | 0.50 | Employment (Court) |

| Date | | | Description | | |
|---|---|---|---|---|---|
| 03/04/1997 | RBB | 13.00 | **Travel to Charlotte; meet with Messrs. Sturm, Dillon, and Baker to prepare for grand jury appearance; post-meeting conference with Mr. Sturm** 11.50 | 1.50 | Travel (Court/Bell) |
| 03/04/1997 | MLS | 13.50 | Meeting with Messrs. Miller and Dillon re grand jury testimony preparation; **travel to Charlotte for same** 12.00 | 1.50 | Travel (Court/Bell) |
| 03/05/1997 | RBB | 10.00 | Meet with Messrs. Sturm, Miller, Dillon, and Baker to prepare for grand jury; meet privately with Mr. Miller to prepare; confer with Mr. Miller during breaks from grand jury testimony; meet with Mr. Miller after testimony; travel 8.50 | 1.50 | Travel (Bell) |
| 03/05/1997 | MLS | 10.00 | Additional witness preparation; provide counsel for grand jury testimony; **return travel to Washington** 8.50 | 1.50 | Travel (Court/Bell) |
| 03/12/1997 | RBB | 0.25 | **Telephone call with Mr. Flexner re his request to be briefed on Mr. Miller's grand jury testimony** 0.00 | 0.25 | Employment (Bell) |
| 07/10/1997 | RBB | 6.00 | Travel to Charlotte; meet with Mr. Miller; meet with Messrs. Miller and Dillon to prepare for grand jury testimony 4.50 | 1.50 | Travel (Court/Bell) |
| 07/11/1997 | RBB | 8.00 | Represent Mr. Miller before grand jury; **return travel** 6.50 | 1.50 | Travel (Court/Bell) |
| **TOTAL** | | | **223.55** | 110.70 | |

B. Wilmer Hale

| Date | Attorney | Billed Hours | Net Hours | Narrative | Reduction | Reason for Reduction (Source) |
|---|---|---|---|---|---|---|
| 1/20/2000 | RBB | 2.00 | 1.00 | TELECONS WITH RICK MILLER, BILL DILLON RE FRUCON SETTLEMENT; JEFF GREEN RE FRUCON SETTLEMENT; CAROLYN MARK RE RELATORS SHARE. | 1.00 | Relator's Share (Bell) |
| 1/22/2000 | RBB | 1.00 | 0.00 | BEGIN DRAFTING LETTER TO CAROLYN MARK RE WHY RELATOR SHOULD RECEIVE 25% SHARE. | 1.00 | Relator's Share (Bell) |
| 1/25/2000 | RBB | 3.00 | 0.00 | DRAFTING LENGTHY LETTER TO CAROLYN MARK DESCRIBING WHY MILLER SHOULD RECEIVE 25% SHARE. | 3.00 | Relator's Share (Bell) |
| 1/26/2000 | RBB | 0.50 | 0.00 | REVISING LETTER TO CAROLYN MARK; TELECON WITH RICK MILLER RE SAME. | 0.50 | Relator's Share (Bell) |
| 1/28/2000 | RBB | 0.40 | 0.00 | TELECON WITH RICK MILLER RE HIS COMMENTS ON LETTER TO CAROLYN MARK. | 0.40 | Relator's Share (Bell) |
| 1/31/2000 | RBB | 0.20 | 0.00 | TELECON WITH CAROLYN MARK; FINALIZING LETTER TO CAROLYN MARK. | 0.20 | Relator's Share (Bell) |
| 2/4/2000 | RBB | 0.20 | 0.00 | TELECON WITH MILLER; SENDING COPY OF LETTER TO CAROLYN MARK TO JIM GRIFFIN (ANTITRUST DIVISION). | 0.20 | Relator's Share (Bell) |

| Date | | | | Description | | |
|---|---|---|---|---|---|---|
| 7/6/2000 | RBB | 2.00 | 1.50 | TELCON MILLER RE: STATUS AND RE: EXTENSION OF TIME; LEAVING MESSAGE FOR MORGAN RE: AGREEMENT TO THREE MONTH EXTENSION OF TIME, TELCON DILLON, TELCON MARK RE: RELATOR'S SHARE. | 0.50 | Relator's Share (Bell) |
| 9/20/2000 | RBB | 0.50 | 0.00 | TELCON CAROLYN MARK RE: RELATOR'S SHARE; TELCON MILLER RE: SAME. | 0.50 | Relator's Share (Bell) |
| 10/19/2000 | RBB | 2.50 | 0.50 | MEETING WITH KEITH MORGAN AND CAROLYN MARK TO DISCUSS RELATOR'S SHARE; TELCONS RICK MILLER, BILL DILLON AND WALTER KINDRED. | 2.00 | Relator's Share (Bell) |
| 10/25/2000 | RBB | 0.30 | 0.00 | TELCON JIM GRIFFIN RE: RELATORS' SHARE; TELCON FROM KEITH MORGAN RE: SAME. | 0.30 | Relator's Share (Bell) |
| 10/26/2000 | RBB | 0.80 | 0.00 | TELCONS MIKE STURM, BILL DILLON AND RICK MILLER RE: RELATOR'S SHARE. | 0.80 | Relator's Share (Bell) |
| 10/31/2000 | RBB | 2.10 | 0.00 | RESEARCH ON RELATORS SHARE AND ON RELATOR'S AWARD THROUGH AN ALTERNATE REMEDY; TELCON MILLER. | 2.10 | Relator's Share (Bell) |
| 11/2/2000 | RBB | 2.10 | 0.00 | READING CASES ON RELATOR'S SHARE AND ALTERNATE REMEDIES. | 2.10 | Relator's Share (Bell) |
| 11/6/2000 | RBB | 2.00 | 0.00 | MEETING WITH KEITH MORGAN AND CAROLYN MARK RE: RELATOR'S SHARE AND LITIGATION STRATEGY. | 2.00 | Relator's Share (Bell) |

| Date | | | Description | | |
|---|---|---|---|---|---|
| 11/7/2000 | RBB | 1.70 | 0.00 | RESEARCH ON DAMAGES ISSUES; TELCON RICK MILLER RE: YESTERDAY'S MEETING WITH DOJ; TELCON MICHAEL STURM. | 1.70 Relator's Share (Bell) |
| 11/14/2000 | RBB | 0.40 | 0.00 | REVIEWING GE CASE AND OUTLINING ARGUMENT ON RELATOR'S SHARE. | 0.40 Relator's Share (Bell) |
| 11/17/2000 | RBB | 1.50 | 0.50 | TELCON RICK MILLER; TELCON CAROLYN MARK TO NEGOTIATE RELATOR'S SHARE; TELCON LARRY GONDELMAN. | 1.00 Relator's Share (Bell) |
| 11/30/2000 | RBB | 0.90 | 0.00 | TELCONS KEITH MORGAN, BILL DILLON, AND RICK MILLER RE: SETTLEMENT ON RELATOR'S SHARE OF AICI AND B+B SETTLEMENTS. | 0.90 Relator's Share (Bell) |
| 12/7/2000 | RBB | 4.30 | 0.00 | REVIEW TIME RECORDS SINCE INCEPTION OF CASE; DRAFT LETTER TO CAROLYN MARK RE MILLER'S CONTRIBUTION; TELECONS WITH MILLER RE LETTER; TELECON WITH MARK. | 4.30 Relator's Share (Bell) |
| 12/8/2000 | RBB | 2.00 | 0.00 | FINAL REVISIONS TO LETTER TO CAROLYN MARK; SEND LETTER TO MARK; TELECONS WITH MARK; TELECON WITH MILLER. | 2.00 Relator's Share (Bell) |
| 12/11/2000 | RBB | 0.60 | 0.00 | TELCONS CAROLYN MARK, RICK MILLER RE: RELATOR'S SHARE. | 0.60 Relator's Share (Bell) |

| Date | TK | Hours | Description | Share | Category |
|---|---|---|---|---|---|
| 12/12/2000 | RBB | 1.50 / 0.00 | TELCONS DILLON, KINDRED, GREEN, AND MILLER RE: B+B SETTLEMENT AND ITS RELATIONSHIP TO REALTOR'S SHARE. | 1.50 | Relator's Share (Bell) |
| 12/13/2000 | RBB | 3.20 / 2.00 | DRAFTING SETTLEMENT AND RELEASE AMONG B+B, FRUCON AND MILLER; TELCON JEFF GREEN RE: TERMS OF RELEASE; REVIEWING DRAFT AGREEMENT BETWEEN DOJ AND MILLER ON RELATOR'S SHARE; TELCONS MORGAN AND MARK RE: STATUS OF RELATOR'S SHARE APPROVALS, TELCON MORGANRE: DAMAGES EXPERT; TELCON MILLER. | 1.20 | Relator's Share (Bell) |
| 12/14/2000 | RBB | 3.00 / 2.00 | NEGOTIATING TERMS OF B+B RELEASE WITH JEFF GREEN, REVISING RELEASE, TELCONS CAROLYN MARK RE: RELATOR'S SHARE; TELCON RICK MILLER RE: CONFIRMATION OF 22% SHARE; TELCON KEITH MORGAN RE: CONSTRUCTION EXPERT. | 1.00 | Relator's Share (Bell) |
| 12/15/2000 | RBB | 1.50 / 1.00 | REVISING B+B AGREEMENT; REVIEWING RELATOR'S SHARE AGREEMENT AND NEGOTIATING ADDITIONAL LANGUAGE WITH CAROLYN MARK; EXECUTING BOTH AGREEMENTS; TELCON KEITH MORGAN RE: TWO ADDITIONAL EXPERTS; TELCON MILLER RE: STATUS. | 0.50 | Relator's Share (Bell) |

| Date | | | Description | | |
|---|---|---|---|---|---|
| 12/21/2000 | RBB | 0.20 | 0.00 TELCON CAROLYN MARK RE: STATUS OF PAYMENT; LEAVING MESSAGE FOR RICK MILLER. | 0.20 | Relator's Share (Bell) |
| 12/29/2000 | RBB | 0.20 | 0.00 TELCON RICK MILLER RE: RECEIPT OF FUNDS | 0.20 | Relator's Share (Bell) |
| 3/16/2001 | RBB | 4.00 | 1.00 LEGAL RESEARCH ON ISSUE OF WHETHER MILLER IS ENTITLED TO SHARE OF SETTLEMENT PROCEEDS FROM ABB; TELCONS WALTER KINDRED AND KEITH MORGAN; CONFERENCE RICK MILLER. | 3.00 | Relator's Share (Bell) |
| 3/17/2001 | RBB | 2.00 | 0.00 ADDITIONAL RESEARCH ON MILLER'S ENTITLEMENT TO ABB SETTLEMENT. | 2.00 | Relator's Share (Bell) |
| 3/18/2001 | RBB | 3.00 | 0.00 DRAFTING MEMORANDUM TO FILE ON MILLER'S ENTITLEMENT TO SHARE OF ABB SETTLEMENT. | 3.00 | Relator's Share (Bell) |
| 3/19/2001 | RBB | 2.50 | 0.00 REVISING MEMORANDUM ON ENTITLEMENT TO ABB SETTLEMENT; DRAFTING LETTER TO MARK AND MORGAN RE: ENTITLEMENT; TELCON MILLER. | 2.50 | Relator's Share (Bell) |
| 3/22/2001 | RBB | 1.30 | 1.10 MEETING WITH SCOTT HAMMOND (DOJ); TELCON BRIAN LEVINE (ATTORNEY FOR HARBERT). | 0.20 | Solely BLH (Bell) |
| 4/10/2001 | RBB | 0.70 | 0.00 TELCON RICK MILLER RE: STATUS OF ABB SETTLEMENT. | 0.70 | Relator's Share (Bell) |

| Date | | | | Description | | |
|---|---|---|---|---|---|---|
| 4/13/2001 | RBB | 4.00 | 0.00 | PREPARING FOR MEETING; MEETING WITH CAROLYN MARK RE: RELATOR'S SHARE OF ABB SETTLEMENT, TELCONS RICK MILLER, TELCON BILL DILLON. | 4.00 | Relator's Share (Bell) |
| 4/16/2001 | RBB | 2.00 | 0.00 | RESEARCH ON ARGUMENT THAT RELATOR IS ENTITLED TO RECOVER ALL DAMAGES ATTRIBUTABLE TO CONSPIRACY HE REVEALED. | 2.00 | Relator's Share (Bell) |
| 4/18/2001 | RBB | 3.00 | 0.00 | RESEARCH ON CONSPIRACY LAW, TELCON BRYAN LAVINE RE: EXTENSION OF TIME; RESEARCH ON CONSPIRACY ISSUES; TELCON CAROLYN MARK RE: RELATOR'S SHARE. | 3.00 | 0.20 Solely BLH + 2.80 Relator's Share (Bell) |
| 5/1/2001 | RBB | 0.40 | 0.00 | TELCON CAROLYN MARK RE: HER MEETINGS WITH B+B ON DAMAGES AND RELATOR'S SHARE. | 0.40 | Relator's Share (Bell) |
| 5/11/2001 | RBB | 0.50 | 0.00 | TELCON MILLER RE: RELATOR'S SHARE; TELCON MILLER RE: SAME. | 0.50 | Relator's Share (Bell) |
| 5/14/2001 | RBB | 0.30 | 0.00 | TELCON CAROLYN MARK RE: RELATOR'S SHARE. | 0.30 | Relator's Share (Bell) |
| 5/15/2001 | RBB | 0.30 | 0.00 | TELCON RICK MILLER RE: NEGOTIATING STRATEGY; LEAVING MESSAGE FOR CAROLYN MARK. | 0.30 | Relator's Share (Bell) |
| 5/16/2001 | RBB | 1.20 | 0.60 | LENGTHY TELCON MARK AND MORGAN RE; SETTLEMENT STRATEGY AND RELATOR'S SHARE; TELCON MILLER. | 0.60 | Relator's Share (Court) |

| Date | | | | Description | | |
|---|---|---|---|---|---|---|
| 7/27/2001 | RBB | 4.00 | **3.50** | MEETING WITH JIM GRIFFITH, SCOTT HAMMOND, BILL DILLON (BY PHONE) AND JOHN ORR (BY PHONE); **TELCON CAORLYN MARK RE: MOTION FOR STAY AND ABB SHARE**; LENGTHY TELCON RICK MILLER RE: ABB STRATEGY. | 0.50 | Relator's Share (Court) |
| 8/28/2001 | RBB | 5.70 | 0.70 | **TELCON RICK MILLER; DRAFTING PRESENTATION ON SHARE OF ABB SETTLEMENT.** | 5.00 | Relator's Share (Court) |
| 8/29/2001 | RBB | 7.10 | 0.00 | **REVISING PRESENTATION TO CIVIL DIVISION ON ABB; REVIEWING CASES AND ADDING NEW SECTIONS TO PRESENTATION.** | 7.10 | Relator's Share (Court) |
| 9/10/2001 | RBB | 3.00 | 2.50 | **TELCON CAROLYN MARK RE: MOVING FOR** STAY, JOINT DEFENSE AGREEMENT, NEGOTIATIONS WITH HOLZMANN, AND **RELATOR'S SHARE**; REVIEWING CASE CITED BY MARK (SEAL V. SEAL); TELCON RICK MILLER. | 0.50 | Relator's Share (Bell) |
| 9/11/2001 | RBB | 2.00 | 0.00 | **REVIEWING SEAL V. SEAL; RESEARCH ON JOINT AND SEVERAL LIABILITY, PREPARING NEW SLIDES FOR PRESENTATION.** | 2.00 | Relator's Share (Court) |
| 9/12/2001 | RBB | 2.50 | 0.00 | **REVISING AND ADDING TO PRESENTATION.** | 2.50 | Relator's Share (Court) |

| Date | | | | Description | | Relator's Share (Bell) |
|---|---|---|---|---|---|---|
| 9/13/2001 | RBB | 0.60 | 0.00 | TELCON CAROLYN MARK RE: STAY, HOLZMANN NEGOTIATIONS, AND MEETING WITH HERTZ ON RELATOR'S SHARE; REVISING RELATOR'S SHARE PRESENTATION. | 0.60 | Relator's Share (Bell) |
| 11/1/2001 | RBB | 3.10 | 0.60 | TELCON MICHAEL HERTZ RE: ABB RELATOR'S SHARE; TELCON BILL DILLON RE: TRIAL STATUS AND RE: RESPONSES TO MOTIONS; CONFERENCE ROGER WITTEN, BEGINNING OUTLINE OF LETTER TO HERTZ, ET AL. | 2.50 | Relator's Share (Bell) |
| 11/2/2001 | RBB | 0.60 | 0.00 | TELCON BILL DILLON; TELCON RICK MILLER RE: ABB RELATORS SHARE. | 0.60 | Relator's Share (Bell) |
| 11/14/2001 | RBB | 0.40 | 0.10 | TELECON CAROLYN MARK RE COMMON INTEREST AGREEMENT AND RE AGREEMENT THAT GOVERNMENT WILL NOT OBJECT TO POSTPONING ABB RELATOR'S SHARE MOTION UNTIL AFTER CRIMINAL TRIAL; TELECON MILLER. | 0.30 | Relator's Share (Bell) |

| 12/7/2001 | RBB | 3.10 | 1.60 | DRAFTING AND FINALIZING LETTER TO CAROLYN MARK MEMORIALIZING CONVERSATION THAT GOVERNMENT WILL NOT OBJECT TO TIMING OF MOTION TO RECOVER RELATOR'S SHARE FROM ABB SETTLEMENT IF MOTION IS FILED AFTER CRIMINAL TRIAL; REVIEWING PROPOSED COMMON INTEREST AGREEMENT; DRAFTING LETTER TO CAROLYN MARK RE: REVISIONS NEEDED IN COMMON INTEREST AGREEMENT. | 1.50 | Relator's Share (Bell) |

| Date | | | Description | | |
|---|---|---|---|---|---|
| 8/14/2002 | RBB | 7.90 | PREPARING FOR MEETING WITH STEVE ALTMAN TO NEGOTIATE RELATOR'S SHARE BY REVIEWING PRESENTATION ON ABB RELATOR'S SHARE AND LETTERS SENT TO CAROLYN MARK RE: RELATOR'S SHARE (1.7); MEETING WITH STEVE ALTMAN AND EILEEN ZIMMER TO REVIEW DOCUMENTS ABOUT JONES' FINANCES AND DISCUSS REASONABLENESS OF SETTLEMENT (2.1); SEPARATE MEETING WITH ALTMAN TO NEGOTIATE RELATOR'S SHARE (.4); REVIEWING TIME ENTRIES; DRAFTING LETTER TO ALAN GOURLEY RE: HOURLY RATES; DRAFTING CONFIDENTIALITY AGREEMENT; ASSEMBLING PACKAGE FOR GOURLEY TO REVIEW AND MEETING WITH VERONICA KAYNE RE: SAME. | 3.70 | 4.20 Relator's Share (Bell) |

| 8/17/2002 | RBB | 5.90 | 4.90 | REVIEWING CASES ON APPORTIONMENT OF FEES AMONG MULTIPLE DEFENDANTS; TELCON MILLER RE: SETTLEMENT STRATEGY; OUTLINING REASONING BEHIND $315,000 COUNTEROFFER; LENGTHY TELCON GOURLEY RE: ATTORNEYS FEES; FAXING DRAFT AGREEMENTS TO MILLER; TELCON MILLER RE: DRAFT AGREEMENTS; TELCON MILLER RE: $180,000 COUNTEROFFER FROM GOURLEY; TELCON GOURLEY RE: $275,000 MILLER COUNTEROFFER; **REVISING DRAFT RELATOR'S SHARE AGREEMENT**; DRAFTING ATTORNEYS FEE SETTLEMENT AGREEMENT AMONG MILLER, JONES AND HOLZMANN. | 1.00 | Relator's Share (Bell) |

| Date | | | Description | | Relator's Share |
|---|---|---|---|---|---|
| 8/19/2002 | RBB | 3.70 | 2.00 REVIEWING JONES' DRAFT OF SETTLEMENT AGREEMENT ON ATTORNEYS FEES; REVISING DRAFT; TELCON GOURLEY TO NEGOTIATE CHANGES; REVIEWING REVISED DOCUMENT INCORPORATING NEGOTIATED CHANGES; **REVIEWING STEVE ALTMAN'S REVISIONS TO MY CHANGES TO RELATOR'S SHARE AGREEMENT; REVISING RELATOR'S SHARE AGREEMENT; TELCONS ALTMAN AND CAROLYN MARK TO NEGOTIATE CHANGES; REVIEWING DOCUMENT WITH NEGOTIATED CHANGES; REVIEWING THREE-WAY SETTLEMENT AGREEMENT; MEETING AT DOJ WITH ALTMAN, MARK, MORGAN AND GOURLEY TO EXECUTE ALL AGREEMENTS, TELCON MILLER RE: FINAL TERMS OF DOCUMENTS.** | 1.70 | Relator's Share (Court) |
| 11/13/2002 | YAA | 1.50 | 0.00 REVIEW PLEADINGS. | 1.50 | Transitioning onto case (Bell) |
| 11/14/2002 | YAA | 4.20 | 0.00 REVIEW NOTES AND PLEADINGS; DRAFT QUESTIONS FOR BELL | 4.20 | Transitioning onto case (Bell) |

| Date | Initials | Hours | Hours | Description | Hours | Category |
|---|---|---|---|---|---|---|
| 11/15/2002 | YAA | 5.40 | 0.00 | REVIEW NOTES AND PLEADINGS; DRAFT QUESTIONS FOR BELL | 5.40 | Transitioning onto case (Bell) |
| 11/22/2002 | YAA | 3.10 | 0.00 | REVIEW FALSE CLAIMS ACT TREATISE RE PROCEDURE; REVIEW FRCP 9(B) STANDARD; REVIEW WRIGHT AND MILLER DISCUSSION OF 9(B) CLAIMS AND NOTED CASES | 3.10 | Transitioning onto case (Bell) |
| 11/23/2002 | YAA | 2.20 | 0.00 | REVIEW TREATISE ON FALSE CLAIMS ACT; REVIEW WRIGHT AND MILLER NOTES ON FRCP 12; REVIEW CITED CASES | 2.20 | Transitioning onto case (Bell) |
| 5/23/2006 | RBB | 3.90 | 3.60 | REVIEW CURRENT DRAFT OF INTERROGATORY ANSWERS; MEETING WITH O'CONNOR, TERRY, REECE, AND MILLER (BY PHONE) TO REVIEW INTERROGATORY ANSWERS; VOICEMAIL FROM SAUNTRY RE: SERVICE ON BILHAR AND EXTENSION OF TIME; **TELECON FROM MILLER RE: LETTER TO DOJ SEEKING SHARE OF CRIMINAL PROCEEDS**; TELECON SAUNTRY RE: SERVICE ON BILHAR AND EXTENSION OF TIME; CONFERENCES O'CONNOR RE: DISCOVERY OF ISSUES. | 0.30 | Relator's Share (Court) |

| Date | | Hours | Description | | Hours | Category |
|---|---|---|---|---|---|---|
| 7/5/2006 | MMB | 11.80 | RESEARCH RE RELEVANCE OF BILL HARBERT BANK RECORDS TO PROVING CONSPIRACY, AND TO ESTABLISHING ABILITY TO SATISFY DAMAGES; DRAFT MOTION TO COMPEL RELATED INTERROGATORY ANSWER AND DOCUMENT PRODUCTION; CONFER WITH MR. GOTTLIEB AND G. REECE RE TASKS RELATING TO DRAFTING MOTIONS TO COMPEL. | 0.00 | 11.80 | Solely BLH (Bell) |
| 7/24/2006 | MMB | 13.80 | TRAVEL TO ATLANTA; REVIEW DOJ ANTITRUST DOCS; PREP SPREADSHEET FOR DOCS REVIEWED; CONFER WITH DOJ RE STRATEGY, REVIEW, SIGNIFICANT DOCS; CONFER WITH MS. O'CONNOR, MR. CEDARBAUM, G. REECE RE REVIEW PROCESS. | 11.80 | 2.00 | Travel (Court/Bell) |
| 7/24/2006 | JC | 10.80 | TRAVEL TO AND FROM ATLANTA (4.8); REVIEW DOCUMENT INDEXES; REVIEW DOCUMENTS (6.0) | 6.00 | 4.80 | Travel (Bell) |

| Date | | | | | |
|---|---|---|---|---|---|
| 7/24/2006 | GR | 13.50 | **TRAVEL TO ATLANTA; REVIEW DOCUMENTS AT DOJ ANTITRUST DIVISION OFFICES IN ATLANTA; DISCUSS COPYING SERVICE JOB WITH VENDOR; PREPARE SPREADSHEET FOR KEEPING TRACK OF DOCUMENT REVIEW PROGRESS; INPUT RESULTS OF DAY'S DOCUMENT REVIEW PROGRESS INTO INDEX.** 11.50 | 2.00 | Travel (Bell) |
| 7/27/2006 | MMB | 15.70 | REVIEW DOJ ANTITRUST DOCS; UPDATE SPREADSHEET FOR DOCS REVIEWED; CONFER WITH MS. O'CONNOR, MR. **CEDARBAUM, G. REECE RE REVIEW PROCESS; TRAVEL BACK TO D.C.** 13.70 | 2.00 | Travel (Bell) |
| 7/27/2006 | GR | 15.70 | REVIEW DOCUMENTS AT DOJ ANTITRUST DIVISION OFFICES IN ATLANTA; CONFER WITH MS. O'CONNOR AND MR. CEDARBAUM RE: PROGRESS OF DOCUMENT REVIEW; UPDATE DOCUMENT REVIEW TRACKING SPREADSHEET; **TRAVEL BACK TO WASHINGTON, D.C. FROM ATLANTA.** 13.70 | 2.00 | Travel (Bell) |

| Date | | Hours | Description | Hours | Hours | Category |
|---|---|---|---|---|---|---|
| 7/28/2006 | JC | 4.20 | MEET WITH MS. O'CONNOR RE: OVERALL PLANNING; TELEPHONE CALL WITH BELL RE: CONFERENCE CALL WITH DILLON; CONFERENCE CALL WITH MS. O'CONNOR AND MS. MARK RE: COORDINATION; EMAIL EXCHANGES RE: DISCOVERY; BILHAR MOTION FOR JUDGMENT ON THE PLEADINGS; TRIP TO BIRMINGHAM; DRAFT OUTLINE FOR CONFERENCE CALL WITH DILLON; DRAFT "MAP" OF CASE | 2.20 | 2.00 | Travel (Bell) |
| 8/1/2006 | NT | 0.50 | REVIEW TEAM ELECTRONIC CORRESPONDENCE; TELEPHONE CONFERENCE FROM/TO MS. BUNCH/MS. TILLOTSON REGARDING RESEARCH OF DEADLINE TO RESPOND TO BILL HARBERT PETITION TO UNSEAL GRAND JURY TESTIMONY FILED WITH ELEVENTH CIRCUIT; REVIEW ELEVENTH CIRCUIT COURT WEBSITE REGARDING SAME | 0.00 | 0.50 | Solely BLH (Bell) |
| 8/8/2006 | JC | 7.00 | REVIEW AICI DOCUMENTS AT AKIN GUMP; EMAIL EXCHANGES RE: VARIOUS DOCUMENTSS, WITNESS CONTACT INFO; MEET WITH MR. REECE RE: DRAFT OPPOSITION TO BILHAR MOTION FOR JUDGMENT ON PLEADINGS; TEAM MEETING; TRAVEL TO BIRMINGHAM FOR HC/HII DOCUMENT REVIEW | 5.00 | 2.00 | Travel (Court/Bell) |

| Date | | Hours | Description | | Travel |
|---|---|---|---|---|---|
| 8/8/2006 | MG | 17.00 | **14.50** PREPARE FOR AICI DOCUMENT REVIEW; REVIEW AICI DOCUMENTS AT AKIN GUMP; **TRAVEL FROM AKIN GUMP TO WILMER;** ATTEND WEEKLY MILLER MEETING; FINISH DRAFTING FORMER TESTIMONY MEMO; FAX MEMO TO BIRMINGHAM; **TRAVEL TO NATIONAL AIRPORT; TRAVEL DCA - CLT - BHM;** REVISE FORMER TESTIMONY MEMO; REVIEW MASTER DOCUMENT MEMO TO PREPARE FOR HARBERT DOC REVIEW; **TRAVEL FROM BHM AIRPORT TO SHERATON;** PRINT AND SEND FORMER TESTIMONY MEMO TO MR. CEDARBAUM. | 2.50 | 2.00 Travel (Bell) + 0.50 Local Travel (Court) |
| 8/10/2006 | JC | 6.50 | **4.50** REVIEW HC/HII DOCUMENTS; **RETURN TRAVEL FROM BIRMINGHAM;** REVIEW REVISED OPPOSITION TO BILHAR MOTION FOR JUDGMENT ON THE PLEADINGS | 2.00 | Travel (Bell) |
| 8/10/2006 | MG | 11.20 | **8.30** COMPLETE HARBERT DOCUMENT REVIEW; **TRAVEL TO AIRPORT; TRAVEL FROM BHM TO CLT TO DCA; TRAVEL FROM AIRPORT HOME;** WHILE TRAVELING, REVIEW, CLEAN UP, REVISE NOTES / REPORT FROM DOCUMENT REVIEW; RESEARCH ADDITIONAL CASE LAW ON AUTHENTICATION OF PRIOR TRIAL EXHIBITS QUESTION: | 2.50 | 2.00 Travel (Bell) + 0.50 Local Travel (Court) |

| Date | | | | Description | | |
|---|---|---|---|---|---|---|
| 8/25/2006 | MG | 11.50 | 10.50 | PREPARE FOR AICI DEPOSITION; **TRAVEL TO AND FROM AND ATTEND AICI DEPOSITION;** DISCUSS DEPOSITION WITH MR. CEDARBAUM AND MS. OCONNOR; PROOFREAD REVISED MOTION FOR PROTECTIVE ORDER REPLY; ASSIST IN FILING OF REPLY; WRITE COVER LETTER AND SEND COPIES OF RECENT FILINGS TO COMPLY WITH SERVICE REQUIREMENTS | 1.00 | Local Travel (Bell) |
| 9/14/2006 | MMB | 18.70 | **14.70** | **TRAVEL TO ATLANTA;** REVIEW BHIC DOCUMENTS; **TRAVEL TO DC;** REVIEW CONTRACT 29 DOCUMENTS AND OUTLINE FOR MEETING WITH GORDON LANG | 4.00 | Travel (Court/Bell) |
| 9/14/2006 | JC | 11.50 | **9.50** | **TRAVEL TO ATLANTA** TO REVIEW DOCUMENTS AT TROUTMAN SANDERS; REVIEW DOCUMENTS; CONF CALL WITH MS. OCONNOR, MR. GOTTLIEB RE: NICHOLS DEPOSITION | 2.00 | Travel (Court/Bell) |

| Date | | | Description | | Relator's Share (Court) |
|---|---|---|---|---|---|
| 9/14/2006 | JMO | 7.90 | 7.00 MEETING WITH MR. REECE ET AL RE FRUCON DEPOSITIONS; CONFER WITH MR. CEDARBAUM RE DOCS IN ATLANTA AND OTHER ISSUES; REVIEW MR. MINER'S CORRESPONDENCE; EMAILS TO MR. MORGAN AND MS. MARK RE SAME; MESSAGES TO DRINKER BIDDLE RE VARIOUS ISSUES; CONFER WITH EXPERT RE EXPERT ISSUES; REVIEW NEW DISCOVERY ORDER, EMAILS RE SAME AND RE APPEAL OF SAME; **REVIEW MR. MINER'S CORRESPONDENCE RE RELATOR'S SHARE; EMAILS WITH TEAM RE SAME; EMAIL WITH CO-COUNSEL RE SAME;** CONFER WITH MR. GOTTLIEB RE NICHOLS DEPOSITION; CONFER WITH MR. CEDARBAUM RE NICHOLS DEPOSITION AND STAFFING ISSUES; CONFER WITH MR. REECE RE FILING NOTICE OF DISMISSAL; CONFER AND EMAILS MR. LANG RE NOTICE OF DISMISSAL; EMAILS MS. MARK RE LANG MEETING; EDIT NOTICE OF DISMISSAL; PREPARE FOR LANG MEETING. | 0.90 | |

| Date | | | | | | |
|---|---|---|---|---|---|---|
| 9/15/2006 | JC | 9.00 | REVIEW DOCUMENTS AT TROUTMAN SANDERS; REVISE, OVERSEE SERVICE OF BLI.HAR 30(B)(6) NOTICE; CONF CALL WITH MS. O'CONNOR, MR. MORGAN, MS. MARK RE: NICHOLS DEPOSITION, WITNESS INTERVIEWS; MEET WITH MS. SAUNTRY RE: DOCUMENT REVIEW; **TRAVEL BACK FROM ATLANTA** | 7.00 | 2.00 | Travel (Court/Bell) |
| 9/16/2006 | RBB | 0.10 | **EMAILS TO AND FROM MS. O'CONNOR REGARDING DOCUMENTS SHOWING RELATORS SHARE** | 0.00 | 0.10 | Relator's Share (Court) |
| 9/16/2006 | JMO | 4.50 | EMAILS WITH MR REECE ET AL RE TRANSCRIPTS, FRUCON ISSUES, **EMAILS WITH MR. CEDARBAUM ET AL RE RELATOR'S SHARE REQUESTS BY DEFENDANTS,** EMAILS WITH MR. BELL AND MR. SHAPIRO RE DOJ STAFFING ISSUES, PREPARE FOR FRUCON DEPOSITIONS. | 4.20 | 0.30 | Relator's Share (Court) |

| Date | Initials | | | Description | Relator's Share (Court) |
|---|---|---|---|---|---|
| 9/17/2006 | GR | 9.80 | 9.30 | REVIEW DOCUMENTS AND PREPARE SUMMARIES OF ANTITRUST SIGNIFICANT DOCUMENTS; **REVIEW R. BELL'S FILES FOR DOCUMENTS RE: RELATOR'S SHARE**; SEND E-MAIL SUMMARIZING CONVERSATION WITH WITNESS F; RESPOND TO E-MAIL QUESTIONS FROM OTHER TEAM MEMBERS; PREPARE INSTRUCTIONS FOR SCANNING OF KWAJALIEN PROCEEDING TRANSCRIPTS; SEARCH FOR MISSING PLEADINGS. | 0.50 |
| 9/18/2006 | JMO | 14.80 | 10.30 | **TRAVEL TO LONDON AND LOCAL TRAVEL** RE SAME FOR FRUCON DEPOSITIONS; PREPARE FOR DEPOSITIONS ON PLANE; CONFER WITH MS. MARK AND MR. MORGAN AND MR. GREEN RE LOGISTICS; CONFER WITH MR. REECE AND MS. MOORE RE FRUCON DOCUMENTS; CONFER WITH MR. CEDARBAUM RE VARIOUS DEVELOPMENTS. | 4.50 / 4.00 Travel (Bell) + 0.50 Local Travel (Court) |

| Date | | Hours | | Description | Relator's Share |
| --- | --- | --- | --- | --- | --- |
| 9/18/2006 | GR | 9.00 | **8.00** | ARRANGE FOR SCANNING OF TRANSCRIPTS; ARRANGE FOR REVIEW OF USAID HOT DOCUMENTS FOR REFERENCES TO UPCOMING DEPONENTS; DRAFT SUMMARIES OF DOCUMENTS; SUPERVISE K. KENYON IN COMPLETION OF DOCUMENTS BINDERS; ATTEND CONFERENCE CALL WITH EXPERT RE: B+B DEPOSITION ISSUES; **REVIEW DOCUMENTS RE: RELATOR'S SHARE AND E-MAIL TO TEAM MEMBERS WITH SUMMARY OF DOCUMENTS**; SEARCH DATABASE FOR DOCUMENTS TO PROVIDE TO EXPERTS. | 1.00 Relator's Share (Court) |
| 9/19/2006 | JMO | 14.80 | **14.30** | MEETINGS WITH MR. MORGAN AND MS. MARK; PREPARE FOR FRUCON WITNESS INTERVIEWS, PREPARE FOR FRUCON DEPOSITIONS, **LOCAL TRAVEL**, MEETING WITH MR. GREEN RE FRUCON DEPOSITIONS, CONFER WITH MR. KLEIN RE APPEALING MOTION TO COMPEL ORDER, CONFER WITH MR. MORGAN AND MR. BELL RE MBI CASE. | 0.50 Local Travel (Court) |
| 9/21/2006 | JMO | 17.30 | **12.80** | PREPARATION FOR KAUS DEPOSITION; PARTICIPATE IN KAUS DEPOSITION; MEETINGS WITH KAUS ATTORNEYS; MEETINGS WITH DOJ ATTORNEYS; **LOCAL TRAVEL TO AND FLIGHT BACK TO DC.** | 4.50 4.00 Travel (Court/Bell + 0.50 Local Travel (Court) |

| 9/25/2006 | NT | 10.00 | REVIEW TEAM ELECTRONIC CORRESPONDENCE; TELEPHONE CONFERENCE WITH MR. CEDARBAUM REGARDING REQUEST FOR DRAFTS OF NOTICE OF DEPOSITIONS AND SUBPOENAS FROM GOV., TO HALL, HILL, LALOR AND HOOVER; REVIEW AND EDIT NOTICE OF DEPOSITION AND SUBPOENA TO WITNESS D TO REFLECT IT BEING SERVED BY GOV.; MEET AND CONFER WITH MS. O'CONNOR TO OBTAIN SIGNATURE ON SAME; TELEPHONE CONFERENCE WITH CAPITAL PROCESS SERVERS REQUESTING PICK UP OF JONES SUBPOENA (CANCELLED REQUEST); TELEPHONE CONFERENCE WITH MS. HENIFIN AND MS. TREACY FROM BUCHANAN INGERSOLL REQUESTING CONFERENCE ROOM SET UP FOR HEMLER INTERVIEW WITH WCPHD AND US. GOV.; ATTEND TEAM MEETING; **TRAVEL TO/FROM USAID OFFICE** TO MEET AND CONFER WITH MR. NICHOLS REGARDING GOULD INTERVIEW DOCUMENTS | 9.50 |
| | | | | 0.50 Local Travel (Court) |

| Date | Initials | | | |
|---|---|---|---|---|
| 9/26/2006 | MMB | 22.40 | TRIAL BOOK PREP; HEMLER INTERVIEW PREP; CONFER WITH MS. O'CONNOR RE SAME; PARTICIPATE IN HEMLER INTERVIEW; EDIT LANG SUMMARY MEMO; **TRAVEL TO PRINCETON, N.J.; TRAVEL TO WASHINGTON, D.C.** | 20.40 |
| | | | | 2.00 Travel (Court) |
| 9/26/2006 | JMO | 11.40 | CONFER WITH MR. SHAPIRO AND MR. BELL RE STRATEGIC ISSUES, PREPARE FOR HEMLER INTERVIEW, **TRAVEL TO AND FROM HEMLER INTERVIEW** AND WORK ON TRAIN ON PREPARING FOR INTERVIEW AND CONFERENCE WITH MS. MARK, CONFER WITH MR. LANG RE SCHEDULING WITNESSES, INTERVIEW MR. HEMLER, CONFER WITH MR. CEDARBAUM RE PASKAR DEPOSITION, EMAILS WITH TEAM RE DISCOVERY ISSUES, REVIEW TRIAL BOOK DRAFT AND COMMENT ON SAME AND EMAIL QUESTIONS RE SAME TO TEAM, EDIT BILHAR MOTION TO COMPEL, EDIT LETTER TO EWERT, EDIT LETTER TO MURPHY, SCHEDULE TEAM MEETING, CONFER WITH MR. CEDARBAUM RE DEVELOPMENTS. | 9.40 |
| | | | | 2.00 Travel (Court) |

| Date | Initials | Hours | | Description | | Category |
| --- | --- | --- | --- | --- | --- | --- |
| 9/29/2006 | JMO | 13.40 | 11.40 | TRAVEL TO AND FROM TOLEDO TO MEET WITH MR. NAGEL, INTERVIEW MR. NAGEL, DRAFT MEMO RE INTERVIEW, CONFER WITH MS. MARK, MR. MORGAN ET AL RE NAGEL INTERVIEW AND OTHER TASKS, CONFER WITH MR. SHAPIRO RE NAGEL INTERVIEW AND OTHER TASKS, CONFER WITH MR. REECE AND MS. BUNCH RE VARIOUS ISSUES, EMAILS WITH MR. GOTTLIEB RE OUTLINES FOR NEXT WEEK. | 2.00 | Travel (Court) |
| 10/2/2006 | MG | 4.00 | 3.75 | REVIEW D LIGHT DOCUMENTS FOR LIGHT PREP SESSION; TRAVEL TO DOJ; ATTEND PREPARATION SESSION FOR LIGHT DEPOSITION; DRAFT SUMMARY OF PREP SESSION TO TEAM | 0.25 | Local Travel (Court) |
| 10/7/2006 | JMO | 1.30 | 0.00 | EMAILS WITH MSRS. CEDARBAUM, REECE, BELL AND MS. BUNCH RE HII DEPOSITION, WITNESS D INTERVIEW, MILLER AND KITCHENS' DEPOSITIONS, HEMLER DEPOSITION, BILL HARBERT DEPOSITION AND ATLANTA DOCUMENTS ISSUES; CONFER WITH MR. REECE RE MILLER DEPOSITION AND RESEARCH ISSUES. | 1.30 | Solely BLH (Bell) |

| Date | | | Description | | |
|---|---|---|---|---|---|
| 10/10/2006 JC | 9.00 | 7.00 | TEAM MEETING; TELECON WITH MS. EWERT RE: WINDLE DEPO; MEET WITH MS. OCONNOR, MR. REECE RE: VARIOUS DISCOVERY ISSUES; FINALIZE PREP FOR IIC 30(B)(6) DEPO; **TRAVEL TO BIRMINGHAM FOR 4 DEPOS** | 2.00 | Travel (Court/Bell) |
| 10/12/2006 JC | 13.00 | 11.00 | TAKE, ATTEND C MILLER, R HARBERT DEPOS; **TRAVEL BACK FROM ATLANTA**; TELECONS WITH MS. OCONNOR RE: VARIOUS DISCOVERY ISSUES: VISIT CLERK'S OFFICE RE: ANDERSON GRAND JURY PETITION; MEET WITH MS. MARK RE: DISCOVERY ISSUES; EMAIL EXCHANGES RE: SAME | 2.00 | Travel (Court/Bell) |
| 10/15/2006 RBB | 7.80 | 5.80 | PREPARE FOR OLLIS DEPOSITION; CONFERENCE BUNCH RE: OLLIS DEPOSITION DOCUMENTS; **TRAVEL TO ASHEVILLE, NC** | 2.00 | Travel (Court) |
| 10/15/2006 MMB | 10.10 | 8.10 | OLLIS DEPO PREP; REVIEW DOJ DOCS RECEIVED BY CAROLYN MARK; **TRAVEL FROM WASHINGTON, DC TO ASHEVILLE,** NC; CONFER WITH R. BELL, MR. CEDARBAUM, G. REECE | 2.00 | Travel (Court) |
| 10/16/2006 RBB | 13.50 | 11.50 | DEPOSE JOHN OLLIS: TELECON OCONNOR RE: KITCHENS DEPOSITION; REVIEW LANG INTERVIEW MEMO, HEMLER INTERVIEW MEMO, AND HEMLER DOCUMENTS; **RETURN TRAVEL** | 2.00 | Travel (Court) |

| Date | Initials | | Description | | | |
|---|---|---|---|---|---|---|
| 10/16/2006 | MMB | 15.50 | ATTEND OLLIS DEPO; **TRAVEL FROM ASHEVILLE, NC TO WASHINGTON, DC;** PREP FOR HEMLER DEPO; CONFER WITH R. BELL RE SAME | 13.50 | 2.00 | Travel (Court) |
| 10/16/2006 | JMO | 16.30 | PREPARATION FOR KITCHENS DEPOSITION, **TRAVEL TO SAME,** CONFER WITH TEAM AND CO-COUNSEL RE VARIOUS DEPOSITIONS AND OUTLINES; CONFER WITH WITNESS E; MEETING WITH KENT GARDNER RE WITNESS D AND DAVIDSON AND CONFER WITH TEAM RE SAME AND REVIEW OF DOCUMENTS RE SAME; CONFER WITH KITCHENS' ATTORNEY; REVIEW OF RESPONSE TO ANDERSON MOTION; EDIT WENDORFF MOTION; EMAILS AND CONFER RE OLLIS DEPOSITION; EMAILS AND CONFER RE WITNESS E CORRESPONDENCE | 14.30 | 2.00 | Travel (Court) |
| 10/16/2006 | GR | 13.70 | PREPARE TOMMY KITCHENS DEPOSITION OUTLINE; PREPARE OTHER MATERIALS TO TAKE TO ORLANDO; **TRAVEL TO ORLANDO** FOR TOMMY KITCHENS DEPOSITION | 11.70 | 2.00 | Travel (Court) |

| Date | Initials | | | Description | | |
|---|---|---|---|---|---|---|
| 10/17/2006 | MB | 11.60 | 8.60 | TERRY WINDLE DEPOSITION PREP.;TOMMY KITCHENS' DEPOSITION PREP.; BHIC 30(B)(6) DEPOSITION PREP.; REVIEW TOMMY KITCHENS' NOTES FOR EVIDENCE OF CHARLIE DAVIDSON AND JOHNNY JONES' CONFRONTATION OF BILL HARBERT ABOUT RIGGED BIDS | 3.00 | Solely BLH (Bell) |
| 10/18/2006 | JC | 12.00 | 10.00 | PREPARE FOR BHIC 30(B)(6) AND ALAN HALL DEPOSITIONS; REVISE LETTER RE: WITNESS E SUBPOENA; TELECONS WITH MS. O'CONNOR, MR. SHAPIRO RE: SAME; WORK ON OTHER DISCOVERY MATTERS; **TRAVEL TO BIRMINGHAM** FOR DEPOSITIONS; FINISH PREPARATIONS FOR BHIC 30(B)(6) DEPOSITION | 2.00 | Travel (Court/Bell) |
| 10/18/2006 | MG | 16.00 | 11.00 | **TRAVEL FROM WILMER – BWI – BHM – OPELEIKA, ALABAMA;** COMPLETE VAN HOOVER OUTLINE; PREPARE FOR WINDLE DEPOSITION; DRAFT CORRESPONDENCE; CONFER WITH TEAM RE DEPOSITIONS AND DISCOVERY MATTERS; CONFER WITH MR. BAUMGARTNER RE: MOTIONS; REVIEW DRAFT MOTIONS | 5.00 | Travel (Bell) |

| Date | Initials | | | Description | | |
|---|---|---|---|---|---|---|
| 10/18/2006 | JMO | 18.20 | 13:20 | PREPARE FOR AND TAKE KITCHENS DEPOSITION, **TRAVEL ORLANDO TO OPELIKA,** CONFER AND EMAILS CO-COUNSEL RE DEPOSITIONS, EDIT CORRESPONDENCE TO OPPOSING COUNSEL, MEET AND CONFER OPPOSING COUNSEL RE VARIOUS MOTIONS AND ISSUES | 5.00 | Travel (Bell) |
| 10/18/2006 | GR | 15.00 | 15:00 | PREPARE FOR TOMMY KITCHENS DEPOSITION; ATTEND TOMMY KITCHENS DEPOSITION; **TRAVEL BACK TO WASHINGTON, DC FROM ORLANDO** | 2.00 | Travel (Court) |
| 10/19/2006 | JMO | 16.30 | 14:30 | PREPARE FOR WINDLE DEPOSITION; WINDLE DEPOSITION; **TRAVEL TO BIRMINGHAM;** PREPARE FOR VAN HOOVER DEPOSITION; CONFER WITH JUDGE ACKER'S CLERK; PREPARE FOR ORAL ARGUMENT; CONFER WITH CO-COUNSEL RE VARIOUS ISSUES; CONFER WITH OPPOSING COUNSEL RE VARIOUS ISSUES; MEET AND CONFER LEEPER RE ADDITIONAL EXHIBITS TO RELATOR'S STATEMENT | 2.00 | Travel (Court/Bell) |

| Date | Initials | | | Description | | Category |
|---|---|---|---|---|---|---|
| 10/20/2006 | JC | 12.00 | 10.00 | ATTEND HEARING ON MOTION TO QUASH BILLY HARBERT SUBPOENA; ATTEND VAN HOOVER DEPOSITION; PREPARE FOR, TAKE BILLY HARBERT DEPOSITION; WORK ON OTHER DISCOVERY MATTERS; MEET WITH MS. O'CONNOR, MR. GOTTLIEB, MR. KLEIN RE: SAME; TELECONS, EMAIL EXCHANGES RE: SAME; **TRAVEL BACK TO D.C. FROM BIRMINGHAM** | 2.00 | Travel (Court/Bell) |
| 10/20/2006 | JMO | 11.00 | 9.00 | PREPARE FOR ORAL ARGUMENT AND VAN HOOVER DEPOSITIONS, VAN HOOVER DEPOSITION, BILLY HARBERT DEPOSITION, CONFER WITH CO-COUNSEL RE VARIOUS ISSUES, CONFER WITH OPPOSING COUNSEL RE VARIOUS ISSUES, **TRAVEL FROM BIRMINGHAM TO DC** | 2.00 | Travel (Court/Bell) |
| 10/21/2006 | RBB | 16.20 | 10.20 | DEPOSE IATROU; **RETURN TRAVEL FROM LONDON TO DC**, REVIEW EMAILS RE: HOOVER AND LALOR DEPOSITIONS | 6.00 | Travel (Bell) |
| 10/22/2006 | MMB | 16.00 | 9.00 | PREP FOR SMILIE ANDERSON DEPO; **TRAVEL FROM D.C. TO BOISE, IDAHO** | 7.00 | Travel (Bell) |
| 10/23/2006 | MMB | 17.00 | 10.00 | ATTEND SMILIE ANDERSON DEPO; **TRAVEL FROM BOISE, IDAHO TO D.C.** | 7.00 | Travel (Bell) |

| Date | | Hours | Description | | Hours | Category |
|---|---|---|---|---|---|---|
| 10/23/2006 | MG | 16.20 | PREPARE FOR BARNES DEPOSITION; **TRAVEL TO SAN FRANCISCO**; CORRESPOND WITH TEAM; DISCUSS HILL AND BARNES DEPOSITIONS WITH MR. REECE AND MS. O'CONNOR | 12.70 | 3.50 | Travel (Court/Bell) |
| 10/23/2006 | JMO | 15.20 | CONFER WITH CO-COUNSEL AND OPPOSING COUNSEL RE DISCOVERY MATTERS, REVIEW DRAFT BRIEFS, PREPARE FOR HILL DEPOSITION, **TRAVEL TO BIRMINGHAM**, CONFER WITH MR GOTTLIEB TO PREPARE FOR BARNES DEPOSITION | 13.20 | 2.00 | Travel (Court/Bell) |
| 10/23/2006 | GR | 15.50 | REVIEW AND PREPARE MATERIALS FOR ALF HILL DEPOSITION; REVISE ALF HILL DEPOSITION OUTLINE; DISCUSS ALF HILL DEPOSITION WITH MS. O'CONNOR; **TRAVEL TO BIRMINGHAM** FOR ALF HILL DEPOSITION | 13.50 | 2.00 | Travel (Court/Bell) |
| 10/24/2006 | MG | 13.00 | PREPARE FOR BARNES DEPOSITION; TAKE BARNES DEPOSITION; **RETURN TRAVEL FROM SAN FRANCISCO TO DC;** REVIEW NOTES AND DRAFT SUMMARY OF DEPOSITION | 9.50 | 3.50 | Travel (Bell) |

| Date | | Hours | Description | Hours | Category |
|---|---|---|---|---|---|
| 10/24/2006 | JMO | 16.00 14.00 | PREPARE FOR HILL DEPOSITION, TAKE HILL DEPOSITION, CONFER WITH MS MARK AND MR REECE RE SAME. CONFER AND EMAILS WITH MR GOTTLIEB RE BARNES DEPOSITION, **TRAVEL FROM BIRMINGHAM TO DC.** | 2.00 | Travel (Court/Bell) |
| 10/24/2006 | GR | 16.00 14.00 | REVISE OUTLINE FOR ALF HILL DEPOSITION; DISCUSS ISSUES RELATED TO ALF HILL DEPOSITION; ATTEND ALF HILL DEPOSITION WITH O'CONNOR; **TRAVEL BACK TO D.C. FROM BIRMINGHAM** | 2.00 | Travel (Bell) |
| 10/25/2006 | MB | 10.80 8.80 | PREPARE FOR FRANK KIMBALL DEPOSITION; REVIEW DOCUMENTS AND PREPARE POTENTIAL QUESTIONS; FRANK KIMBALL DEPOSITION PREPARATION SESSION; **TRAVEL FROM D.C.TO HILTON HEAD, SC** | 2.00 | Travel (Bell) |
| 10/26/2006 | MB | 9.30 7.30 | FINALIZE FRANK KIMBALL DEPOSITION OUTLINE; TAKE FRANK KIMBALL DEPOSITION; WRITE SUMMARY OF SAME; **TRAVEL FROM HILTON HEAD BACK TO D.C.** | 2.00 | Travel (Court/Bell) |

| Date | TK | Hours | Hours | Description | Travel Hours | |
| --- | --- | --- | --- | --- | --- | --- |
| 11/2/2006 | GR | 15.80 | 13.80 | PREPARE AND COLLECT DOCUMENTS FOR FINANCIAL EXPERT; REVIEW DEPOSITIONS FOR FINANCIAL EXPERT; REVIEW MORRISON-KNUDSEN DOCUMENTS; PREPARE OUTLINE FOR DEPOSITION OF BRIEN GOODALE; DISCUSS DEPOSITION OUTLINE WITH MS. O'CONNOR AND MR. CEDARBAUM; **TRAVEL TO NASHVILLE**; REVIEW TRIAL TRANSCRIPT OF BRIEN GOODALE AND SMILEY ANDERSON; REVIEW GRAND JURY TRANSCRIPT OF ROY ANDERSON | 2.00 | Travel (Bell) |
| 11/3/2006 | GR | 16.50 | 14.50 | PREPARE DEPOSITION OUTLINE FOR BRIEN GOODALE; ATTEND AND TAKE DEPOSITION OF BRIEN GOODALE; **TRAVEL FROM NASHVILLE TO D.C.**; REVIEW DEPOSITION TRANSCRIPT OF RICK MILLER AND SUMMARIZE RELEVANT PAGES FOR EXPERTS; PREPARE SUMMARY OF BRIEN GOODALE DEPOSITION AND E-MAIL TO TEAM | 2.00 | Travel (Bell) |

| 11/7/2006 | MT | 14.00 | 13.50 | REVIEW TEAM ELECTRONIC CORRESPONDENCE AND RESPOND ACCORDINGLY; MEET AND CONFER WITH MS. KENYON REGARDING DELIVERY AND QUALITY CHECKING OF DUPLICATED EXPERT EXHIBIT MATERIAL; TELEPHONE CALLS TO LANGUAGE INNOVATIONS TO INQUIRE ABOUT GERMAN TRANSLATIONS, FOLLOW UP TELEPHONE CONFERENCE WITH MR. REECE REGARDING SAME; TELEPHONE CONFERENCE WITH MR. CEDARBAUM REGARDING DELIVERY OF DOCUMENTS TO BE TRANSLATED; MEET AND CONFER WITH MR. REECE REGARDING ADDITIONAL EXPERT EXHIBITS AND COMPARISON OF EXPERT INDEX TO TEAM INDEX; **TRAVEL TO, FROM LANGUAGE INNOVATIONS** FOR MEET AND CONFER WITH MARIELA BUTLER REGARDING HAND OVER OF DOCUMENTS TO BE TRANSLATED, MEET AND CONFER WITH MR. REECE REGARDING SAME; ATTEND TEAM MEETING REGARDING EXPERT REPORTS; FINALIZE PRODUCTION OF EXPERT REPORTS AND EXHIBITS THERETO TO CASE PARTIES | 0.50 | Local Travel (Court) |

| Date | | | | | |
|---|---|---|---|---|---|
| 11/20/2006 | JMO | 14.30 | 8:30 | TRAVEL TO/FROM ST. LOUIS; INTERVIEW WITNESS J; CATCH UP ON READING/RESPONDING TO TEAM EMAILS. | 6.00 Travel (Bell) |
| 12/7/2006 | JMO | 12.10 | 11.60 | PREPARE FOR, TRAVEL TO/FROM AND PARTICIPATE IN HEARING. | 0.50 Local Travel (Court) |
| 12/19/2006 | MG | 9.80 | 9.30 | PREPARE FOR NEWMAN DEPOSITION; TRAVEL TO/FROM AND CONDUCT NEWMAN DEPOSITION; REVIEW FILINGS AND EMAILS; DISCUSS HARBERT U.K. HEARING. | 0.50 Local Travel (Court) |
| 1/23/2007 | JMO | 11.20 | 7.20 | SET UP MEETINGS RE MOTIONS TO COMPEL BHIC AND HII; SET UP CONFERENCE RE AMENDMENT COMPLAINT; EMAIL SCHUBERT RE MEETING; EMAILS RE DOCUMENT TRANSLATIONS; CONFER W/ MR. GOTTLIEB RE AMENDED COMPLAINT; CONFER W/ MR. SMITH RE C&L DOCUMENT; CONFER W/ MR. REECE AND MR. BAUMGARTNER RE WENDORFF DEPOSITION AND DOCUMENTS; PREPARE FOR WENDORFF DEPOSITION; EMAILS RE FACCIOLA; EMAILS AND MESSAGES RE PWC WITNESSES; CONFER W/ MR. ZANE RE WENDORFF DOCUMENTS; EMAIL GOVERNMENT RE WITNESS F; TRAVEL TO GERMANY FOR WENDORFF DEPOSITION. | 4.00 Travel (Court) |

| Date | Initials | | | Hours | Type |
|---|---|---|---|---|---|
| 1/24/2007 | RBB | 10.00 | 8.50 REVIEW DOCUMENTS RELATED TO KRINGS AND ICON; DRAFT LIST OF QUESTIONS FOR CRANDALL; INTERVIEW CRANDALL; CONFERENCES SMITH RE: INTERVIEW AND INTERVIEW MEMO; **RETURN TRAVEL.** | 1.50 | Travel (Court) |
| 1/24/2007 | JMO | 16.10 | 11.60 **TRAVEL TO GERMANY FOR DEPOSITION; LOCAL TRAVEL;** MEET WITH USAID AGENTS; MEET WITH GERMAN ATTORNEYS; CONFER W/ MR. ZANE RE WENDORFF DOCUMENTS; PREPARE FOR DEPOSITION; CONFER W/ TOM FINNEGAN, PWC. | 4.50 | 4.00 Travel + 0.50 Local Travel (Court) |
| 1/24/2007 | STS | 10.10 | 8.60 **TRAVEL TO METROPARK,** NJ WITH MR. BELL TO CONDUCT INTERVIEW OF BRIAN CRANDALL (ICON); PREPARE ROUGH DRAFT OF IMPORTANT NOTES FROM MEETING WITH BRIAN CRANDALL; COORDINATE WITH PARALEGAL STAFF RE: PREPARATION OF C&L DOCS FOR REVIEW WITH MR. GOTTLIEB | 1.50 | Travel (Court) |

| Date | | | Description | | Hours | Notes |
|---|---|---|---|---|---|---|
| 1/25/2007 | JMO | 15.40 | **TRAVEL TO** AND TAKE AND DEFEND WENDORFF DEPOSITION; PREPARE FOR SAME AND PREPARE FOR NEXT DAY; CONFER W/ LOCAL COUNSEL AND USAID AGENTS; CONFER WITH MR. CEDARBAUM AND MR. BELL RE VARIOUS ISSUES; EMAILS W/ MR. SCHUBERT RE UPDATE; EMAILS W/ USAID AGENTS RE WITNESS SEARCHES. | 15.15 | 0.25 | Local Travel (Court) |
| 1/26/2007 | JMO | 12.10 | **LOCAL TRAVEL** AND TAKE AND DEFEND WENDORFF DEPOSITION; EMAIL MR. ZANE RE SAME. | 1.85 | 0.25 | Local Travel (Court) |
| 1/27/2007 | JMO | 11.10 | **LOCAL TRAVEL AND TRAVEL TO US;** EMAIL RE CRANDALL. | 6.00 | 4.50 | 4.00 Travel + 0.50 Local Travel (Bell) |

| Date | | Hours | Description | | |
|---|---|---|---|---|---|
| 1/31/2007 | JMO | 8.90 | PREPARE FOR STATUS CONFERENCE; **TRAVEL TO STATUS CONFERENCE; STATUS CONFERENCE; TRAVEL RETURN;** CONFER WITH MS. WIGMORE RE PLANNING; CONFER W/ MR. SHAPIRO RE PLANNING; CONFER W/ MR. CEDARBAUM RE PLANNING; REVIEW LOCAL RULES AND DEPOSITION DESIGNATION MATERIALS; EDIT AND CONFER RE AMENDED COMPLAINT AND MOTION TO FILE SAME; EDIT TALKING POINTS; CONFER W/ MR. REECE, MR. BAUMGARTNER AND MR. GOTTLIEB RE SCHEDULE. | 8.65 | |
| | | | | 0.25 | Local Travel (Court) |

| 2/6/2007 | NT | 11.00 | 10.75 | CONTINUE DRAFTING PRETRIAL STATEMENT PLAINTIFFS' WITNESS LIST; REVIEW DEPOSITIONS, NOTICES AND SUBPOENAS FOR DEPONENT RESIDENCY INFORMATION, ELECTRONIC CORRESPONDENCE WITH MR. CEDARBAUM REGARDING SAME; MEET, CONFER AND SUPERVISE MS. PRICE WITH REVIEWING TRANSCRIPTS FOR EXHIBITS HELD AND ORDERING COPIES OF SAME FROM COURT REPORTERS; FORWARD DRAFT OF PRETRIAL STATEMENT PLAINTIFFS' WITNESS LIST, WITNESS INTERVIEW LIST AND DEPOSITION DESIGNATION LIST TO MS. O'CONNOR, MR. CEDARBAUM AND MR. SHOOK; ELECTRONIC CORRESPONDENCE WITH MS. CARRINGTON AND MR. SHOOK REGARDING MS. CARRINGTON'S REQUEST FOR DEPOSITION TRANSCRIPTS INFORMATION AND FORWARDING OF TOWSEY AND BILLY HARBERT, JR. TRANSCRIPTS TO MS. BARRY, DOJ PARALEGAL; **TRAVEL TO FROM** AND TIME SPENT AT FEDERAL FINGERPRINTING CENTER FOR GOVERNMENT SECURITY CLEARANCE; EDIT WITNESS LIST AND PRETRIAL STATEMENT PLAINTIFFS' WITNESS LIST |
| | | | 0.25 | Local Travel (Court) |

| Date | | Hours | Description | Hours | Hours | Category |
|---|---|---|---|---|---|---|
| 2/19/2007 | JMO | 15.20 | TRAVEL TO/FROM TOLEDO; INTERVIEW MR. NAGEL; PREPARE FOR NAGEL MEETING; CONFER W/ MR. SHAPIRO RE STRATEGY AND PRETRIAL STATEMENTS; REVIEW DEPOSITION EXCERPTS; PREPARE FOR ECKERT CALL RE BRINKMANN DEPOSITION; WORK ON PRETRIAL STATEMENTS. | 11.20 | 4.00 | Travel (Court) |
| 2/19/2007 | HS | 11.20 | PREPARE FOR AND CONDUCT INTERVIEW OF MR. NAGEL; REVIEW DRAFT VERDICT FORM AND JURY INSTRUCTIONS; TRAVEL TO/FROM TOLEDO; EMAIL TO MR. MORGAN | 7.20 | 4.00 | Travel (Court) |
| 3/15/2007 | MG | 14.30 | PARTICIPATE IN VARIOUS WITNESS PREPARATION SESSIONS; REVISE PROOF OUTLINE; REVIEW DIRECT EXAMINATION OUTLINES; REVIEW EXHIBIT DESIGNATIONS; REVIEW AND REVISE GRAPHICS; TRAVEL TO DOJ AND PARTICIPATE IN VIDEOCONFERENCE INTERVIEW OF DAVID WILLIAMS; OTHER MISCELLANEOUS TRIAL PREPARATION | 14.15 | 0.15 | Local Travel (Court) |

| Date | | | Description | | | |
|---|---|---|---|---|---|---|
| 3/17/2007 | NT | 13.00 | REVIEW TEAM ELECTRONIC CORRESPONDENCE; BEGIN GATHERING OF DOCUMENTS AND DRAFTING OF INDEX FOR MILLER TRIAL PREPARATION BINDERS IN PREPARATION FOR CLIENT MEETING PER MR. BELL'S REQUEST; **TRAVEL TO COURT HOUSE** AND ASSIST WITH WORK ROOM SET UP; SUPERVISE PROJECT ASSISTANTS WITH WORKLOAD, MEET AND CONFER WITH MR. REECE REGARDING MILLER RESPONSES TO DEFENDANTS INTERROGATORIES; MEET AND CONFER WITH MS. CASWELL REGARDING PENDING WORK ASSIGNMENTS | 12.90 | 0.10 | Local Travel (Court) |
| 3/19/2007 | MG | 16.60 | PREPARE DOCUMENT BINDERS FOR JURY SELECTION; PREPARE TO ARGUE MOTIONS IN LIMINE; **TRAVEL TO COURT**; ATTEND FIRST DAY OF TRIAL; PREPARE WITNESSES; REVIEW DEMONSTRATIVES; RESEARCH CONSPIRACY ADMISSIONS CASE LAW; PREPARE TALKING POINTS AND BINDER FOR MS. O'CONNOR RE: DEFENSE DEMONSTRATIVES AND CONSPIRACY ADMISSIONS ARGUMENT | 16.50 | 0.10 | Local Travel (Court) |

| Date | | | | |
|---|---|---|---|---|
| 3/22/2007 | NT | 11.00 | 10.80 | REVIEW AND MONITOR TEAM ELECTRONIC CORRESPONDENCE; **TRAVEL TO - FROM COURT HOUSE** TO ASSIST WITH WORK ROOM CLEAN UP; TELEPHONE CONFERENCES WITH MS. BAYNHAM REGARDING READING OF GRESELIN AND PENDING TRIAL EXHIBITS TO BE USED; MEET AND CONFER WITH MS. BUNCH REGARDING HEMLER TRIAL EXHIBITS; MEET, CONFER AND ELECTRONIC CORRESPONDENCE WITH MR. BYRDSONG REGARDING LOADING OF HEMLER DOCUMENTS INTO TRIAL DIRECTORY; UPDATE MASTER LIST OF EXHIBITS ADMITTED INTO EVIDENCE; MEET AND CONFER WITH MS. CASWELL REGARDING PENDING ASSIGNMENTS |
| | | | 0.20 | Local Travel (Court) |

| Date | | Hours | Description | | |
|---|---|---|---|---|---|
| 3/27/2007 | NT | 12.00 | REVIEW TEAM ELECTRONIC CORRESPONDENCE; PREPARE SABBIA STIPULATION COPIES AND PDF SAME PER MR. CEDARBAUM'S REQUEST; **TRAVEL TO AND FROM DISTRICT COURT** AND ASSIST TEAM WITH TRIAL ROOM SETUP, PREPARE WORK ROOM FOR AFTERNOON BREAK; REVIEW PDX DEMONSTRATIVE EXHIBITS FOR NEXT NUMBER AVAILABLE PER MR. RUSHING; UPDATE OF MASTER EXHIBITS ADMITTED LIST; MEET WITH AND SUPERVISION OF PROJECT ASSISTANTS; MEET AND CONFER WITH MS. DAVIS REGARDING TRIAL TRANSCRIPTS | 11.80 | |
| | | | | 0.20 | Local Travel (Court) |

| 3/28/2007 | NT | 15.00 | REVIEW TEAM ELECTRONIC CORRESPONDENCE; PREPARE EXHIBITS AND GATHER WITNESS DOCUMENTS; **TRAVEL TO** AND SET UP OF COURT WORK ROOM; ASSIST TRIAL TEAM WITH COURT ROOM SET UP; EDIT BRINKMANN DESIGNATIONS TO ADD HC/HII COUNTER DESIGNATIONS, ELECTRONIC CORRESPONDENCE WITH MR. RUSHING AND MR. BAUMGARTNER REGARDING SAME; MEET AND CONFER WITH MR. SMITH REGARDING BOOTH DOCUMENTS; MEET AND CONFER WITH MR. REECE REGARDING MILLER DIRECT EXAMINATION EXHIBITS; **TRAVEL TO COURT HOUSE FOR** AFTERNOON DELIVERY OF EXHIBITS TO BE USED; MEET AND CONFER WITH PROJECT ASSISTANTS REGARDING TOWSEY DESIGNATION COPIES NEEDED IN COURT PER MS. O'CONNOR'S REQUEST; ASSIST TRIAL TEAM WITH COURT ROOM AND COURT WORK ROOM CLEAN UP; REVIEW AND EDIT MASTER EXHIBITS ADMITTED LIST; MEET AND CONFER WITH MS. CASWELL, MR. RUSHING AND MR. CULTICE REGARDING PENDING WITNESS PREPARATION; MEET AND CONFER WITH MR. CEDARBAUM REGARDING WENDORFF | 14.80 | |
| | | | | 0.20 | Local Travel (Court) |

| Date | | Hours | Description | | |
|---|---|---|---|---|---|
| 3/29/2007 | NT | 15.00 | REVIEW TEAM ELECTRONIC CORRESPONDENCE; PREPARE DOCUMENTS FOR COURT; **TRAVEL TO** AND ASSIST WITH COURT ROOM AND COURT WORK ROOM SET UP; ATTEND TRIAL AND ASSIST TRIAL TEAM AT COURT; MONITOR ELECTRONIC CORRESPONDENCE; PREPARE HOOVER EXHIBITS FOR PENDING HOOVER DIRECT; UPDATE MASTER EXHIBITS ADMITTED LIST; MEET AND CONFER WITH TEAM MEMBERS REGARDING UPDATES TO WITNESS FILES; SUPERVISE PA STAFF WITH CASE PROJECTS; MEET AND CONFER WITH MS. CASWELL REGARDING PENDING ASSIGNMENTS | 14.90 | 0.10 Local Travel (Court) |
| 4/3/2007 | NT | 12.00 | REVIEW TEAM ELECTRONIC CORRESPONDENCE; PREPARE DAILY COURT DOCUMENTS FOR COURT; **TRAVEL TO AND** SET UP OF COURT WORK ROOM AND COURT ROOM; ATTEND TRIAL AND ASSIST TRIAL TEAM; PACK UP COURT ROOM; UPDATE MASTER EXHIBITS ADMITTED LIST AND FORWARD TO TEAM; MEET AND CONFER WITH MR. RUSHING REGARDING TOWSEY AND MASHBURN EXHIBITS; SUPERVISE PROJECT ASSISTANTS | 11.90 | 0.10 Local Travel (Court) |

| Date | | | | |
|---|---|---|---|---|
| 4/4/2007 | NT | 13.00 | 12.90 | REVIEW TEAM ELECTRONIC CORRESPONDENCE; PREPARE FURTHER EXHIBITS FOR MASHBURN TESTIMONY; REVIEW AND PRINT OUT MASTER ADMITTED EXHIBIT LIST FOR COURT; **TRAVEL TO AND** ASSIST WITH COURT ROOM SET UP; ASSIST AND ATTEND TO TRIAL TEAM AT COURT; ASSIST WITH PACK UP OF COURT ROOM; ATTEND TEAM MEETING; UPDATE MASTER ADMITTED EXHIBIT LIST AND DISTRIBUTE TO TEAM; PREPARE MASHBURN EXHIBITS FOR REDIRECT: ELECTRONIC CORRESPONDENCE WITH MR. RUSHING REGARDING PENDING PROJECTS; MONITOR OF TEAM ELECTRONIC CORRESPONDENCE |
| | | | 0.10 | Local Travel (Court) |

| Date | | Hours | Description | | | |
|---|---|---|---|---|---|---|
| 4/5/2007 | NT | 12.00 | REVIEW TEAM ELECTRONIC CORRESPONDENCE; **TRAVEL TO AND** PREPARE TRIAL TEAM AND COURT ROOM; ATTEND AND ASSIST TRIAL TEAM DURING TRIAL; PACK UP OF COURT ROOM AND TRIAL TEAM MATERIAL; PREPARE PENDING EXHIBITS; SUPERVISE PROJECT ASSISTANTS ON CREATION OF CROSS WITNESS BINDERS; MEET AND CONFERS WITH MS. CASWELL AND MR. RUSHING REGARDING PENDING PROJECTS; MONITOR TEAM ELECTRONIC CORRESPONDENCE | 11.90 | 0.10 | Local Travel (Court) |
| 4/6/2007 | GR | 14.80 | REVISE OUTLINE AND PREPARE DOCUMENTS FOR MIKE GWYN INTERVIEW; **TRAVEL TO AND FROM CHARLOTTE** FOR GWYN INTERVIEW; DRAFT MEMORANDUM RE: INTERVIEW OF MIKE GWYN; RESEARCH ISSUE RE: ALF HILL. | 10.80 | 4.00 | Travel (Court/Bell) |

| Date | | Hours | | Description | | |
|---|---|---|---|---|---|---|
| 4/9/2007 | NT | 10.00 | 9.90 | MONITOR OF ELECTRONIC CORRESPONDENCE; PREPARE DOCUMENTS FOR COURT; **TRAVEL TO** COURT AND ASSIST WITH PACKING OF COURT MATERIAL; MEET AND CONFER WITH MS. CASWELL REGARDING PROJECT ASSISTANT WORKLOAD; MEET AND CONFER WITH MR. RUSHING REGARDING PENDING ASSIGNMENTS; REVIEW AND UPDATE MASTER ADMITTED EXHIBITS LIST, FORWARD SAME TO TEAM; SUPERVISE PROJECT ASSISTANTS WITH PENDING WITNESS BINDERS | 0.10 | Local Travel (Court) |
| 4/10/2007 | NT | 12.00 | 11.90 | REVIEW TEAM ELECTRONIC CORRESPONDENCE; PREPARE DOCUMENTS FOR COURT SESSION; **TRAVEL TO AND** ASSIST WITH COURT ROOM SET UP; PREPARE HILL PHOTO EXHIBITS AND SUPERVISE PROJECT ASSISTANTS REGARDING SAME; TRAVEL TO AND FROM COURT TO ASSIST WITH AFTERNOON SESSION; REVIEW PLAINTIFF'S TRIAL EXHIBIT LIST; UPDATE MASTER ADMITTED EXHIBIT LIST; MONITOR OF TEAM ELECTRONIC CORRESPONDENCE | 0.10 | Local Travel (Court) |

| 4/11/2007 | NT | 12.00 | 11.80 | PREPARE DOCUMENTS FOR TODAYS COURT SESSION; **TRAVEL TO** AND ASSIST WITH COURT ROOM SET UP; TELEPHONE CONFERENCES, MEET AND CONFERS WITH MR. HEFFEL REGARDING BOUTWELL AND INSURANCE DOCUMENT RESEARCH IN CPORT; REVIEW TRIAL TRANSCRIPTS VIA LIVENOTE; **TRAVEL TO** AND ASSIST WITH PACK UP OF COURT ROOM AND WORK ROOM SPACE; ATTEND TEAM MEETING; MEET AND CONFER WITH MR. GOTTLIEB REGARDING REDACTION OF HII'S RESPONSES TO RELATORS FIRST SET OF INTERROGATORIES, MEET AND CONFER WITH MS. BROWN REGARDING SAME; SUPERVISE PROJECT ASSISTANTS AND TEMPORARY ASSISTANTS REGARDING PENDING WITNESS PREPARATION MATERIAL; UPDATE MASTER ADMITTED EXHIBITS LIST; MEET AND CONFER WITH MR. RUSHING REGARDING BURLES EXHIBITS AND PENDING WITNESS PREPARATION | 0.20 | Local Travel (Court) |

127

| 4/12/2007 | NT | 12.00 | 11.90 | PREPARE COURT DOCUMENTS FOR TODAYS COURT SESSION; TRAVEL TO AND ASSIST WITH COURT ROOM SET UP; REVIEW AND ORGANIZE BURLES EXHIBITS; REVIEW APRIL 11, 2007 TRIAL TRANSCRIPT AND COMPARE NOTED EXHIBITS TO MASTER ADMITTED EXHIBITS LIST; **TRAVEL TO COURT HOUSE** AND ASSIST WITH REMOVAL OF COURT DOCUMENTS AND CLEAN UP OF WORK ROOM; MEET AND CONFER WITH MR. RUSHING REGARDING PROJECT ASSISTANT WORKLOAD AND SCHEDULING; UPDATE MASTER ADMITTED EXHIBITS LIST; ELECTRONIC CORRESPONDENCE TO AM COURT REPORTER REGARDING DISCREPANCIES FOUND ON APRIL 11, 2007 AM TRIAL TRANSCRIPT; SUPERVISE PROJECT ASSISTANTS REGARDING WITNESS PREPARATION MATERIALS; MEET AND CONFER WITH MS. CASWELL REGARDING TODAYS COURT SESSION; MONITOR TEAM ELECTRONIC CORRESPONDENCE | 0.10 | Local Travel (Court) |

4/13/2007 NT 11.50 REVIEW TEAM ELECTRONIC CORRESPONDENCE; PREPARE EXHIBIT LISTS AND TRANSCRIPTS FOR TODAYS COURT SESSION; TRAVEL TO AND ASSIST WITH COURT ROOM SET UP; DELIVER DOCUMENTS TO COURT ROOM ON DAILY BASIS; REVIEW TRANSCRIPTS IN LIVENOTE; REVIEW AND EDIT ADMITTED EXHIBIT LIST; SUPERVISE PROJECT ASSISTANT TEAM; MEET AND CONFER AND ELECTRONIC CORRESPONDENCE WITH MS. CASWELL REGARDING UPDATES OF DOCUMENT REQUESTS FROM COURT; ORGANIZE PLEADING DOCUMENTS AT COURT HOUSE WORK ROOM; ATTEND TRIAL AND ASSIST WITH COURT ROOM CLEAN UP; MONITOR TEAM ELECTRONIC CORRESPONDENCE 0.10 Local Travel (Court)

11.40

129

| Date | | Hours | Description | | |
|------|---|-------|-------------|---|---|
| 4/18/2007 | NT | 12.00 | REVIEW TEAM ELECTRONIC CORRESPONDENCE; ASSIST MR. GOTTLIEB WITH WILLIAMS EXHIBIT DOCUMENTS; **TRAVEL TO** AND ASSIST WITH SET UP OF COURT ROOM; ATTEND TRIAL AND ASSIST TRIAL TEAM; PACK UP COURT ROOM; SUPERVISE PROJECT ASSISTANTS REGARDING ATTORNEY REQUESTS; REVIEW PLAINTIFFS AND DEFENDANTS EXHIBIT LISTS AND UPDATE ADMITTED EXHIBIT LIST; MONITOR TEAM ELECTRONIC CORRESPONDENCE AND RESPOND ACCORDINGLY | 0.10 | Local Travel (Court) |
| | | 11.90 | | | |
| 4/19/2007 | NT | 12.00 | REVIEW TEAM ELECTRONIC CORRESPONDENCE; ASSIST WITH PREPARATION OF MCCUE CROSS EXHIBITS; **TRAVEL TO** AND ASSIST WITH COURT ROOM SET UP; ATTEND TRIAL AND ASSIST TRIAL TEAM; ASSIST WITH PACK UP AND UNLOADING OF COURT PRODUCTION; REVIEW ADMITTED EXHIBIT LIST; SUPERVISE PROJECT ASSISTANTS REGARDING ATTORNEY REQUESTS; MONITOR TEAM ELECTRONIC CORRESPONDENCE AND RESPOND ACCORDINGLY | 0.10 | Local Travel (Court) |
| | | 11.90 | | | |

| Date | | | | Description | | |
|---|---|---|---|---|---|---|
| 4/20/2007 | NT | 12.00 | 11.90 | REVIEW TEAM ELECTRONIC CORRESPONDENCE; ASSIST WITH PASKAR AND PLEADING PRINT OUTS FOR TRIAL TEAM REVIEW; **TRAVEL TO** AND SET UP OF COURT ROOM; ATTEND TRIAL AND ASSIST TRIAL TEAM; MEET AND CONFER WITH COURT DEPUTY CLERK REGARDING FORMAT OF PLAINTIFFS EXHIBITS TO BE USED BY JUDGE AND JURY DURING DELIBERATIONS | 0.10 | Local Travel (Court) |
| 4/30/2007 | NT | 14.00 | 13.90 | REVIEW TEAM ELECTRONIC CORRESPONDENCE; PREPARE DOCUMENTS FOR COURT; **TRAVEL TO** AND ASSIST TEAM DURING TRIAL; PACK UP OF COURT MATERIAL, DOWNLOAD DEFENDANTS' CLOSING DEMONSTRATIVES TO L DRIVE; REVIEW AND PRINT OUT PARTIES CLOSING DEMONSTRATIVES IN PREPARATION FOR COURT; MONITOR ELECTRONIC CORRESPONDENCE | 0.10 | Local Travel (Court) |
| 5/1/2007 | NT | 12.00 | 11.90 | REVIEW TEAM ELECTRONIC CORRESPONDENCE; **TRAVEL TO**, ATTEND AND ASSIST TRIAL TEAM DURING CLOSING ARGUMENTS; MEET AND CONFER WITH MR. RUSHING REGARDING PENDING CASE ASSIGNMENTS | 0.10 | Local Travel (Court) |

| Date | | | | Description | | |
|---|---|---|---|---|---|---|
| 5/2/2007 | NT | 12.00 | 11.90 | REVIEW TEAM ELECTRONIC CORRESPONDENCE; ASSIST MR. CEDARBAUM WITH CD COPY REQUESTS OF PROPOSED JURY INSTRUCTIONS AND PLAINTIFFS OPPOSITIONS TO DEFENDANTS JURY INSTRUCTIONS; **TRAVEL TO AND ASSIST WITH COURT ROOM SET UP**; ASSIST TRIAL TEAM, PACK UP OF COURT ROOM | 0.10 | Local Travel (Court) |
| 5/4/2007 | MG | 4.40 | 4.30 | RESEARCH VERDICT FORM LAW, **TRAVEL TO** AND ATTEND FINAL DAY OF TRIAL; DISCUSS POST-TRIAL WORK | 0.10 | Local Travel (Court) |
| 5/7/2007 | MG | 2.00 | 1.80 | **TRAVEL TO/FROM COURT** TO ATTEND SESSION FOR JUROR QUESTION ANSWER | 0.20 | Local Travel (Court) |
| 5/14/2007 | MG | 4.50 | 4.30 | REVIEW COUNTERCLAIM INSTRUCTIONS AND MTD; **TRAVEL TO/FROM COURT FOR VERDICT**; ATTEND COURT SESSION RE: VERDICT | 0.20 | Local Travel (Court) |
| 5/14/2007 | JMO | 1.80 | 1.60 | **TRAVEL TO AND FROM** AND ATTEND COURT FOR VERDICT. | 0.20 | Local Travel (Court) |
| TOTAL | | 1,047.00 | | | 288.50 | |

## APPENDIX III

The Court has determined the following, comprehensive reductions are necessary to exclude time dedicated to non-compensable tasks and to counter unreasonable and/or excessive billing:

Clerical Tasks (non-compensable)
 Attorney Hours 0.5%
 Paralegal Hours 5.0%

Ambiguous Time Entries 10.0%
Block Billing 10.0%
Inefficient Staffing 5.0%